BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**GEOFFREY A. BARROW**
Assistant United States Attorney
Geoffrey.Barrow@usdoj.gov
1000 SW Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 6:06-cr-60011-AA-01 |
| v. | **OPPOSITION TO DEFENDANTS MOTION FOR RELEASE FROM CUSTODY** |
| **JOSEPH DIBEE,** | |
| **Defendant.** | |

Defendant Joseph Dibee was an active participant in a conspiracy to commit arsons in a failed effort to intimidate, coerce, and frighten the public into changing their lawful conduct. After the government confronted Dibee with evidence of his guilt, he destroyed evidence and fled the United States, leaving his family and community behind for more than twelve years. Over the years, he knew that he was wanted and, through counsel, attempted to avoid any consequences for his actions.  He was finally captured in Cuba traveling under a Syrian passport in a different name.  Now, he asks this Court to release him pending trial.  His motion should be denied—Dibee remains a risk of flight and a danger to the community and nothing in his motion rebuts the statutory presumption that he be detained pending trial.

I.      **Factual & Procedural Background**

   A.      **Dibee's Involvement in the Conspiracy**

The Court is undoubtedly familiar with the underlying facts of the case. Between December 25, 1995, and October 15, 2001, at least 20 different arsons and attempted arsons occurred in five western states, causing property damage in excess of $40 million. The crimes remained unsolved until the government was able to develop cooperating witnesses. Through the cooperating witnesses, the government uncovered a conspiracy comprised of a group calling themselves "the Family" and operating under the mantels of the "Animal Liberation Front" and the "Earth Liberation Front" (ALF/ELF). The group attempted to influence government policy and business practices by means of violence, sabotage, destruction of property, and intimidation. They took elaborate steps to conceal their crimes, which they termed "direct actions." The conspirators carefully planned and orchestrated these actions to conceal their identities and maximize the impact their crimes had on the community.

Dibee was an integral member of the conspiracy and an active participant for several years. For example, Dibee was a central figure in the arson at the Cavel West Meat Packing plan in Redmond, Oregon on July 21, 1997.

Prior to July 21, 1997, co-defendant Kevin Tubbs read an article about the Cavel West Meat Packing Plant in Redmond, Oregon, slaughtering wild horses. Tubbs traveled to Redmond, Oregon, in a van registered in his false name of Ronald Calloway. After locating the meat packing facility, Tubbs performed reconnaissance to determine what kind of damage he could cause to the facility. After Tubbs returned to Eugene, Oregon, he contacted Dibee and they discussed the possibility of damaging the facility. Tubbs also contacted Jacob Ferguson and requested Ferguson's assistance. Sometime later, Dibee, Tubbs, and Ferguson traveled to

**Government's Opposition to Defendant's Motion for Release**                                                     **Page 2**

Redmond, Oregon, and performed reconnaissance of the Cavel West Plant. After the reconnaissance, they determined that it would take more than three people to commit the arson. Dibee told Tubbs that he would recruit Jonathan Paul to assist. At Tubbs request, Dibee designed and fabricated timing devices to destroy the facility.

Dibee, Tubbs, and Ferguson met with Paul and Jennifer Kolar. Dibee, Tubbs, and Ferguson were upset with Paul for bringing Kolar into the group before they had approved of her participation in the direct action. Nevertheless, the group decided to proceed with the action and traveled to a staging area near Redmond, Oregon. At the staging area, they realized that their two-way radios had no batteries. They decided to cancel the mission for the night and to return to Eugene, Oregon.

The following day, Dibee, Tubbs, Ferguson, Paul, and Kolar returned to the staging area near Redmond, Oregon, in Tubbs' van and in Paul's vehicle. At the staging area, the conspirators donned dark clothing, performed a radio check, and dug a hole in which to hide their clothing after the arson. All five drove towards the Cavel West plant in Tubbs' van.

They arrived in Redmond on July 21, 1997, and parked in a parking lot near the Cavel West plant. Tubbs remained with the van and served as a lookout while the others went to the plant and placed the incendiary devices. Tubbs also monitored police radio traffic on a police scanner. After they placed the incendiary devices and returned to the van, Tubbs drove everyone back to the staging area. They removed their dark clothing and placed it in the prepared hole. They poured muriatic acid over the clothing and buried the evidence. Dibee, Tubbs, and Ferguson left Paul and Kolar and returned to Eugene, Oregon.

The incendiary devices functioned and destroyed the meat packing plant by fire, resulting in significant financial loss.

**Government's Opposition to Defendant's Motion for Release**                                    **Page 3**



*Figure 1 Cavel West, Redmond, Oregon*

Tubbs wrote the majority of a communique, which claimed responsibility for the fire and mailed it to the *Oregonian* newspaper. The communique bragged that the arson "would bring to a screeching halt what countless letter writing campaigns could never stop."

The Cavel West arson was not an isolated incident for Dibee. Four years later, Dibee and Gerlach performed reconnaissance at the Bureau of Land Management's Wild Horse Corrals near Litchfield, California. They wanted to target the facility to prevent the government from removing wild horses from public lands and sending them to slaughterhouses.

Dibee and Tubbs agreed to conduct a direct action at the BLM Wild Horse Corrals. They recruited Rebecca Rubin from Canada to participate in a horse release and arson. In October 2001, Dibee and Rubin recruited Thurston to participate. Dibee also recruited Kolar to participate.

**Government's Opposition to Defendant's Motion for Release**                   **Page 4**

On October 11, 2001, Dibee and Kolar picked up Canadian residents Thurston and Rubin after they illegally entered the United States near Cultus Lake, British Columbia. They went to Dibee's residence in Seattle, Washington, where they met Meyerhoff and planned the action. Meyerhoff constructed the incendiary devices at Dibee's residence.

On October 12, 2001, Dibee, Rubin, and Thurston gathered equipment for the action at Dibee's residence. Dibee and Meyerhoff mixed the fuel for the incendiary devices. Each incendiary device consisted of a five-gallon plastic bucket containing a mixture of gasoline and heavy petroleum distillate. The devices had sophisticated delayed igniters with redundant dual timers. The timers consisted of an electronic alarm clock functioning to complete an electric circuit between a nine-volt battery and a rocket igniter. The igniter was placed between matches surrounding a road flare. The road flare was on a lid above the bucket of fuel and served to ignite it. The devices met the definition of incendiary bombs prohibited under federal law.

The following day, Dibee, Rubin, Thurston, and others drove in Dibee's truck to Olympia, Washington, where Brianna Waters joined the group and on to Eugene, Oregon, where Tubbs joined the group.

On October 14, 2001, Dibee, Thurston, Rubin, Meyerhoff, Kolar, and Rubin arrived at the BLM site and camped nearby where they planned the action in detail. On a mound overlooking the site, Thurston tested a night-vision scope for use in the crime.

At about midnight on October 15, 2001, the group dressed in black clothing and gloves and placed socks over their shoes to conceal their tracks. Tubbs, Meyerhoff, and Dibee used two-way radios to communicate. The group drove to the horse corrals where Rubin and Thurston attempted to free the horses by removing segments of fences. Tubbs drove Dibee, Kolar, and Meyerhoff closer to the buildings. Tubbs acted as a lookout while Meyerhoff and

**Government's Opposition to Defendant's Motion for Release**            **Page 5**

Kolar placed the incendiary devices, one at a hay building, and another on the porch of a building, and a third under a vehicle. Only one device ignited, destroying a barn and its contents.



*Figure 2 BLM Wild Horse Corrals, Litchfield, California*

The building and other real and personal property were owned and possessed by the Bureau of Land Management of the U.S. Department of the Interior. BLM suffered losses of $207,497.60, including destruction of a 135' x 35' barn.

Thurston issued the final communique from Canada. It threatened future targeting of "industries and organizations that seek to profit by destroying the earth."

B.    Dibee's Indictment

On January 19, 2006, a grand jury in the District of Oregon indicted Dibee and ten others for Conspiracy to Commit Arson in violation of 18 U.S.C. 844(n). Dibee and others were subsequently charged in superseding indictments. Dibee has also been charged in the Western

**Government's Opposition to Defendant's Motion for Release**                                    **Page 6**

District of Washington and the Eastern District of California with offenses related to the conspiracy. Warrants issued for Dibee's arrest in all three districts where sent to Interpol.

### C. Dibee's Flight

On December 7, 2005, agents in the Western District of Washington served Joseph Dibee with a grand jury subpoena. Two days later, Dibee and his attorney met with a federal prosecutor and agents for a reverse proffer. Dibee and his lawyer listened as the government outlined the evidence the government had gathered of Dibee's involvement in the Cavel West arson. The government hoped that Dibee would accept responsibility for his involvement in the conspiracy and cooperate with the government's investigation.

Dibee did not give any statement to investigators and he did not testify before the grand jury. Instead, investigators learned that after he left the meeting, Dibee burned incriminating evidence in his fireplace. Dibee enlisted a friend to drive him to Mexico. Agents believe that Dibee left the United States less than seventy-two hours after he learned of the evidence the government had compiled against him.

From Mexico City, Dibee flew to Beirut, Lebanon. From Lebanon, he traveled to Syria where he established residence. He eventually moved to Russia. Neither Syria nor Russia have an extradition treaty with the United States. Dibee remained a fugitive for more than twelve years.

In August of 2018, the El Salvadoran National Police stopped Dibee. He was traveling with a Syrian passport in the name of "Yousef Deba" and Russian residency paperwork in the name of "Yousef Deba"[1]:

---

[1] Before he fled the United States, Dibee maintained an American passport in the name of Joseph Mahmoud Dibee.

**Government's Opposition to Defendant's Motion for Release**                                   **Page 7**




*Figure 3 Dibee's Russian Residency Document*



*Figure 4 Dibee's Syrian Passport*

**Government's Opposition to Defendant's Motion for Release**            **Page 8**

Dibee was carrying an itinerary indicating that he had flown from Krasnodar, Russia to Moscow to Havana, Cuba on May 21, 2018. He was scheduled to return to Krasnodar on August 2, 2018, by way of Havana and Moscow:



*Figure 5 Dibee's Itinerary*

**Government's Opposition to Defendant's Motion for Release**            **Page 9**

He was also carrying airline tickets from Quito, Ecuador to San Salvador and San Salvador to Havana:



*Figure 6 Dibee's Airline Tickets*

He reportedly told El Salvadoran officials that he had been kayaking with friends in Ecuador.

In El Salvador, officials obtained biometric data from Dibee that linked him to the outstanding warrants for his arrest in the United States.  It appears that El Salvadoran officials were initially confused by the difference between the name on the warrant, Joseph Mahmoud Dibee, and "Yousef Deba," the name on Dibee's Syrian passport and Russian residency documents.  El Salvadoran officials were unable to resolve the discrepancy before Dibee's plane left for Havana.

When Dibee landed in Havana, Cuban authorities detained him.  Documents provided by the Cuban government indicate that they believed he was traveling with two passports, one

**Government's Opposition to Defendant's Motion for Release**                                              **Page 10**

Russian and one Syrian.[2]  Cuban authorities contacted the U.S. government and agreed to turn Dibee over to the United States.  On August 9, 2018, the FBI took custody of Dibee in Havana and flew him to Portland, Oregon.

Dibee made his initial appearance before the Honorable John V. Acosta on August 10, 2018.  Citing the presumption for detention set forth at 18 U.S.C. § 3142(e)(3)(C) of the Bail Reform Act, the government moved to have Dibee detained as a danger to the community and a risk of flight.  Pretrial services concurred, and Judge Acosta ordered Dibee to be detained pending trial. ECF No. 245.  Dibee now moves for release pending trial.  His release plan involves living with his sister in Seattle, Washington, where he would conduct research on clean mining technology.

## II.     Applicable Law

### A.     Standard of Review

Review of a magistrate judge's release order is *de novo*.  *United States v. Koenig*, 912 F.2d 1190, 1192-93 (9th Cir. 1990).  However, the court "is not required to start over in every case, and proceed as if the magistrate's decision and findings did not exist." *Id*. at 1193.  Rather, the court should "review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." *Id*.

### B.     Factors for Consideration

A defendant shall be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any

---

[2] The government relied on this information in seeking Dibee's detention before Judge Acosta. The undersigned did not provide this information to the press.  The government agrees with defendant that the Russian document is a Russian Federation Alien's Residence Permit issued on May 5, 2015, that is valid through May 5, 2020.

**Government's Opposition to Defendant's Motion for Release**                                       **Page 11**

other person and the community." 18 U.S.C. § 3142(e). The government bears the burden of establishing danger to the community by clear and convincing evidence; risk of flight need be proven only by a preponderance of the evidence. *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

Where, as here, there is probable cause to believe that defendant committed an offense enumerated in 18 U.S.C. § 2332b(g)(5)(B), which carries a maximum term of imprisonment of 10 years or more, there exists a rebuttable presumption that no condition or combination of conditions of release will reasonably assure the appearance of the person as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(C). Count 1 of the Second Superseding Indictment charges Dibee with Conspiracy to Commit Arson in violation of 18 U.S.C. § 844(n) and Count 6 charges Dibee with Arson in violation of 18 U.S.C. § 844(i). Both offenses carry a maximum penalty of 10 years or more and are specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B).

In presumptive detention cases, the burden of proof shifts to defendant to rebut the presumption of dangerousness. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (noting that in terrorism case involving presumption, the presumption shifts a burden of production to the defendant, [but] the burden of persuasion remains with the government). Even if the presumption is rebutted, however, the presumption does not disappear, but continues to carry evidentiary weight. *See Hir*, 517 F.3d at 1086 (The presumption is not erased when a defendant proffers evidence to rebut it; rather the presumption remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)).

If a defendant proffers evidence to rebut the presumption, the Court should consider the following factors to determine if there are any conditions of release that will reasonably assure the appearance of the defendant and the safety of the community:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including (A) the person's character, physical and mental condition, family and community ties, employment, financial resources, criminal history, history relating to drug or alcohol abuse, and record concerning appearance at court proceedings; . . .

(4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

18 U.S.C. § 3142(g) (emphasis added).

The Federal Rules of Evidence do not apply in pretrial detention proceedings. Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f)(2)(B). Accordingly, both the government and the defense may present evidence by proffer or hearsay. *Winsor*, 785 F.2d at 756.

### III.   Dibee is a Danger and a Flight Risk; He Should be Detained

Dibee has failed to meet his burden of production in rebutting the presumption that "no condition or combination of conditions of release will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e). But even without the presumption, Dibee's violent actions followed by his international flight make him a clear danger and a flight risk.

/ / /

/ / /

### A. The Nature & Circumstances of this Offense, 3142(g)(1)

As set forth above, the dangerous nature of the underlying offenses is undeniable. Dibee directly participated in arsons that destroyed public and private facilities. More importantly, the fires jeopardized the lives of first responders called upon to extinguish the flames and the lives and livelihood of those who lived and worked in the communities Dibee targeted. Dibee suggests that the charges are not dangerous because "[n]o person or animal was harmed in the fire[s]." Def. Mem. at 11-12. This Court thoroughly rejected a similar argument in sentencing a codefendant more than twelve years ago:

> [I]t is only dumb luck that no one was hurt or even killed, and not because of any, quote careful planning. You didn't know what was in all those buildings or what could potentially cause a greater danger to responders once the fire was set. . . . [O]nce you left the scene, you had no control over the fire.

Tr. 8/17/07 at 324. Back then, the defense offered expert testimony that use of an incendiary device by a co-conspirator was not inherently dangerous. The Court strongly disagreed, "the only conclusion that can be drawn from the specific placement of the incendiary devices is that defendant and his coconspirators intended to cause as much damage as possible." *Id.* at 326. With that damage comes an inherent risk.

Dibee also attempts to argue that the charged offenses are not dangerous due to the length of sentences the Court previously imposed on certain co-defendants. Def. Mem. at 7. Here, Dibee faces a mandatory-minimum 60 months in jail. His advisory guideline sentence will likely be significantly higher. As this Court is aware, several co-defendants were given credit for providing substantial assistance to the government. Dibee argues that he is entitled to credit for substantial assistance due to his efforts to provide the government with information while he was a fugitive. There are several problems with this argument. First, there is no agreement between

**Government's Opposition to Defendant's Motion for Release**                                      **Page 14**

the government and Dibee regarding substantial assistance. The case he cites, *United States v. Hererdia*, 768 F.3d 1220, 1230 (9th Cir. 2014), involves a breach of a plea agreement. There is no plea or cooperation agreement in this case. The second case Dibee relies on, *United States v. Robinson*, 741 F.3d 588, 600 (5th Cir. 2014), stands for the proposition that a sentencing court may consider cooperation under 18 U.S.C. § 3553(a) even in the absence of a § 5K1.1 motion by the government. The government agrees that at sentencing, after defendant has accepted responsibility for his conduct, the Court may consider Dibee's claim that he cooperated while he was a fugitive. However, Dibee would be still be subject to the mandatory-minimum 60 month sentence. Second, the undersigned contacted retired AUSA Kirk Engdall. Mr. Engdall recalls hearing from one or more attorneys hired by Dibee's parents to represent him. According to Mr. Engdall, the attorneys offered information in exchange for the government agreeing to dismiss all charges against Dibee. Mr. Engdall forwarded the information to the FBI for evaluation. However, Mr. Engdall was not willing to dismiss the charges against Dibee—which was always Dibee's demand. In the end, the information was not actionable.

More importantly, despite his claims that the sentence he faces is not significant enough to warrant his continued detention, Dibee never turned himself in to authorities. Instead, he went to great lengths to hide his identity and avoid capture. His actions when he knew he was facing charges belie any argument now that he is not concerned about a possible sentence.

### B. The Weight of the Evidence, 3142(g)(2)

The weight of the evidence strongly supports detention. As set forth above, the government's case was built on cooperating witnesses who were inside the conspiracy. Due to the strength of the evidence, all but one of the coconspirators resolved their cases short of trial.

One coconspirator, Brianna Waters, was convicted following a jury trial in the Western District of Washington.

### C. Defendant's History & Characteristics, 3142(g)(3)

Dibee argues that he should be released from custody because he made productive use of his time as a fugitive, working on environmental projects such as renewable energy, biodiesel and green mining technology. It is very difficult for the government to assess what Dibee did while he was hiding in Syria and Russia. The government is willing to accept Dibee's representation that he tried to lead a productive life. The government is also cognizant of the fact that by fleeing to Syria and Russia, Dibee was separated from his family for an extended period. But, that was Dibee's decision—he could have accepted responsibility like the other co-defendants, served his time and been back with his family. He cannot claim post-offense rehabilitation when he has spent the last decade avoiding responsibility for the crimes he committed.

What is critical here is that Dibee never surrendered to face these charges. Even when confronted on his kayaking trip to El Salvador, he did not admit he was a wanted person. Instead, he got on the plane and headed to Cuba hoping, no doubt, that he had once again avoided capture. If he had self-surrendered years ago this might be a different case, but he did not. He may have been engaged in good works, but he was hiding from the authorities and there is no reason to believe he would not flee again if given the opportunity. Dibee is here because he got caught and now he needs to face the violent crimes he committed. The fact that he tried to provide information accompanied by a demand that all charges against him be dismissed does not demonstrate that Dibee is suddenly a reformed person who should be released in this case. It simply shows the opposite—that Dibee will go to great lengths to avoid being held accountable.

**Government's Opposition to Defendant's Motion for Release**                                                          **Page 16**

Much has been said of Dibee's talents in fields of environmental science, engineering and computer programing. The fact remains that Dibee used these same skills to engineer incendiary devices that he designed to destroy buildings.

Finally, Dibee cites his ties to the community and proposes to live with his sister, a long-term Seattle resident. He further notes that his elderly father lives in the area. These ties were insufficient to keep Dibee in the United States in 2005 or convince him to return for more than 12 years (despite his claims that he is not facing a significant sentence). They certainly do not provide adequate assurance that he will stay in the country in 2019. In fact, Dibee now has significant ties in Russia, including a wife. These foreign ties create an incentive to flee that is undoubtedly greater than Dibee faced in 2005.

### D. Nature & Seriousness of the Danger Posed by Defendant's Release, 3142(g)(4)

The government concedes that it must rely on defendant's conduct in the underlying offense and the statutory presumption to support its argument regarding the danger posed by defendant's release. Dibee was hiding in Russia and Syria for more than twelve years. The government has almost no information regarding his conduct during that time.

Dibee's known history does demonstrate his willingness to defy authority and to use violence to impose his will on others. The government has no evidence to suggest that he has evolved or matured enough to comply with conditions placed upon him. Instead, all recorded evidence shows that Dibee has and will continue to put his own judgment and his own beliefs above the court-imposed rules. His release would pose an unacceptable risk of danger to the community.

/ / /

/ / /

## IV.   CONCLUSION

This Court should affirm Judge Acosta's release order and order defendant detained pending trial.

Dated: December 12, 2019                                  Respectfully submitted,

                                                          BILLY J. WILLIAMS
                                                          United States Attorney

                                                          /s/ *Geoffrey A. Barrow*
                                                          GEOFFREY A. BARROW
                                                          Assistant United States Attorney