1

2                    UNITED STATES DISTRICT COURT

3                        DISTRICT OF OREGON

4              THE HON. ANN L. AIKEN, JUDGE PRESIDING

5

6   UNITED STATES OF AMERICA,        )
                                     )
7              Plaintiff,            )
                                     )
8         vs.                        )No. 6:06-cr-60011-AA
                                     )
9   JOSEPH DIBEE,                    )
                                     )
10             Defendant.            )
    _____ )

11

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              MONDAY, DECEMBER 23, 2019

16                    EUGENE, OREGON

17           TELEPHONIC STATUS CONFERENCE

18

19

20

21

22                        Jan R. Duiven
                          Official Federal Reporter
23                        United States Courthouse
                          405 East Eighth Avenue
24                        Eugene, Oregon 97401
                          (541) 431-4112
25                        jan_duiven@ord.uscourts.gov

APPEARANCES

For the U.S. Government:

        U.S. Attorney's Office
        1000 SW 3rd Avenue #600
        Portland, Oregon 97204
        (503) 727-1000
        BY:  MR. GEOFFREY BARROW
        geoffrey.barrow@usdoj.gov
        (Appearing by phone)


For the Defendant:

        MR. PAUL HOOD
        Paul Hood, Attorney at Law LLC
        P.O. Box 66876
        Portland, Oregon 97290
        (541) 513-7545
        paul@paulhoodlaw.com
        (Appearing by phone)


Also present:

        Agent Tim Suttles
        (appearing by phone)

MONDAY, DECEMBER 23, 2019; 11:01 A.M.

-o0o-

1

2

3

4          COURTROOM DEPUTY:  The United States

5    District Court for the District of Oregon is now

6    in session.  Honorable Ann Aiken presiding.  Now

7    is the time -- oh.  Now is the time set for

8    criminal case 06-60011, United States of America

9    versus Joseph Dibee.  Telephone status conference.

10          THE COURT:  Good morning.  If I

11   could ask people to introduce themselves for the

12   record, I'd appreciate it.

13          MR. BARROW:  Geoffrey Barrow on

14   behalf of the United States and I'm joined at

15   counsel table by Tim Suttles with the (inaudible).

16          (Reporter inquiry.)

17          THE COURT:  Wait.  Stop.  Stop.

18          MR. BARROW:  Tim Suttles is a

19   special agent with the FBI and he is the case

20   agent in this matter.

21          THE COURT:  You're going to need to

22   slow down and be more articulate and perhaps move

23   a little back from the microphone.

24          MR. BARROW:  Is that better?

25          THE COURT:  It seems to be better.

1          MR. HOOD:  And Paul Hood for Joseph

2     Dibee, who is present and in custody.

3          THE COURT:  So as you know, the

4     Ninth Circuit has sent this back for a review, so

5     I'm happy to hear anything further that needs to

6     be placed on the record.  So I'll open, I guess,

7     with the government and I'm happy to hear anything

8     you wish to tell me.

9          MR. BARROW:  Thank you, your Honor.

10    As you noted, the case has been remanded for

11    reconsideration of the defendant's motion for

12    release.  First, I'd note there is a rebuttable

13    presumption that no condition or combination of

14    conditions of release will reasonably assure the

15    appearance of the defendant and the safety of the

16    community.  I note also that defendant bears the

17    burden of proof to rebut the presumption of

18    dangerousness.

19          The government retains the burden of

20    persuasion.  I'd also note that the danger to the

21    community must be established under the clear and

22    convincing standard and that the risk of flight

23    prong is subject to the preponderance of the

24    evidence standard.

25          In the government's view, the

following facts are uncontested.  If that is not

the case, the government is prepared to call

Special Agent Tim Suttles to establish the

following facts.

First, the indictment in this case

triggered rebuttable presumption.  I just noted.

Second, prior to indictment on December 7th of

2005, Mr. Dibee was served with a grand jury

subpoena.  Two days later, he and an attorney met

with the government in Seattle.  At that meeting

the government outlined the evidence the

government had compiled implicating Mr. Dibee in

the arson that destroyed the Cavel West

meatpacking plant.  And at that meeting the

government asked Mr. Dibee to accept

responsibility for the attempt and to cooperate

with the government's investigation.

After that meeting, Mr. Dibee

returned to his home, he burned incriminating

evidence in his fireplace, and he enlisted a

friend to drive him to Mexico.  From Mexico City,

he flew to Beirut, Lebanon, and from Lebanon, he

flew to Syria where he had family connections.

He established residence in Syria.

Syria is a country with no extradition treaty with

the United States.  He obtained a Syrian passport

in the name of Yousef Deba, that is Y-O-U-S-E-F,

D-E-B-A.  Mr. Dibee already had a U.S. passport in

the name of Joseph Mahmoud Dibee, D-I-B-E-E.

Although Mr. Dibee claims that Deba is a Syrian --

Syrian spelling for his name, Mr. Dibee listed his

parents' names and his name in his U.S. passport

application using the spelling D-I-B-E-E.

Mr. Dibee relocated from Syria to

Russia in 2010, where he established both a

residence and obtained visas to reside in Russia,

eventually married and adopted a son, both of whom

currently reside in Russia.

Mr. Dibee knew that he had been

charged in the United States.  On two separate

occasions he contacted authorities to offer

information.  On both occasions that cooperation

was conditioned on the complete dismissal of all

U.S. charges.  As this Court noted in its hearing

on December 13th of 2019, Mr. Dibee knew that

there were U.S. charges.  According to Pretrial

Services report, Mr. Dibee met with his sister

while he was a fugitive.

On May 21st of 2018, Mr. Dibee

traveled from Russia to Havana, Cuba.  He was

1   scheduled to return to Russia on August 2nd of

2   2018.  Instead, Mr. Dibee was stopped in

3   El Salvador.  At the time he was traveling with a

4   Syrian passport.  Again, that passport is in the

5   name of Yousef Deba.  He also was carrying Russian

6   residency paperwork also in the name of Yousef

7   Deba.

8               El Salvador authorities obtained

9   biometric data from Mr. Dibee that leads to the

10  outstanding warrant here in the United States.

11  Twice positive fingerprinted, El Salvadoran

12  authorities were confused by the difference

13  between the name on his American warrant, which is

14  Joseph Dibee, and the name on Dibee's travel

15  documents.  That confusion enabled Mr. Dibee to

16  board the plane to Havana and the plane departed.

17              In Cuba, Mr. Dibee was detained.

18  When he was told that he was being detained on an

19  Interpol notice, he requested asylum in Cuba.

20  Cuban authorities contacted the United States and

21  agreed to turn Mr. Dibee over to U.S. authorities.

22              Mr. Dibee has never attempted to

23  address -- to resolve the charges against him

24  aside from his efforts to request complete

25  dismissal while living in countries that have no

extradition treaties with the United States.

Aside from a letter from a single company that employed Mr. Dibee for a few weeks in 2018, he offers nothing but his uninformed statements regarding his activities for the past 12 years.  That he was able to obtain employment internationally despite his fugitive status further supports the risk of flight.

Now, the government has sympathy for Mr. Dibee.  He stands accused for crimes he committed 18 years ago.  He made a life for himself in Russia where his wife resides and where he gained employment that he's been recognized for.  He has talents that the government believes could make a positive contribution to society, and I'm sure that he wishes he could go back in time to make different decisions regarding his participation in these crimes and his decision to flee from the United States to avoid prosecution.

The government's sympathy, however, is tempered by the fact that defendant's condition is entirely of his own making.  Over a period of several years, he engaged in a conspiracy to intimidate, coerce, and frighten the public into agreeing with his views.  In 2005, he was given an

```
 1   opportunity that many of his codefendants did not
 2   get.  That's the opportunity to cooperate in the
 3   investigation and accept responsibility early on.
 4              Instead of cooperating, instead of
 5   accepting responsibility, Mr. Dibee chose to run.
 6   He ran from his family.  He ran from his
 7   community, and he ran from his work, and he ran
 8   from his past, and established a life for himself
 9   in Syria and later in Russia, and he successfully
10   avoided confronting his past for more than a dozen
11   years.
12              Critically, Mr. Dibee never
13   surrendered to face the charges.  If he had
14   self-surrendered many years ago, this would be a
15   very different case.  Then his citations to the
16   work he does, his research, could lay an argument
17   that he was a changed man and that the crimes he
18   committed and risk of flight that he poses were
19   well behind him.
20              That, however, is not what happened.
21   He would not be in this courtroom today if he had
22   not been caught, and he only got caught because
23   authorities in El Salvador were able to run his
24   fingerprints and relayed the warrant to Cuban
25   authorities.  He now argues that he should get
```

credit for providing information to the government while he was a fugitive.  Those efforts were always conditioned on the government's dismissing all of the charges against him.  That's something the government could not do in light of the seriousness of the charges.

He argues that the offenses were not serious because no one was injured.  As this Court noted at sentencing other codefendants, that's simply not true.  The fires were completely out of defendant's control, and the fact that no one was injured by these fires was due to sheer luck more than anything else.

The sentences that this Court imposes on Mr. Dibee's codefendants in no way lessened the severity of the underlying conduct. As the Court is aware, there are many factors that this Court used to fashion codefendant sentences and they have no bearing on Mr. Dibee's eventual sentence in this case.

The weight of the evidence is clearly strong in this case.  It was strong enough to convince Mr. Dibee that he should flee the country in 2005, and it remains strong today.

Mr. Dibee has argued that he is

rehabilitated, that he's a changed man, and he cites the work that he has done in Russia and elsewhere.  The problem with his argument is that any changes that he underwent while in Russia were not of a nature to convince him to surrender to U.S. authorities to face these charges.  What it's changed in this case is that Mr. Dibee got caught.

Now, the defendant does not have strong ties to this community.  While his sister and father reside in Seattle, they were there in 2005, and those ties were not enough to keep Mr. Dibee in the United States, and they are not strong enough to make Mr. Dibee surrender to the U.S. authorities in more than a dozen years.

In fact, Mr. Dibee's strongest community ties are still in Russia.  That is where he's done most of his work.  That is where his community is.  That's where his wife resides, and I understand that he has a stepson in Russia. Those ties in Russia only provide a greater incentive to flee than Mr. Dibee had in 2005.

Now, his release plan in this case involved him living with his sister in Seattle. The government is troubled by the fact, as set forth in the bail report, that the defendant's

sister met with him while he was a fugitive.  At
that time she was either unwilling or unable to
get him to surrender to face the charges here in
this case, and there's no reason to suspect that
she will be able to convince him to remain here
now.  It's also my understanding that Mr. Dibee's
sister helped to sell Mr. Dibee's property after
he left the United States.

Now, Mr. Dibee argued that he should
be released because four of his 11 codefendants
were released in this case.  That comparison fails
to recognize that Mr. Dibee is one of very few
defendants that fled.  This case is, in fact, most
similar to Rebecca Rubin.  She was a Canadian
citizen.  In fact, Mr. Dibee recruited her to
participate in the Litchfield arson.  At that time
she was lawfully living in Canada where she was
when she was indicted in 2006.  Four years later,
she voluntarily surrendered to U.S. authorities
and was detained by this Court pending trial.

At sentencing, the Court recognized
the significance of Ms. Rubin surrendering to U.S.
authorities and this Court sentenced her to
60 months.

On the issue of flight, prior to

this hearing we had a discussion with Pretrial

Services and the defendant about his passport.

And my understanding is that passport is still in

Mr. Dibee's possession through his sister. I

don't believe that's through any fault of

Mr. Dibee. I think that's a miscommunication, but

I'd simply note that the passport is not in

government possession.

Now, the argument -- the

government's argument on risk of flight is clearly

stronger than its argument on dangerousness, but I

would submit that's largely due to the fact that

our insight into Mr. Dibee's life in Russia and

Syria is extremely limited. I will note that the

defendant's history includes using violence to

impose his will on others and that propensity

poses an unacceptable danger to the community.

Now, again, the defendant argued the

charges aren't serious because of what some of the

codefendants received. As the Court knows, the

government moved for downward departures in

several of the codefendant cases. No such motion

is anticipated in this case.

When assessing dangerousness, it is

defendant's conduct that must be assessed. I

```
 1    would note that the defendant has skills that he
 2    outlined at the hearing last week, and they're
 3    considerable skills, but it's those skills the
 4    defendant relied upon in building the destructive
 5    devices that destroyed the Cavel West plant.
 6                    I would also note although the
 7    defendant gave a lengthy, albeit unsworn,
 8    statement, at no point did he assure this Court
 9    explicitly that he would return to face these
10    charges.  And on that basis, your Honor, we
11    believe that the defendant should be detained.  We
12    believe that he poses an unacceptable risk of
13    flight and a danger to the community.  We believe
14    nothing the defendant has offered this Court
15    rebuts the presumption and we believe that the
16    facts warrant continued detention.
17                    I'm happy to answer any questions
18    the Court may have.
19                    THE COURT:  I don't have any right
20    at the moment.  I'll hear from both sides first.
21    So, counsel, go ahead.
22                    MR. HOOD:  Thank you, your Honor.
23    This is Paul Hood for Joseph Dibee.
24                    THE COURT:  All right.  Right away
25    we are not going to be able to hear you.
```

1    MR. HOOD:  All right.  I'll speak

2 closer to the microphone, but I worry that I'm too

3 close now.  Is this good?

4    THE COURT:  That's better.

5    MR. HOOD:  Okay.  This is Paul Hood

6 for Joseph Dibee.

7    Your Honor, I'd like to talk for

8 just a moment about the Ninth Circuit ruling,

9 which I take as an invitation to the Court to

10 present more complete and clarified findings.

11    I think the Ninth Circuit realizes

12 that these sorts of rulings are rarely appealed by

13 the government, but that the government will no

14 doubt appeal if this Court and when this Court

15 maintains its re- -- renews its prior ruling from

16 December 13th.

17    I would like to address one thing in

18 particular that the government said, and this is a

19 quotation from Mr. Barrow, and this is where I'm

20 starting because I see the central point.

21 Mr. Barrow said moments ago what has changed in

22 this case is that Mr. Dibee got caught.  And the

23 problem is, your Honor, that the government is

24 ignoring very significant and straightforward

25 evidence that it shouldn't ignore and that it

cannot ignore.  I'm certainly not going to allow
that and I hope the Court will not allow that
either.

Mr. Dibee's most recent alleged
criminal conduct is in October of 2001.  The
government says it has limited insight because for
part of the time Mr. Dibee was not in custody, he
was in Syria and Russia.  But the government, once
again, ignores the fact that in 2002, 2003, 2004,
and 2005, Mr. Dibee was in the United States.
There was no additional criminal conduct.

I am stressing that point because on
December 13th, this Court had reviewed the memos,
heard argument, and heard perhaps most importantly
the statement from Mr. Dibee.  He gave what was,
in my view, one of the most unusual and remarkable
statements I have ever heard a criminal defendant
make in the case.  He essentially gave a science
lecture.  He talked to this Court at length about
his innovations, about his projects, both his past
and ongoing efforts.  I believe that was central
to this Court's conclusion that he should be
granted pretrial release.

In addition, your Honor, those
innovations reflect a change in philosophy that I

have been arguing to the Court both in the memo,
in my oral argument, and I see it as illustrated
by his statements, and it is that he has changed
in a specific way.  He regards the best way to
protect the natural world is to link up the profit
motive that drives businesses with green
technology.  So that innovation becomes the most
profitable means.

                    And you may remember a moment from
his remarks that specifically reflects that where
he talked about the problem of the separation of
gold and ore using mercury, and he talked about
how dangerous that is to the environment.  He
talked about specific reasons why it's dangerous.
He talked about the fact that mercury is an
element.  It doesn't biodegrade.  It doesn't break
down, as he put it.  It just sits there.  But, of
course, it doesn't just sit there in one place.
It can also, because of heavy rain, flood into
watersheds and create all sorts of problems.

                    He talked about his alternative
method which is not only better for the
environment because it's potentially much more
efficient than mercury and something that
businesses would use, it's something that they

```
 1   would seek out, and that sort of innovation that
 2   is so good for the natural world and for humanity
 3   is reflected in the letter from Douglas McKinnon
 4   in support of release for Mr. Dibee.  And
 5   Mr. Dibee talked about how he met Douglas
 6   McKinnon, talked about who Douglas McKinnon is.
 7                   All of these things are consistent
 8   with common sense and with the Court's own
 9   experience in this case, which is that people
10   change over time.  You have people in this case
11   who were idealistically motivated, but over time
12   learned the error of their ways, and Mr. Dibee has
13   learned that error as well.
14                   And most importantly -- like he
15   said, most importantly, that this is just
16   something I can't get past, your Honor.  You got
17   to hear from him.  I think he spoke to you for at
18   least ten minutes.  You got to evaluate him.  You
19   got to assess his credibility.  You got to make a
20   judgment about him.  You got to see how he teared
21   up when he talked about Syrian refugees.  You got
22   to see that he cares about people.  He cares about
23   the natural world.  And the government can only
24   reference you back to a kind of genre argument to
25   how serious these crimes are.  We're not saying
```

they're not serious.

When I make reference to sentences that other defendants have received in this case, and I talked about the two categories of defendants, that was reflective of defendants (inaudible). I'm not arguing that the charges aren't serious. I'm saying instead that there's a pattern here. There's a pattern of two different groups of defendants.

One group received sentences ranging from 37 to 60 months. Those were defendants charged with between two and four counts. And then you have defendants charged with 17 or more counts in a 65 count indictment.

And the point is -- sorry, your Honor. It's that time of year. Pardon me. The point is there's no intermediary there. There's no 8-, 9-, 10-count defendants. There's this massive gap and that means Mr. Dibee is firmly placed in that first collection of defendants -- and we're talking about defendants and Mr. Barrow made specific reference to Rebecca Rubin. Those defendants, Rebecca Rubin among them, did no worse than five years in any instance and I would say that gives you a specific data point to rely upon.

1        Where the government turns to this

2   kind of genre argument about how serious the crime

3   is, we turn to the more specific argument specific

4   to this case that you know the outcomes, and as I

5   point out in my memo in support of pretrial

6   release, if you knew someone was facing a sentence

7   of around 37 to 60 months, it would certainly not

8   be outlandish to say that that person would

9   receive pretrial release.

10        In addition, your Honor, the

11   government continues to make a lot -- a lot of

12   statements about this idea of the name Yousef

13   Deba.  It's on and on and on -- it's on and on and

14   on throughout the argument.  It's referenced in

15   the very first paragraph of the memo that the

16   government presented in opposition for pretrial

17   release.

18        And I again say to your Honor, and I

19   think -- I think the Court understands this, that

20   that is no different than if I were of Italian

21   descent and I relocated to Italy and I went by

22   Paolo instead of Paul.  And that's my

23   understanding what my Italian name would be.  Or

24   if I moved to a Spanish-speaking nation and I went

25   by Pablo instead of Paul.  I mean, the

government's making so much of this with you, it's
simply the Arab/Syrian version of Joseph Dibee.
There's -- and there's nothing that they're
showing you that would disagree or dispute that.

The government has stated details
about the rebuttable presumption and has
specifically noted to you that the ultimate burden
of persuasion remains with the government.  What
the defendant has is a burden of production.  We
have met that burden, your Honor.

And I, this morning, filed a very
short supplemental memorandum in support of the
motion for release from custody.  It details
briefly that legal standard, and then it
references several findings that I think the Court
did make implicitly and could make explicitly in
support of continued pretrial release, or I should
say, renewed pretrial release for Mr. Dibee.

The first of those is that Mr. Dibee
has changed.  The Court specifically referenced
that.  The Court specifically referenced its
experience with this case and its experience with
other defendants in this case.  And, of course,
this idea that people change just fits with common
sense.  But it isn't just common sense.  It's the

1 reality of this case. It's 2002, 2003, 2004, 2005

2 with no criminal conduct.

3 It's all those additional years

4 beyond that where, admittedly, the government will

5 say they don't know everything that Mr. Dibee was

6 doing, but I think the Court has a good idea when

7 you listened to what I call his science lecture,

8 where he goes through the details of all the

9 projects he had been working on, where he goes

10 through the details of specific types of solar

11 technology that he -- that he attempted to develop

12 in Syria, and that plan fell apart because of the

13 Syrian War.

14 And I think you saw his emotional

15 reaction when he was talking about that. You got

16 to assess him. You made your assessment and I'm

17 asking you to stand by it.

18 In addition, you specifically

19 referred to him as a different person with

20 enormous skills to provide and you talked about

21 how you wanted him to go forward and use those

22 skills.

23 Also, your Honor, the government is

24 not disputing the fact that Mr. Dibee twice

25 contacted the government about supervised

1   releasing himself.  Now the government says, Well,

2   you know, it didn't work out, and they make some

3   other comments about it, but I want to talk about

4   exactly what happened in a greater level of

5   detail.

6              Mr. Dibee was represented by an

7   attorney during that process, Nancy Hollander.  I

8   have spoken to her.  I have memos from her from

9   the time reflecting the conversations that

10  occurred.  These included conversations with

11  assistant United States attorney Kirk Engdall who

12  was handling the case at the time.

13             Mr. Dibee, at great risk to himself,

14  attempted to provide assistance to the United

15  States government.  This is referenced in the

16  confidential memo, but I'm going to talk about it

17  in a bit more detail now.  And I would note this.

18  If I'm mistaken, please correct me.  I will give

19  the government a moment to respond to this point.

20  But I don't believe that FBI Agent Suttles was

21  present for the conversation of June 7th, 2011.

22  If I'm wrong about that, I'm not trying to violate

23  decorum, but I would just like to note that

24  Mr. Suttles wasn't.  Because if he was, maybe we

25  should call him as a witness.

1          June 7, 2011.  It's a conversation

2   with Nancy Hollander, attorney for Joseph Dibee.

3          Steve, Eiffer?  Eifer?  And Kirk

4   Engdall.

5          MR. BARROW:  And what subject and

6   where was this?

7          MR. HOOD:  Well, it was a phone

8   conference.  It was on the subject of Mr. Dibee

9   providing assistance to the United States

10  government to prevent a Syrian attack -- while he

11  was in Syria to prevent an attack against Israel.

12  It was related to what you and I have talked about

13  with Mr. Barrow.  It's the "roomful of money"

14  conversation.

15          MR. BARROW:  One minute, please.  So

16  Mr. Suttles or Agent Suttles, excuse me, is

17  familiar with the call -- contemporaneously

18  familiar with the call but wasn't present when

19  this call occurred.

20          MR. HOOD:  Thank you.  I appreciate

21  that clarification.

22          Your Honor, the memorandum of

23  June 7th, 2011, from Nancy Hollander, again, the

24  attorney that represented Joseph Dibee at the

25  time, the attorney that I've talked to on the

phone who has provided me her memos, indicates

that it's written a bit like a script in that you

have a speaker and then a note about what the

speaker said, and the statement by Kirk Engdall is

reflected in the sealed memorandum.  And that

statement from Kirk Engdall is the information

he's given us will already help at the end of all

of this.

Mr. Dibee believed that money was

being collected in Syria and that that money was

ultimately going to be used to fund a terrorist

attack against Israel.  He contacted U.S.

authorities about this while residing in Syria.

That is an incredible risk to him to have done

that.

Syria -- well, I mean I think the

Court would be -- would appreciate just how much

dirt that is, would appreciate the potential for

Syrian authorities to learn of that and to take

harsh and extreme measures against him.  And, in

any case, you have a statement from Kirk Engdall

saying that he helped himself.  That Mr. Dibee, by

giving that information, has helped himself at the

end of all of this.

I say all this, your Honor, because

Mr. Dibee has a lot to lose if he were to run on this case. I think that we potentially have an enforceable assistance statement, a promise of leniency. I think it could most reasonably be interpreted as something that would crack any notion of a mandatory minimum being applied in this case.

In addition, even if the government will not agree with me on this point, the Court can find it. The Court can find that there was a promise of leniency made. In addition to that, even if no such promise was ultimately made that would crack the mandatory minimum, the Court could still rely upon it as a -- a background factor related to Mr. Dibee that could be taken in consideration at sentencing.

Now, turn back for a moment to Exhibit 2 if you have it in front of you. If you don't, I would point out to you you have Darren Thurston, Jonathan Paul, Kendall Tankersley, Rebecca Rubin, all in that category of defendants that Mr. Dibee is firmly implanted in. They got sentences ranging from 37 to 60 months. I'm not aware of any of them being able to give or attempting to give the kind of assistance at great

1  personal risk dealing with security forces in
2  Syria, potentially living in an apartment where
3  the ears may have walls [sic], calling on a phone
4  that he doesn't know is secure and offering the
5  United States government assistance to prevent
6  what he believes is going to be a terrorist attack
7  against Israel.
8              The only person that should even
9  begin to be put in that category is Jonathan Paul.
10 I don't know because I'm not allowed to know all
11 of the assistance that Jonathan Paul gave to the
12 government.  The government's sentencing
13 memorandum on this point suggests a 17-level
14 downward departure for Jonathan Paul.  I imagine
15 that Jonathan Paul attempted to assist.  I don't
16 know if he was successful.  But his attempted
17 assistance probably ultimately related to property
18 crimes, crimes where buildings were destroyed,
19 arsons occurred, not a terrorist attack
20 potentially being carried out against the nation
21 of Israel.
22             I would say to you that Joseph Dibee
23 deserves at least as much as Jonathan Paul got.  I
24 would love to hear the government's position
25 today, now, as we're talking about this in more

1  detail if they believe that somehow the assistance

2  that Joseph Dibee offered is worth less at saving

3  lives and the risk he took to try to protect human

4  life is somehow less than the assistance that

5  Jonathan Paul provided.

6  Again, I don't know the details of

7  that, but it amounted to a recommendation of a

8  17-level downward departure, and of course

9  Jonathan Paul broke out of the mandatory minimum.

10  Now, if Mr. Dibee runs, he loses all

11  of that, I think.  I think any idea that this

12  Court would enforce an assistance agreement or a

13  promise of leniency if Mr. Dibee runs again, if he

14  breaks out of pretrial release, if he cuts the

15  ankle monitor off and disappears, I can't imagine

16  that the Court would keep that as an option for

17  him, and Mr. Dibee knows that.  He knows that he

18  has so much to lose if he were to run.

19  That is more specific -- what I just

20  said to you in those few moments, your Honor, is

21  more specific than any argument that the

22  government is making because the government

23  continues to rely on this notion of a genre.  It's

24  a really serious crime.  That's what it's saying.

25  Also, this Court, in referencing and

1    granting -- in granting pretrial release on

2    December 13th, this Court referenced the quality

3    of Mr. Dibee's home plan.  It referenced how well

4    specifically his sister was established in the

5    community.  His sister is a doctor.  She's

6    worked -- she's been a doctor for 20 years.  She's

7    worked for the same employer for 12 years.

8              His brother-in-law is an engineer.

9    He's been an engineer for 25 years.  I think he's

10   been with the same company for about the same

11   length of time.  I had the details more on the tip

12   of my tongue, your Honor, but the point is when we

13   were here on Friday, December 13th, is they're

14   extremely well-established people and they're very

15   willing to have him in their home.

16             Now the government makes reference

17   to the U.S. passports, and I'm glad the government

18   was very clear about this because I want to --

19   it's true, to my knowledge, that the U.S. passport

20   is still in the possession -- pardon me -- the

21   Syrian passport.  I misspoke.  That the Syrian

22   passport is still in the possession of Maha Coles.

23   Two things about that.  One is that it's expired.

24   But, two, is the only reason it's still in her

25   possession is because Noe Rios called me this past

```
 1   week and we were trying to figure out, and I don't
 2   think this point is disputed by anyone, and
 3   there's an officer who's here today, that we
 4   didn't know where to turn the passport in because
 5   there was no case open in Washington, no --
 6   nothing -- nothing that the Pretrial Services
 7   Office would take the passport for.
 8              My suggestion was going to be just
 9   to mail it down here, but in the meantime while
10   all that was getting figured out, we got the
11   ruling from the Ninth Circuit and Joseph Dibee
12   went back into custody.  I mean, we can figure out
13   the passport situation.  It can be mailed.  It can
14   be shredded and the bits could be handed over to
15   the Pretrial Services Office in Seattle.  I'm
16   being a little off the cuff and flippant when I
17   say that, your Honor, but it can be taken care of.
18   That can be dealt with.  It is no act of
19   misconduct.
20              And, in fact, I want to talk -- and
21   I addressed this in my supplemental memo -- about
22   just how good Mr. Dibee was for the brief time
23   that he was on pretrial release.  Because the
24   Court directed him to be there first thing Monday
25   morning in Seattle, and I was on the phone with
```

```
1    him, and I think he was there at about 7:45 a.m.
2    He was there.  He was there before there was even
3    anyone to come out and talk to him.  He was
4    waiting in the lobby of Pretrial Services Release
5    Office to be processed.
6                    And then, of course, your Honor, on
7    Wednesday of last week at about 2:20, and I'm
8    pretty confident about that time because, of
9    course, when rulings are published, we get emails,
10   and so at 2:20 in the afternoon on Wednesday of
11   last week, I -- I -- there's an email that goes
12   out that -- the notification that the Ninth
13   Circuit has -- has remanded this case to you, is
14   ordering Mr. Dibee back into custody.
15                   I saw that email I believe shortly
16   after that, quite shortly after that, 20 minutes
17   maybe, and I -- you know, I just called Noe Rios
18   as I was reading it so it stands out in my memory.
19   I then called Mr. Dibee.  I called him at about
20   2:53 p.m., so it's about 30 minutes after the
21   ruling had come out, and Mr. Dibee was back down
22   at the Pretrial Services Office at 3:40 p.m.
23   Okay?  An hour and 20 minutes after the email goes
24   out announcing the ruling.
25                   He has been extraordinarily
```

compliant to this point.  I mean, one of the

reasons I think that the government -- I don't

know that the government will admit this, and

maybe it's not even in their thinking, but maybe

it is.  You know, they had to expedite this

because if this had gone under a normal briefing

schedule, the original briefing schedule for this

issued by the Ninth Circuit was going to be -- the

government's memo was going to be due, I believe,

on December 30th.  The defense memo would have

been due about ten days later.

          If we had gone that far into

January, we would have had a track record for

Mr. Dibee.  He would have been compliant and

compliant and compliant because, your Honor, your

December 13th assessment of him, which I think is

the most profound piece of evidence in this

case -- you got to size him up.  The Ninth Circuit

hasn't done that.  You got to do that.  You got to

assess his credibility, his demeanor.  You got to

put that into your experience with this case and

with defendants in other cases and you made an

evaluation of him and you found that he's a

different person.  And that finding is the most

overwhelming finding in the case.  It is the one

1    that is of the most important.

2              The government mentions that his

3    sister helped him sell property while he was at

4    large.  Your Honor, to my understanding, that was

5    done, and I referenced this on December 13th, that

6    Mr. Dibee continued to pay his taxes even after he

7    left the United States.

8              That -- you know, the extent to

9    which he has conducted himself -- I'm not --

10   again, please understand.  I'm not arguing that

11   these aren't serious crimes.  I'm not arguing that

12   it's not of significance that he left the United

13   States.  But the government keeps ignoring so many

14   other arguments.  The government won't even

15   acknowledge this, the Exhibit 2 that I made, where

16   you see, you know -- you know, you just see the

17   outcomes here.

18             I'm not arguing it's not serious,

19   but people got pretrial release in this case.

20   Jonathan Paul, Kendall Tankersley, Suzanne Savoie,

21   who had 17 counts in her -- against her from the

22   65-count second superseding indictment, and Daniel

23   McGowan who had 18, all granted pretrial release.

24             Your Honor, you've had experience

25   with this case.  You've made an assessment of

Mr. Dibee.  I'm asking you just to stand by that

assessment.

                    The Ninth Circuit has given you what

I regard as an invitation to substantiate your

rulings more extensively because the Ninth Circuit

recognizes that this is an unusual situation and,

undoubtedly, the government will appeal this

ruling if you again return to your position and

grant Mr. Dibee pretrial release.  And that ruling

is exactly what you should do.

                    The best position you were ever in,

the best position of anyone has ever been in this

case to evaluate the pretrial release question was

at the conclusion of Mr. Dibee's statements on

December 13th that he detailed to you his efforts.

                    And you noted, your Honor, that you

wanted him to continue those, and he should.  He

should.  The government says, Well, it wasn't

under oath that he made those statements.  Your

Honor, I don't -- I don't think you can fake the

kind of scientific knowledge that Mr. Dibee was

demonstrating through his statements.

                    And I -- again, I think it is one of

the most unusual statements I have -- it is.  I

just -- not one of.  It is the most unusual

statement I have ever heard from a defendant in
custody.  He's basically giving us a science
lecture, but it's a science lecture that fits with
his changed philosophy which fits with the fact
that he is a different person.

And, your Honor, I would add this.
You know, even in the brief time he's been out, he
has been visited by two professors who are aware
of the work that he would like to do and are
offering him assistance.  I mean, one of the
things he was talking to me about, one of the
things his family was talking to me about, for
instance, while he was out of custody, your Honor,
was that the Seattle office was putting a
restriction on his computer use.  I believe the
Court had ruled computer monitoring.

But what the Seattle office ended up
saying, as I understand it, was, well, that he
couldn't use any device, smartphone, computer,
what have you, that would have internet capability
which, of course, is exactly what he needs because
the work that he's doing requires him to get on
the internet, look at science journals, do
research.  As my client would put it -- he's put
it to me this way and it just makes sense, if what

he's trying to do was easy, someone else would
have already done it.

The problems that he's trying to
solve are serious problems for humanity. He
talked to you in what I called his science lecture
about how the rainwater changes the pH balance,
and I don't even remember all the details, but I
remember the poison gas which is deadly for people
and there's nothing you can do about it once
someone gets exposed.

Now, those kinds of details aren't
fake. Yeah, he didn't take the witness stand. He
didn't swear out an oath. But he's not faking it,
your Honor, and you judged him correctly. He has
changed. There are plenty of evidentiary findings
available to you. He has rebutted the rebuttable
presumption. The government has not met its
burden of persuasion. He should be released
again, your Honor. Thank you.

MR. BARROW: Your Honor, this is the
government. May I respond?

THE COURT: I'd just like to remind
people of this one fact. He was arrested August
of 2018. Correct?

MR. BARROW: That's correct, your

1  Honor.

2           THE COURT:  And today is

3  December 23rd, 2019, and we are still in a

4  pretrial format.  Just a reminder.  Go ahead.

5           MR. BARROW:  Your Honor, I think

6  Mr. Hood and I talked about the delay and I think

7  we're going to address -- we plan to address that

8  with the Court in our January status conference.

9           But in response to Mr. Hood's

10 arguments, Mr. Dibee did give us kind of a lengthy

11 lecture.  I don't doubt the sincerity of what

12 Mr. Dibee said during that lecture, but it does

13 not in any way address his risk of flight in this

14 case.

15          I guess I would ask:  When did

16 Mr. Dibee's transformation occur?  I certainly

17 hope that it occurred prior to him getting caught.

18 I hope he realized that he could use his talents

19 to improve the planet through innovative ideas and

20 economics prior to him being caught.

21          What his transformation did not do

22 is it did not lead him to surrender, to face his

23 past and to address these charges.  He was working

24 on all of those great ideas while a fugitive from

25 justice in the United States.

1          The government's argument for

2    detention is not a genre argument.  What is unique

3    about the defendant is that he fled and he was a

4    fugitive for a dozen years.

5          Now, the issue of the name on the

6    defendant's passport, the Syrian passport, I'm not

7    insinuating that he made that name up.  I'm merely

8    pointing out that it's not a name that's used on

9    his American passport.  It is the name that was on

10   his arrest warrant.  And the use of that Syrian

11   name on the Syrian passport enabled him to flee

12   from El Salvador.  It was certainly more

13   convenient for him to travel on an El Salvador --

14   on a Syrian passport in a name that is not Joseph

15   Dibee than if he were trying to travel on his

16   American passport.

17          I'd like to also address the issue

18   of cooperation.  I talked to a former AUSA Kirk

19   Engdall about the information that Mr. Hood has

20   outlined, and he was very confident that there

21   were no promises that were ever made to Mr. Dibee.

22   As the Court undoubtedly knows, a cooperation

23   agreement is a contract.  A defendant offers their

24   cooperation in exchange for something and that

25   cooperation may be accepted by the government.  In

any cooperation agreement, part of what Mr. Dibee would be required to do would be to surrender and to accept responsibility for the crime. That is not what happened.

In fact, my understanding is that Mr. Dibee's offer of information was conditioned on dismissal of all of the charges. That was Mr. Engdall's recollection. And Mr. Dibee also withheld details of the information unless he could secure a promise that he would not be prosecuted.

None of the defendants that Mr. Hood is comparing Mr. Dibee with were fugitives. None of those defendants conditioned their cooperation on complete dismissal of all of the charges that they were facing. Simply put, Mr. Dibee's in a completely different category, a category of his own. As I argued before, he's most similar to Ms. Rubin. But Ms. Rubin surrendered without a promise that all charges be dismissed.

Finally, I would just like to address Mr. Dibee's conduct while he was on release. I do appreciate the fact that Mr. Dibee surrendered when he learned of the Ninth Circuit's order that he do so, but the amount of time that

he was on release was simply not sufficient for us to judge his compliance with conditions. Keep in mind, it took him several days to flee the country in 2005.

On the record before the Court, we'd ask the Court to detain Mr. Dibee both as a risk of flight and a danger to the community. Thank you.

MR. HOOD: Your Honor, this is Paul Hood. If I may just address the dismissal of all charges part of the government's argument.

THE COURT: Sure. Go ahead.

MR. HOOD: That is not reflected in any memorandum or any discussion I've had with Nancy Hollander. It may be Kirk Engdall's recollection, but it would be a recollection of the conversation that he had in 2011, specifically about the June 7th, 2011. I can say that date because that's the date on the memo that I have from Nancy Hollander.

Certainly it is true that there was never an ultimate agreement reached for Mr. Dibee to turn himself in and there was never a contract, but, nonetheless, a promise of leniency can be enforceable without a contract. I don't want to

```
 1   go into all that.  We may litigate that later in
 2   this case in any event -- in any case, your Honor,
 3   but there -- that idea that they had to dismiss
 4   all charges and that's the only way that -- it's
 5   just not -- it's not accurate, your Honor.  It's
 6   not reflected.
 7                 And I don't have Kirk Engdall here
 8   and you don't have him here so we can hear from
 9   him to find out how good is his memory when the
10   conversation was from 2011.
11                 Again, your Honor, I think you have
12   plenty in front of you.  Mr. Dibee has met the
13   rebuttable presumption.
14                 THE COURT:  Unless -- is there
15   anything else?
16                 MR. BARROW:  I'm sorry?
17                 THE COURT:  Is there anything else?
18                 MR. BARROW:  Not for the government,
19   your Honor.  Thank you.
20                 MR. HOOD:  And not from the -- just
21   a moment, actually, your Honor.
22                 No.  Nothing more from the
23   defendant, your Honor.  Thank you.
24                 THE COURT:  Well, thank you.  After
25   this was placed on my docket at the last minute
```

1    and I -- I made my ruling from the bench, I'm

2    going to take this under advisement and I'll have

3    a written ruling for you trying to reach the

4    question that's been sent back by the Ninth

5    Circuit.

6                    So you'll have it in writing so it

7    will be available and clear, but I'm going to tell

8    you I will see you in January and I -- one of the

9    things in moving this case is -- with the fact

10   that it came to me a year and a half after he's

11   been arrested and has been in custody and didn't

12   challenge the initial determination, but at some

13   point, this case needs to be moving and a

14   resolution done.

15                   And so whatever I decide to do

16   today, this case will be under regular status

17   conference hearings to move and get to a

18   resolution.

19                   It's an old case.  We all know many

20   of the facts of this case.  And we just -- it's --

21   it needs to be resolved.  Or tried.

22                   So with that stated, I'll get

23   something out to you shortly.  Thank you.

24                   (Reporter inquiry.)

25                   THE COURT:  We have a new court

1 reporter who is not familiar with all the players

2 in the building.  So anything else?

3                 MR. BARROW:  Not for the government.

4 Thank you, your Honor.

5                 THE COURT:  Thank you.

6                 MR. HOOD:  Thank you, your Honor.

7 Nothing more from the defense.

8       (The proceedings recessed at 11:50 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

-o0o-

I certify, by signing below, that the foregoing is a correct transcript, to the best of my ability, of the record of proceedings in the above-entitled cause heard by speakerphone, taken by stenographic means. Due to the telephonic connection, parties appearing via speakerphone or cellphone, speakers overlapping when speaking, fast speakers, the speaker's failure to enunciate, and/or other technical difficulties that occur during telephonic proceedings, this certification is limited by the above-mentioned reasons and any technological difficulties of such proceedings. A transcript without an original signature or conformed signature is not certified.

*/s/ Jan R. Duiven*                        1/24/2020
JAN R. DUIVEN, CSR, FCRR, CRC        DATE
Official Court Reporter
Oregon CSR No. 96-0327