Paul Hood, OSB 132271
PO Box 66876
Portland, OR  97290
Telephone: 541-513-7545
paul@paulhoodlaw.com

Attorney for Defendant Joseph Dibee

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO.  6:06-cr-60011-AA-1 |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM IN SUPPORT OF** |
| | ) | **MOTION TO RECONSIDER** |
| v. | ) | **PRETRIAL RELEASE** |
| | ) | |
| JOSEPH DIBEE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Joseph Dibee, through his attorney, Paul Hood, provides this memorandum in support of the separately filed Motion to Reconsider Release from Custody.  This Court has previously denied the Defendant's request for release but did so without prejudice.  Order and Opinion, ECF 286 at 1.  Based on the supplemental information provided herein regarding flight risk and the changed circumstance of the COVID-19 pandemic, the Court should grant pretrial release to Mr. Dibee and place him on house arrest with electronic monitoring at the home of his sister, Dr. Maha Coles.  This is the same release plan that was previously advocated and briefly permitted.

///

///

///

**Legal Standard**

Generally, the Government bears the burden of proving by a preponderance of evidence that defendant is a flight risk.  Unites States v. Santos-Flores, 794 F.3d 1088, 1090 (9th Cir. 2015).  However, the crimes charged in this matter give rise to a rebuttable presumption that no release condition or combination of release conditions will reasonably assure the appearance of the accused and the safety of the community.  18 U.S.C. § 3142(e).  Although the presumption shifts a burden of production to the Defendant, the burden of persuasion remains with the Government.  United States v Hir, 517 F.3d 1081, 1086 (9th Cir. 2008).

The "burden of production" requires the defendant to produce "some credible evidence" showing reasonable assurance of appearance and/or no danger to the community. United States v. Carbone, 793 F.2d 559, 560 (3rd Cir. 1986).  "Some credible evidence" suggests the defendant does not have to produce substantial or voluminous evidence to rebut the presumption of detention.  For example, in United States v. Hare, 873 F.2d 796 (5th Cir. 1989), the only evidence produced by the defendant in a presumption case on the issue of risk of flight was on cross-examination of a government witness, when the defendant elicited the fact that the defendant had twice self-surrendered to prison and that he had not had any probation or parole violations.  Id. at 799.  The court found that that evidence alone was sufficient to rebut the presumption of detention on the issue of flight.  Id.

Once a detained defendant provides evidence to rebut the presumption in favor of detention, four factors guide the release decision: the nature and circumstances of the offense, the weight of the evidence, the nature and seriousness of the danger posed to the community, and defendant's history and characteristics.  18 U.S.C. § 3142(g).  The discussion of those four

factors will be narrowed in this memorandum because the Court has explicitly found that Mr. Dibee "does not pose a danger to the community." Order and Opinion, ECF 286 at 9.

The COVID-19 pandemic is also relevant to the question of pretrial release. A person's physical health is a mandatory consideration when assessing the suitability of release under the Bail Reform Act. 18 U.S.C. § 3142(g)(3)(A). A serious deterioration in health while incarcerated may constitute a special circumstance militating in favor of release even in cases involving a presumption of detention. Salerno v. United States, 878 F.2d 317, 317 (9th Cir. 1989). And, even when a court has already determined that pretrial detention is appropriate, a change in circumstances will warrant review of a pretrial detention order. 18 U.S.C. § 3142(f)(2)(B). Beyond the Bail Reform Act, the Eighth Amendment prohibition on "cruel and unusual punishments," includes deliberate indifference to unsafe, life-threatening conditions. See generally, Parsons v. Ryan, 754 F.3d 657 (9th Cir. 2014). "That the Eighth Amendment protects against future harm to inmates is not a novel proposition." Helling v. McKinney, 509 U.S. 25, 33 (1993). "[A] remedy for unsafe conditions need not await a tragic event." Id.

### Procedural History of Defendant's Motion for Release from Custody

On December 13, 2019, the Court granted Mr. Dibee's Motion for Release from Custody. The Government appealed to the Ninth Circuit on December 16, 2019. On December 18, the Ninth Circuit remanded the matter, without conducting a hearing, and ordered Mr. Dibee back into custody. That Order was published by e-mail at 2:18 pm. Defense counsel saw the Order and contacted Mr. Dibee by phone at about 2:45pm. Mr. Dibee turned himself back in before 4:30 that afternoon. On December 23, this Court heard additional argument on pretrial release. On January 29, 2020, the Court denied Mr. Dibee's motion for pretrial release without prejudice. The Court explicitly found that Mr. Dibee does not present a danger to the community. The

Court denied the motion for pretrial release on the basis of flight risk only.  Order and Opinion, ECF 286.

## Supplemental Information Regarding Flight Risk

The Government has argued that Mr. Dibee is a risk to return to Russia where his wife resides.  The Government's argument necessarily focuses motive to flee because the method and opportunity for flight are completely nonexistent.  How Mr. Dibee would return to Russia without first resolving his cases is difficult to imagine.  COVID-19 has made international travel exceedingly difficult.  Nightly news programs regularly feature Americans unable to return to the United States as one flight after another is cancelled.  Even without the travel difficulties created by the COVID-19 pandemic, Mr. Dibee is not a flight risk.  His passport is expired, and he does not have the passport.  Dr. Coles has mailed it and his Russian residence documents to defense investigator Erin Howell.  All of those would be provided to Officer Noe Rios or another agent of the Pretrial Services Office as a precondition for release from custody.  In addition, it appears that Mr. Dibee's residence status in Russia is no longer valid because Russian residency permits—both temporary and permanent—must be re-validated every year.[1]  Mr. Dibee's permit has not been re-validated because he has been outside of Russia for nearly 21 months and for the entire calendar year of 2019.  It is true that Mr. Dibee wants to return to his wife in Russia.  In practice, if he is ever to achieve that goal, he must first resolve the cases against him.  The current settlement negotiations provide a reasonable hope for that result through global resolution of all three cases against Mr. Dibee, this case as well as the cases in Washington and California.

---

[1] See LawyersRussia.com (last updated March 20, 2020) available at https://www.lawyersrussia.com/residence-permit-in-russia.  [Please note: defense counsel intends to locate the specific Russian statute which requires annual reauthorization and provide that citation to the Court.  In light of the public health emergency presented by COVID-19, counsel elected to file this memorandum without that statutory citation.]

The Government has made much of Mr. Dibee's flight from the United States in 2005, but Mr. Dibee's motives are significantly different today. In 2005, Mr. Dibee believed he was facing a minimum of 35 years in prison. Undersigned defense counsel has interviewed attorney Bob Goldsmith who represented Mr. Dibee at that time. On December 9, 2005, Mr. Goldsmith and Mr. Dibee met with an Assistant United States Attorney and two FBI agents regarding the investigation that would soon become Western District of Washington case 3:05-cr-5828. The Government wanted Mr. Dibee to assist the prosecution of alleged co-conspirators. At some point in the discussion, a representative of the Government discussed Mr. Dibee's alleged violation of 18 USC § 924(c)(1)(A), which carried a mandatory minimum of thirty years served consecutively to any other sentence. Mr. Goldsmith believes he also talked to Mr. Dibee about that charge independent of the meeting with the Government. This means that in 2005 Mr. Dibee believed that he was facing a minimum of thirty-five years in prison because Count 1, which alleged Conspiracy to Commit Arson, carries a mandatory minimum of five years to go along with the thirty-year consecutive sentence.

This is not meant to excuse any of Mr. Dibee's conduct, but it does explain his thinking at the time and how his thinking has changed. In December of 2005, Mr. Dibee believed he faced a choice between assisting the Government or going to prison until he was more than seventy years old. Today, Mr. Dibee realizes that the choices presented in 2005 were a false dilemma. No one charged in the Washington case went to prison for anything close to three decades. Six defendants—including Mr. Dibee—were charged in case 3:05-cr-5828. The heaviest sentence in the case was 84 months for Kevin Solondz who had been charged with violating 18 USC § 942. Briana Waters had faced the same charge and was sentenced to 48 months even after going to trial.

Sentences of that length are similar to the sentences of Mr. Dibee's co-defendants in the matter before this Court.  As has been previously argued, Mr. Dibee is firmly planted within a group of co-defendants who did no worse than 60 months.  At the December 13 hearing, defense counsel provided the Court with a table of sentences from this case.  For ease of reference, that table has been provided as an exhibit with this memorandum.  Defendants in this case fall into two easily distinguished groups: defendants with four or fewer charged counts against them and defendants with seventeen or more counts against them.  Mr. Dibee has three counts against him. Defendants with four or fewer counts have received sentences ranging from 37 months to 60 months.  See Exhibit 1 for Motion to Reconsider Pretrial Release.

To be clear, there is no current, formalized plea offer; however, the range of settlement discussions addressing all three cases against Mr. Dibee have consistently contemplated results very different from the 35-year minimum sentence discussed in December of 2005.  Of course, unlike 2005, Mr. Dibee now has almost twenty months in custody to count against whatever sentence he may eventually receive.  In addition, Mr. Dibee believes that he has a potentially persuasive argument for leniency based on post-offense rehabilitation related to his years of good works in the field of green technology.  All of that would be lost if he were to flee.  On top of all of this, Mr. Dibee is also recovering from surgery and in ongoing need of physical therapy to correct his misaligned jaw.

Undersigned counsel has previously argued that Mr. Dibee made a sincere effort to turn himself in after he fled the United States.  Defense counsel has described memoranda detailing multiple conversations between former lawyers for Mr. Dibee and Assistant United States Attorneys.  Additional defense investigation has revealed another way to quantify the extent of Mr. Dibee's efforts to turn himself in.  Undersigned defense counsel now has the billing records

for the law firm of Freedman, Boyd, Hollander, Goldberg, Ives & Duncan of Albuquerque, New

Mexico, which represented Mr. Dibee in his efforts to turn himself in.  That representation

extended for about 38 months, starting on April 13, 2011 and ending on April 7, 2015, then

starting again on August 7, 2015, as Mr. Dibee tried a second time to turn himself in and ending

on October 27, 2016.  The legal fees for the representation totaled just over $73,500, meaning

this was not a passing effort.  Mr. Dibee made a serious attempt to turn himself in.

      Mr. Dibee made this good faith effort in spite of what he perceived as bad faith on the

part of the Government.  While abroad, Mr. Dibee reviewed the charges against him in this

matter.  Count 2 alleges conspiracy to commit arson and destruction of an energy facility.

Second Superseding Indictment, ECF 115 at 27.  Defendant's original Memorandum in Support

of Release Custody detailed the undisputed fact that Mr. Dibee had nothing to do with Count 2.

In conspiracy cases there can often be some debate on whether a defendant was "involved" with

an alleged crime, but, in this case, even the Government's (Omnibus) Sentencing Memorandum,

which names four people as being involved with that incident, makes no mention of Mr. Dibee.

See ECF 10 in case CR 06-60069-AA at 32.  At the hearing of December 13, 2019, undersigned

counsel referred to Count 2 as "bogus."  The Government did not attempt to defend Count 2 at

that hearing.  Consider the impact of Count 2 on Mr. Dibee's thinking as he attempted to turn

himself in.  Agents of the Government had previously told him he will go to prison for more than

thirty years.  Upon reviewing the charges in Oregon, he discovered that the Government had

made a charge against him that was completely unsupported by evidence.  In spite of this, he

attempted to turn himself in.  Perhaps without Count 2, those negotiations could have had a

better chance of success.

As already noted, Mr. Dibee has a burden of production on the question of flight risk. The information provided in the previous seven paragraphs easily meets the burden of presenting "some credible evidence" that Mr. Dibee is not a flight risk. Indeed, the Government cannot meet the ultimate burden of persuasion on this issue. Mr. Dibee is not a flight risk and should be released on house arrest with electronic monitoring at the home of his sister.

### Changed Circumstances Due to the COVID-19 Health Emergency

Much has changed since January 29, 2020, when the Court denied Mr. Dibee's motion for pretrial release. On March 11, 2020, The World Health Organization declared Coronavirus Disease 2019 (COVID-19) a pandemic.[2] On March 13, 2020, Chief Judge Marco Hernandez issued Standing Order 2020-4, postponing all court appearances in the District of Oregon until at least April 27, except for hearings conducted telephonically. On March 16, 2020, the Trump Administration issued guidance recommending that, for the next eight weeks, gatherings of ten persons or more be canceled or postponed.[3] On March 23, 2020 Oregon Governor Kate Brown issued Executive Order 20-12 requiring Oregonians to stay at home under most circumstances and closing many businesses in an effort to reduce the spread of COVID-19. On March 24, 2020 the Oregon Health Authority reported an additional 18 confirmed cases in Oregon, bringing the total to 208, with 8 deaths.[4] Dr. Renee Edwards, chief medical officer at Oregon Health and

---

[2] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) available at https://bit.ly/2W8dwpS.

[3] Sheri Fink, *White House Takes New Line After Dire Report on Death Toll,* THE NEW YORK TIMES (March 17, 2020) available at https://www.nytimes.com/2020/03/16/us/coronavirus-fatality-rate-white-house.html?action=click&module=Spotlight&pgtype=Homepage.

[4] Shane Dixon Kavanaugh, OregonLive, *Coronavirus in Oregon: 3 More Dead as Known Cases Climb to 209, Health Officials Say* (March 24, 2020), available at https://www.oregonlive.com/coronavirus/2020/03/coronavirus-in-oregon-3-more-dead-as-known-cases-climb-to-209-health-officials-say.html.

Science University, has estimated that the number of infected persons in Oregon will double every 6.2 days.[5]

Pretrial confinement creates an ideal environment for the spread of infectious disease.[6] This seems to be especially true in the case of COVID-19.  The social distancing that public health officials advocate as essential to limiting the spread of the disease is simply impossible in jail and prison facilities.  Crowding, inadequate ventilation, and security issues all contribute to the spread of infectious disease.[7]  Hand sanitizer, an effective disinfectant recommended by the Centers for Disease Control to reduce transmission rates, is contraband in jails and prisons because of its alcohol content.[8]  Recent empirical evidence confirms that COVID-19 can and unfortunately will spread quickly in jails and prisons.  In China, officials have confirmed COVID-19 spreading at a rapid pace in Chinese prisons.[9]  In the Daenam inpatient psychiatric ward in South Korea, where conditions of confinement are similar to those at an American jail, 101 out of 103 inmates became infected with COVID-19, and, as of February 29, 2020, seven

---

[5] *See* The Oregonian/OregonLive, *Coronavirus in Oregon: More Nursing Home Residents Test Positive for the Disease* (March 17, 2020), available at https://www.oregonlive.com/coronavirus/2020/03/coronavirus-in-oregon-march-17-1-in-3-counties-record-covid-19-case.html.

[6] Joseph A. Bick, Infection Control in Jails and Prisons, 45 *Clinical Infectious Diseases* 1047, 1047–55 (2007), available at https://doi.org/10.1086/521910.

[7] Michael Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (March 13, 2020) available at https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

[8] Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA JOURNAL (March 13, 2020) available at https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[9] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider, Feb. 21, 2020, available at https://bit.ly/2vSzSRT.

patients had died of complications from the disease.[10]  The same scenario is now unfolding in the United States.  By March 21, 2020, twenty-one inmates and seventeen employees had tested positive for COVID-19 at Riker's Island Jail in New York City.[11]  To address the crisis, New York Mayor Bill de Blasio announced that twenty-three inmates would be released from custody and that additional inmates were also under consideration for release, pending state approval.[12]  Similar steps are being taken elsewhere.  Ohio released more than 200 low-level, non-violent prisoners from its jails on March 16, and is poised to release hundreds more.[13]  The Los Angeles County jail released 600 prisoners and expects to release more.[14]  In Oregon, the Washington County Jail released 60 inmates on March 16, 2020 and plans to release more.[15]

In this time of crisis, the response of Multnomah County authorities has not been reassuring.  While other institutions have demonstrated a degree of transparency regarding the spread of COVID-19 by reporting confirmed cases among inmates and employees, the Multnomah County Sheriff's Office has given no assurances regarding transparency.  The

---

[10] Min Joo Kim, *How a South Korean Psychiatric Ward Became a 'Medical Disaster' When Coronavirus Hit*, THE WASHINGTON POST (February 29, 2020) available at https://www.washingtonpost.com/world/asia_pacific/how-a-south-korean-psychiatric-ward-became-a-medical-disaster-when-coronavirus-hit/2020/02/29/fe8f6e40-5897-11ea-8efd-0f904bdd8057_story.html.

[11] NBC New York, *21 Inmates, 17 Employees Test Positive for COVID-19 on Riker's Island: Officials* (March 21, 2020) available at https://www.nbcnewyork.com/news/coronavirus/21-inmates-17-employees-test-positive-for-covid-19-on-rikers-island-officials/2338242/.

[12] Id.

[13] CNN (March 16, 2020) available at https://www.cnn.com/2020/03/16/us/inmates-released-jail-coronavirustrnd/index.html.

[14] Los Angeles Times (March 16, 2020) available at https://www.latimes.com/california/story/2020-03-16/la-jailpopulation-arrests-down-amid-coronavirus.

[15] Oregonian (March 16, 2020) available at https://www.oregonlive.com/coronavirus/2020/03/oregon-courtsjails-respond-to-coronavirus-washington-county-jail-to-release-60-inmates-court-hearings-seewidespread-delays.html.

Sheriff's Office has posted a website regarding Covid-19.[16]  At that posting, the Sheriff

acknowledges the problem and recognizes the need to reduce the jail population.  "Additional

measures to reduce the spread of COVID-19 in jails may be needed, such as reducing the jail

population through early release or release to pretrial supervision." Id.  However, there is no

mention at that website of any commitment to reporting present or future suspected or confirmed

cases of COVID-19 among inmate or staff at the Inverness Jail, where Mr. Dibee is housed.

Whether there are cases at Inverness now or in the near future, there is no guarantee that the

Multnomah County Sheriff's Office will publicize that information.  The Government and this

Court have a duty to maintain the safety of Mr. Dibee.  That duty cannot be fulfilled when

County authorities have made no commitment to full disclosure of a potential health emergency

at the Inverness Jail.  In addition, the Sheriff's website makes no mention of screening protocols

to prevent jail staff from infecting inmates or for identifying inmates who are already infected.

        This Court should have little to no confidence in the ability of the Inverness Jail to protect

Mr. Dibee.  The nearly sixty-day delay in getting him a physical therapy appointment following

his surgery to correct an injury he received from an assault at the jail demonstrates the limitations

of the Multnomah County Sheriff's Office, and arranging a physical therapy appointment seems

far simpler than protecting a jail population from the spread of COVID-19.

        Mr. Dibee is 52 years old.  While the fatality rate for COVID-19 is highest among the

elderly, the fatality rate for people aged 50 to 59 may be as high as 1.3%.[17]  Of course, even

when not fatal, COVID-19 can cause serious health consequences.  Among symptomatic patients

---

[16] See Multnomah County Sheriff's Office Response to COVID-19 available at
https://www.mcso.us/site/COVID_19.php.
[17] See Worldometer, *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths*, (last
updated February 29, 2020) available at
https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics

from 50 to 59 years of age, COVID-19 requires hospitalization in about 10.2% of cases.[18]  Mr.

Dibee is already recovering from surgery after being assaulted in jail, has lost weight, and is

struggling to gain the weight back because he suffers from a misaligned jaw due to the long

delay in providing him with access to necessary physical therapy.  It is simply awful to think that

his situation could get even worse when there is a readily available alternative.

The best solution is to place Mr. Dibee on house arrest at the home of his sister, Maha

Coles.  Undersigned counsel has conferred with Dr. Coles regarding the safety of her home.  No

one at her home has displayed symptoms.  The last day of school that either of her children

attended was March 13.  The members of the household are practicing social distancing and have

been for about two weeks.  No one in the home has traveled outside the United States recently.

Jeff Coles, the husband of Dr. Coles, is now working remotely and has not traveled for work in

about four weeks.  No one in the home has attended any large public gatherings recently.

Regarding the precautions that she takes as a medical professional, Dr. Coles provided the

following information:

> "Obviously, my work as a physician puts me at increased risk of exposure to
> COVID-19. In an attempt to mitigate the risk from this, Kaiser Permanente of
> Washington has closed all of the satellite clinics to in person care. Work at these facilities
> is now virtual and phone work only. I work four days a week, three of which are virtual
> work at my regular satellite clinic.  The one day a week I do see patients is in a clinic at
> our main facility. Patients are prescreened in this clinic to ensure that they have no
> respiratory symptoms. And even though these patients have screened negative for
> COVID-19 symptoms, we always follow universal precautions with every patient. I also
> wear a mask and wash my hands multiple times per patient visit. Those that have any
> respiratory complaints are seen in a separate clinic by personnel who are wearing full
> personal protective equipment (PPE).  When I arrive home, I change out of the outfit that
> I wore to work, take a shower, and put on fresh clothing. I also routinely disinfect
> commonly touched surfaces. And I use a separate towel from everyone in the house."

---

[18] Imperial College COVID-19 Response Team, *Impact of Non-pharmaceutical Interventions
(NPIs) to Reduce COVID-19 Mortality and Healthcare Demand* at 5 (March 16, 2020) available
at https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-
fellowships/ImperialCollege-COVID19-NPI-modelling-16-03-2020.pdf.

E-mail from Dr. Coles to Defense Counsel, March 22, 2020. The level of detail provided by Dr. Coles speaks for itself.  It is simply not possible for the Inverness Jail to provide a level of medical precautions anywhere near what Mr. Dibee would receive while at the home of his sister.  For the reasons stated and based upon new information and changed circumstances, this Court should grant the request for pretrial release.

 DATED this 25th day of March 2020.          Respectfully submitted,

                                             /s/ Paul Hood
                                             PAUL HOOD, OSB No. 132271
                                             Attorney for Joseph Dibee