BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**GEOFFREY A. BARROW**
Assistant United States Attorney
Geoffrey.Barrow@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 6:06-cr-60011-AA-1 |
| v. | **OPPOSITION TO DEFENDANT'S MOTION TO RECONSIDER DETENTION ORDER** |
| **JOSEPH DIBEE,** | |
| **Defendant.** | |

Defendant moves this Court to reconsider its January 29, 2020, Order (ECF 286) denying his motion for release based not on any errors of fact or law underlying the Order but instead on the speculative prospect of a COVID-19 outbreak at the facility where he is being detained pending trial. Defendant's speculation is both unsubstantiated and unwarranted. There are no known cases of COVID-19 at the facility and no evidence that the facility's staff is unprepared to address such cases if they should arise. Defendant's proposed release to home confinement with his sister, a physician, in Seattle, Washington, the epicenter of the COVID-19 outbreak, could

*increase* his chances of contracting the disease and it would not reasonably assure his appearance and the safety of the community. The Court should deny the motion.

I. **Factual & Procedural Background**

The factual and procedural history of this case is fully set forth in the government's Opposition to Defendant's Release from Custody (ECF No. 269), which is incorporated herein by reference, and this Court's Order (ECF No. 286). In summary, for several years defendant was a member of a conspiracy to commit arson. The conspiracy attempted to influence government policy and business practices by means of violence, sabotage, destruction of property, and intimidation.

Dibee was personally responsible for at least two arsons. In July of 1997, Dibee helped to destroy the Cavel West Meat Packing Plant in Redmond, Oregon, using timing devices he designed and fabricated. Four years later, he helped destroy the Bureau of Land Management's Wild Horse Corrals near Litchfield, California.

Dibee and his attorney met with the government in December of 2005. After hearing the case against him, Dibee destroyed evidence and enlisted a friend to drive him to Mexico. From Mexico City, Dibee flew to Beirut, Lebanon. From Lebanon, he traveled to Syria where he established residence. He eventually moved to Russia where he met and married his wife, who remains in Russia. Neither Syria nor Russia have an extradition treaty with the United States. Dibee remained a fugitive for more than twelve years. He was arrested in Havana, Cuba, traveling on a Syrian passport in August of 2018.

/ / / /

/ / / /

## II. Applicable Law

### A. Standard for Reconsideration of Detention

Pursuant to 18 U.S.C. § 3142(f), a detention hearing may be reopened "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." In seeking to re-open the detention hearing, Dibee relies solely on the COVID-19 outbreak and the travel restrictions associated with the pandemic to establish that he is no longer a flight risk.

### B. Factors for Consideration

A defendant shall be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The government bears the burden of establishing danger to the community by clear and convincing evidence; risk of flight need be proven only by a preponderance of the evidence. *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

Where, as here, there is probable cause to believe that defendant committed an offense enumerated in 18 U.S.C. § 2332b(g)(5)(B), which carries a maximum term of imprisonment of 10 years or more, there exists a rebuttable presumption that no condition or combination of conditions of release will reasonably assure the appearance of the person as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(C). Count 1 of the Second Superseding Indictment charges Dibee with Conspiracy to Commit Arson in violation of 18 U.S.C. § 844(n) and Count 6 charges Dibee with Arson in violation of 18 U.S.C. § 844(i). Both offenses carry a

maximum penalty of 10 years or more and are specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B).

In presumptive detention cases, the burden of proof shifts to defendant to rebut the presumption of dangerousness. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (noting that in terrorism case involving presumption, the presumption shifts a burden of production to the defendant, [but] the burden of persuasion remains with the government). Even if the presumption is rebutted, however, the presumption does not disappear, but continues to carry evidentiary weight. *See Hir*, 517 F.3d at 1086 (The presumption is not erased when a defendant proffers evidence to rebut it; rather the presumption remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)).

If a defendant proffers evidence to rebut the presumption, the Court should consider the following factors to determine if there are any conditions of release that will reasonably assure the appearance of the defendant and the safety of the community:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including (A) the person's character, physical and mental condition, family and community ties, employment, financial resources, criminal history, history relating to drug or alcohol abuse, and record concerning appearance at court proceedings; . . .

(4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

18 U.S.C. § 3142(g) (emphasis added).

**Government's Opposition to Defendant's Motion to Reconsider Detention Order**           **Page 4**

The Federal Rules of Evidence do not apply in pretrial detention proceedings. Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f)(2)(B). Accordingly, both the government and the defense may present evidence by proffer or hearsay. *Winsor*, 785 F.2d at 756.

## III.  ARGUMENT

The defense urges the Court to reopen its detention determination in light of the global COVID-19 pandemic. The Court should decline to do so.

### A.  COVID-19 Concerns Alone Do Not Warrant Release

Defendant cites the speculative possibility of exposure to COVID-19 while incarcerated as grounds for release. The current rate of infection in Oregon correctional institutions where federal pretrial detainees are held is zero. Defendant cites no specific vulnerability to the illness, and other than generalized concerns about in-custody defendants, cites no particularized risk to himself based upon the current custodial environment.

As of March 30, 2020, the Bureau of Prisons reported only nineteen cases among incarcerated inmates nationwide. Those inmates have been isolated and are receiving appropriate medical treatment.[1] To date, there have been *no* confirmed cases at the BOP facilities at Sheridan, and the warden there reports that extraordinary screening procedures have already been implemented.[2]

/ / / /

/ / / /

---

[1] Available at https://www.bop.gov/coronavirus, last viewed March 30, 2020, at 9:42 a.m. reporting COVID-19 positive cases as of March 29, 2020, at 3:00 p.m.

[2] For example, every delivery driver bringing goods to the complex is screened at the entry gate. Their temperatures are taken and they must complete a questionnaire before even being allowed onto prison grounds. Incoming inmates are specifically screened for COVID-19.

**Government's Opposition to Defendant's Motion to Reconsider Detention Order**                                                              **Page 5**

In Multnomah County, where defendant is housed, the Multnomah County Sheriff's Office has taken steps over the past few weeks to mitigate risks of COVID-19.  On March 13, 2020, as stated in a press release from March 18, 2020, the following steps have been taken:

- The Sheriff's Office opened an additional dorm at Multnomah County Inverness Jail Friday, March 13, to allow for better implementation of social distancing guidelines;

- With input from Dr. Michael Seale of Multnomah County Corrections Health and former Tri-County Health Officer Dr. Paul Lewis, enhanced screening measures have been enacted when individuals arrive at jail. This process includes screening for specific symptoms related to COVID-19, travel history and contact history, as well as testing per Oregon Health Authority guidelines and enforcing social distancing.

- Sheriff's Office staff is conducting enhanced facility cleaning — a standard practice during cold and flu season.

"Multnomah County Public Safety Partners Responding to COVID-19" Press Release, March 18, 2020, *available at* https://multco.us/multnomah-county/news/multnomah-county-public-safety-partners-responding-covid-19.  Jail visitations have also been cancelled. Further, local law enforcement has delayed reporting dates and prioritized cases to reduce the potential for crowding at jail facilities.

Jail officials report the Multnomah County Sheriff's Office "is taking proactive steps and implementing temporary measures to ensure the health and safety of our workforce and those we serve during this health emergency, and to preserve long-term viability of law enforcement and jail operations in the county." "Multnomah County Sheriff's Office Response to COVID-19," available at https://www.mcso.us/site/COVID_19.php.

**Government's Opposition to Defendant's Motion to Reconsider Detention Order**                                                                    **Page 6**

Corrections Health has been screening for travel and COVID symptoms on entry to the jail and for any respiratory complaint since the end of January. They now screen everyone at booking and continue daily screening for all incoming individuals for at least the first 14 days of incarceration, and for all individuals with underlying conditions (age >60, insulin-dependent diabetes, cardiovascular disease, pregnancy, etc.) for at least 30 days. The Jail's Classification Unit has set up specialized housing modules so that Corrections Health can further screen new bookings and watch for symptoms through an incubation period before placing them in an open dorm.

To date, there have been *zero* confirmed cases of COVID-19 within MCSO corrections facilities. Tests are being completed based upon public health guidance and Corrections Health screenings for COVID 19 symptoms.

Defendant does not claim to have any conditions that would make him uniquely vulnerable to the COVID-19 virus. The speculative possibility of COVID-19 finding its way into a pretrial detention facility at some point in the future is no reason to ignore the clear and present danger defendant poses to the community, and the clear and present risk of flight he presents if released.

Nothing about the COVID-19 pandemic materially changes the defendant's incentives to flee or mitigate the danger he poses to others. *See* 18 U.S.C. §3142(e)(1). Defendant's belief that incarceration increases his chances of infection—a belief evidenced by his current motion—suggests that his incentives to abscond may have increased. And during a time when community and law-enforcement resources are devoted to fighting COVID-19, it may be easier for a motivated defendant to do so. Nor are COVID-19's risks necessarily a deterrent to flight, for someone, like defendant, facing substantial charges and the likelihood of lengthy incarceration upon his conviction.

Defendant focuses his motion solely on the health risks he and other incarcerated individuals purportedly face from a potential COVID-19 outbreak. The Bail Reform Act, however, prohibits categorical grants or denials of bail that are untethered from an individualized determination of the factors set forth in §3142(g). *See United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). To be sure, the Bail Reform Act instructs the Court to consider a defendant's own "physical and mental health" in determining "whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §3142(g)(3)(A). For example, if a defendant suffers from a serious medical condition that is either incapacitating or requires constant medical care, it may be reasonable to infer that this condition makes the defendant less likely to flee or less of a risk to the community (depending, of course on his past criminal history and the nature of his current offense). But the general existence of a pandemic does not have significant bearing on whether a non-symptomatic defendant's actual "physical and mental health" weighs in favor of release. Defendant's pointing to a potential COVID-19 outbreak at Inverness Jail is certainly not sufficient to justify reconsidering the Court's ruling that release on conditions would be inadequate to ensure defendant's appearance or to protect "the safety of any other person and the community." 18 U.S.C §3142(e)(1).

### B. New Information Demonstrates Defendant's Release Poses a Danger to the Community and a Risk of Flight

The Court's January 29, 2020, Order found that defendant did not pose a danger to the community because there was no evidence that defendant had engaged in violent activity since the offense conduct in 2001. The government conceded that it had very little information about defendant's behavior during the twelve years he was a fugitive. Evidence that was not

**Government's Opposition to Defendant's Motion to**                      **Page 8**
**Reconsider Detention Order**

previously presented to the Court supports a finding that defendant's release would pose a danger to the community and that he remains a risk of flight.

On June 11, 2019, while detained at FCI Sheridan, Dibee called a number identified as belonging to his sister, Dr. Maha Coles. A transcript of the call is attached as Exhibit A.[3] The call was placed from a monitored line and includes a standard warning that the call is being recorded. Dibee tells the woman on the line to "listen to me in Arabic and do not say anything in English." He explains that he has been accused of allowing someone to use his phone, and he is concerned that he will be prohibited from making calls for three months. He further complains that "the woman who accused me she is playing with my mails." Dibee gives a very direct order, "I want you to sue her personally not the FCI but for her only I want to destroy her house. I want to ruin her life. understand what I mean?" Dibee explains his approach:

> They don't understand unless you are violent with them so I want to let them understand. I want to sue them and let them pay me 4 million dollar and then we will see where the things are going to work.

Exhibit A at 2. Later, he characterizes the conduct as criminal and says that he wants to see the employee arrested. Despite his representation to this Court that he changed during his years as a fugitive, here, Dibee is expressly urging violence. He seeks to destroy the life of a BOP employee over a disciplinary matter.

In the call, Dibee also talks about traveling to Russia. In the context of the female contacting Dibee's lawyer, she asks if she should call "Paul." Dibee responds, "I am going to kick him at the beginning of the month but when I go to Russia I am going to kick him."

---

[3] In the call, Dibee speaks with another individual on unrelated topics. That portion of the call has been redacted.

**Government's Opposition to Defendant's Motion to**                **Page 9**
**Reconsider Detention Order**

This evidence, which was not previously available to the Court supports detaining defendant as a danger to the community and a risk of flight.

### C. Defendant's Release Plan Would Not Assure His Appearance or Protect the Community

Defendant's proposed release plan to home confinement with his sister, a physician in Seattle, Washington, could *increase* his chances of contracting the disease and it would endanger others. King County, Washington has 2,161 reported COVID-19 cases and 141 deaths.[4] Dibee's sister's work as a physician unfortunately puts her at a greater risk of exposure than the general population.

Moreover, release on conditions such as home monitoring poses a risk to the Probation Officers who must install location-monitoring tools, which is a fact the Court should consider "given the current recommendations regarding implementation of social distancing." *United States v. Martin*, 2020 WL 1274857, *4 (D. Md. Mar. 17, 2020). Also, in the current climate, irresponsible social habits will endanger the community. *See Hir*, 517 F.3d at 1088 ("community," within the meaning §3142, is not necessarily confined to local geography). All Washington residents are currently subject to a stay-at-home order to avoid the spread of COVID-19. *See* Washington Governor's Proclamation 20-25 (March 23, 2020). Oregon residents are subject to similar restrictions. *See* Oregon Governor's Executive Order No. 20-12 (March 23, 2020). These rules, though enforceable by peace officers, rely largely on voluntary obedience. A person who ignores such admonitions and rules could increase infection rates, leading to severe illness and death. If defendant were released from custody, he would likely be

---

[4] Available at https://www.doh.wa.gov/emergencies/coronavirus, last viewed on March 30, 2020, at 10:09 a.m.

**Government's Opposition to Defendont's Motion to Reconsider Detention Order**  **Page 10**

transported by U.S. Marshals from Inverness Jail to the courthouse in downtown Portland. Presumably, a member of Dibee's family would drive from Seattle to Portland to pick him up and return to Seattle. This travel could jeopardize the health of numerous people.

Defendant concedes that he wants to return to Russia, but suggests that COVID-19 travel restrictions and the fact that he has surrendered his passport to his attorney would prevent him from fleeing. Def. Mem. at 4. While Dibee may not be able to fly from Portland to Russia, nothing would prevent him from illegally crossing the border, securing a new Syrian passport and booking an available flight.[5] He clearly has the resources and, having fled once before, the ability to do so.

Defendant's speculative concerns regarding an outbreak at Inverness Jail should not be permitted to overwhelm the careful balance of factors prescribed by Congress in determining whether he is properly subject to pretrial detention. *See Martin*, 2020 WL 1274857 at *3 (rejecting similar argument, and noting that "as concerning as the COVID-19 pandemic is," the court's consideration "must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act."). Dibee's release plan would not assure his appearance or the safety of the community. He should remain in custody pending trial.

Dated: March 30, 2020                                    Respectfully submitted,

                                                         BILLY J. WILLIAMS
                                                         United States Attorney


                                                         s/ *Geoffrey A. Barrow*
                                                         GEOFFREY A. BARROW
                                                         Assistant United States Attorney

---

[5] There is a Syrian embassy in Vancouver, Canada, approximately 140 miles from Seattle.

**Government's Opposition to Defendant's Motion to Reconsider Detention Order**                                    **Page 11**