Paul Hood, OSB 132271
PO Box 66876
Portland, OR 97290
Telephone: 541-513-7545
paul@paulhoodlaw.com

Attorney for Defendant Joseph Dibee

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. 6:06-cr-60011-AA-1 |
| Plaintiff, | ) ) ) | **DEFENDANT'S REPLY TO GOVERNMENT OPPOSITION TO MOTION TO RECONSIDER DETENTION ORDER** |
| v. | ) ) | |
| JOSEPH DIBEE, | ) ) | |
| Defendant. | ) ) | |

    Joseph Dibee, through his attorney, Paul Hood, provides this Reply to the Government's Opposition to Defendant's Motion to Reconsider Detention Order.

    The Government does not dispute that it has a duty to maintain the safety of Mr. Dibee, but the Government makes no constructive suggestion toward fulfilling that obligation. The Government argues that Mr. Dibee is not "uniquely vulnerable" but suggests no criteria for determining who is uniquely vulnerable category and who is not. It appears that the phrase "uniquely vulnerable" is just a euphemism for mortality rate. Certain people are more likely to die from COVID-19 than are other people, but what rate of death counts as "uniquely vulnerable" according to the Government? The Government gives us no suggestion for how to the answer to that question.

As was previously noted in the Defendant's motion to reconsider, Mr. Dibee is 52 years old, and the death rate for people aged 50 to 59 years may be as high as 1.3%. Another study places the number at 0.6% (six-tenths of one percent).[1] The Government does not dispute that the higher number may be accurate, but, for the sake of argument, suppose the lower number is correct. Six-tenths of one percent equates to about 1 death in 167 cases (while 1.3% would be about 1 in 77 cases). It is monstrous to think that Government will prevail on an argument that 1 in 167 is not sufficiently "vulnerable." If there were a jail where 1 out of every 167 inmates died while in custody, the District of Oregon would bar that jail from being used to house detainees awaiting trial. In spite of that simple truth, the Government refuses to recognize the risk to Mr. Dibee or the Government's own duty to address that risk.

We do not have to wait for Mr. Dibee to be harmed before acting to prevent the harm. That is common sense. Fortunately, it is also the law. The Eighth Amendment protects against future harm to inmates. Helling v. McKinney, 509 U.S. 25, 33 (1993). This point was made in the Defendant's Memorandum, and the Government does not deny it, but still the Government argues that the risk to Mr. Dibee is "speculative." Just as with the phrase "uniquely vulnerable," there is no suggestion of a criterion or threshold for determining how speculative is too speculative. COVID-19 is highly contagious, even when an infected person shows no symptoms. Jails cannot practice social distancing and regularly bring in new inmates. Instead of "speculative" risk, the better adjective appears to be "inevitable" risk.

---

[1] Imperial College COVID-19 Response Team, *Impact of Non-pharmaceutical Interventions (NPIs) to Reduce COVID-19 Mortality and Healthcare Demand* at 5 (March 16, 2020) available at https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/ImperialCollege-COVID19-NPI-modelling-16-03-2020.pdf.

On March 30, 2020, the Government's Opposition stated, "The current *rate of infection* in Oregon correctional institutions where federal pretrial detainees are held *is zero*." ECF 304 at 5 (emphasis added). Four days later, that claim is now demonstrably false. As of April 2, 2020, two deputies at the Marion County Jail have tested positive for COVID-19.[2] As of that same date, at least eight inmates at the Marion County Jail were detained on United States Marshal holds. All eight of those inmates have been charged federally in the District of Oregon, all in the Portland Division.[3] The Government's claim that there were zero infections as of March 30 was probably inaccurate when it was made and should have been phrased as zero "confirmed" infections, rather than the more ambitious wording presented at ECF 304. In any event, the news out of Marion County demonstrates how quickly this situation is changing.[4]

As to the Inverness Jail, where Mr. Dibee is held, the Multnomah County Sheriff has made no commitment to disclosure of confirmed cases. We also do not know what percentage of staff and inmates at Inverness have reported symptoms or been tested or when the tests occurred. The Government's Objection references various steps taken by the Multnomah County Sheriff's

---

[2] Maxine Bernstein, OregonLive, "2 Marion County jail deputies test positive for coronavirus; test ordered for 320 inmates," (April 2, 2020) available at https://www.oregonlive.com/coronavirus/2020/04/two-marion-county-jail-deputies-have-tested-positive-for-coronavirus.html.

[3] The Marion County Sheriffs Office publishes the jail inmate roster here: https://apps.co.marion.or.us/jailrosters/mccfi_mcso.htm. That roster identifies inmates detained on United States Marshal holds. The names of the eight inmates have not been listed in this motion in order to protect their privacy. The names of those inmates and their associated federal court case numbers will be provided to Assistant United States Attorney Geoffrey Barrow to permit the Government to confirm this information.

[4] Since the Government's filing on March 30, 2020, there has also been a confirmed case in the Oregon State Penitentiary. Noelle Crombie, OregonLive, "Prison Employee is First Confirmed Coronavirus Case in Oregon Department of Corrections," (April 1, 2020) available at https://www.oregonlive.com/coronavirus/2020/04/prison-employee-is-first-confirmed-case-of-covid-19-in-oregon-department-of-corrections.html.

Office such as, "enhanced screening measures" when individuals arrive at the jail to check for specific symptoms. ECF 304 at 6. Of course, asymptomatic individuals can spread the disease. The Government's Objection also references "enforcing social distancing." Id. There is no explanation for how that is supposed to done in a jail. In spite of the Government's assertion of zero infections, there could be cases at Inverness now, just as there were cases at Marion County, in spite of the Government's assertion. The infection rate in Oregon continues to grow. The Government concedes that jails are a unique incubator for infectious disease, as was already addressed in Defendant's prior memorandum. Even the Multnomah County Sheriff's Office agrees on its website that some inmates may need to be released in order to address the pandemic, as was also addressed in the Defendant's earlier memorandum. In fact, the Government's Opposition references the March 18, 2020 press release Sheriff's Office that acknowledged the need to reduce jail crowding. ECF 304 at 6.

As was noted in Defendant's Memorandum in Support of the Motion to Reconsider Release from Custody, 10.2% of symptomatic adults aged 50-59 require hospitalization. The 1-death-in-167-cases ratio applies to patients treated in hospitals, but the Multnomah County Sheriff's Office had difficulty scheduling an initial physical therapy appointment for Mr. Dibee and finally did so only after this Court placed enormous emphasis on the issue. Even then, the appointment was late by nearly two months. There is simply nothing about this situation that inspires confidence in the ability of the Inverness Jail to prevent COVID-19 infections, detect those infections, or get an inmate to a hospital in a timely fashion once that inmate is infected. Even if an inmate is transported to a hospital, a wave of COVID-19 patients from jails could overwhelm hospital resources.

///

Case 6:06-cr-60011-AA-1
Defendant's Reply to Government Opposition to Pretrial Release pg. 4

**Supplemental Information Regarding Danger to the Community**

The Government has produced a transcript of a phone call from June of 2019. The recording of that call has not been produced to the Defendant, and the transcript is in dispute. Even to a non-Arabic reader, the English translation appears odd. For example, Mr. Dibee is supposed to have said (in Arabic), "Yeah, and every day same as the other day, but today is a better harder."[5] ECF 304-1 at 2. Mr. Dibee is also supposed to have said (in Arabic) the equivalent of, "They don't understand unless you are <u>violent</u> with them, so I want to let them understand. <u>I want to sue them</u> and let them pay me 4 million dollar [sic] and then we will see where the things are going to work."[6] ECF 304 at 9 (emphasis added). If the correct interpretation is "violence," why is Mr. Dibee talking about a lawsuit as his way of being "violent" with them?

Keeping in mind that the Government has not produced a recording of this phone call, undersigned counsel believes that the Arabic word translated into "violence" is instead accurately translated as "compulsion" or "force" in the non-violent and non-physical sense of the word "force." The better interpretation for an English-language reader would be: "They only understand when you make them understand, so I am going to make them understand. I am going to sue them." That's not a threat of violence. The Government describes Mr. Dibee as "expressly urging violence." ECF 304 at 9. That is simply false. He is expressly urging a lawsuit, as is his legitimate right.

Elsewhere, the interpretation presented by the Government seems simplistic and lacks appreciation for idioms or figurative language. Consider this statement, also attributed to Mr.

---

[5] Bluntly, this reads as if it were created using Google Translate.
[6] "[W]e will see <u>where</u> the things are going to work" reads like Google Translate.

Dibee, "I want to destroy her house" in reference to the person that Mr. Dibee wanted to sue. The Government seems to be treating this as a literal statement, without considering that in some cultures the concept of "house" can mean a person's standing in the community or reputation. Again, this is not a threat of violence. It's a threat to sue. Put differently, if a plaintiff said, "I am going to sue the pants off of you," the Government would not treat that statement literally.

It is accurate that Mr. Dibee wanted to sue a member of the staff at FCI Sheridan who worked in the mailroom. He is angry in that call because he believes that a mailroom staffer is intentionally interfering with his mail. See ECF 304-1 at 3. It is also true that there were repeated problems with Mr. Dibee's mail and communications both in and out of FCI Sheridan. Undersigned counsel personally experienced those problems during this representation. In one instance, members of Mr. Dibee's family had sent visitor permission applications to FCI Sheridan and had confirmed that those applications arrived at the institution's post office box, but the applications had not been delivered to the counselor who would review them even more than a week after the applications arrived. Finally, out of concern that the applications would not be processed in time for the planned visits, undersigned counsel drove copies of the completed applications to FCI Sheridan, hand delivered them to the reception desk, and asked the officer at reception to radio for the counselor who would review them. The reception officer did. The counselor immediately called the reception desk officer on the phone, while undersigned counsel was still present. The counselor picked up the applications and had them reviewed and approved that day. In other words, the problem appears to have been the failure of mailroom staff to deliver the applications.

In addition, Dr. Maha Coles, the sister of Joseph Dibee, repeatedly sent letters to her brother while he was at FCI Sheridan, and the letters never arrived. When Mr. Dibee did receive

mail it often took about two or three weeks longer than the amount of time required for mail to arrive to other inmates. Mr. Dibee began to document the problems, including getting written statements from fellow inmates to use in a possible lawsuit against FCI Sheridan. After the phone call to his sister, when he discussed that issue, his cell was searched and the statements were seized. The pattern of violations continued. Mr. Dibee had accumulated case notes and legal research. When he was transferred out of Sheridan to the Columbia County Jail those materials were not sent with him and did not get to him for about three months. Even when they did arrive, his reading glasses were not included, and those glasses have never been adequately replaced because he has different correction requirements in each eye.

To the knowledge of undersigned counsel, the staff of Columbia County never complained that Mr. Dibee threatened them or created problems while in their facility. In addition, on December 20, 2019, when Mr. Dibee was transferred back to the Multnomah County Detention Center (where he had been before going to Sheridan initially), the Multnomah County Sheriff's Office, Classification Summary Report, stated, "Dibee has had no issues while in MCSO custody but due to the Sheridan remarks stating institution safety concerns and threatening staff he will start GEN DC. 7 day review."

**Risk to Return to Russia**

The Government also argues flight risk based on an interpretation of one sentence from the phone conversation. The translation seems to be another example of poor work by the interpreter. Mr. Dibee allegedly said (again in Arabic), "I am going to kick him at the beginning of the month but when I go to Russia I am going to kick him." Undersigned counsel has discussed this statement with Assistant United States Attorney Geoffrey Barrow. The Government seems to believe the statement expresses an intention to return to Russian and then

fire undersigned counsel from the case. (Shortly after the statement, Mr. Dibee allegedly says, "I might ask for another lawyer, or 2, or 3, or 4 lawyers." ECF 304-1 at 3.) Assume Mr. Dibee was frustrated with undersigned counsel, why return to Russia and then request substitute counsel. As translated, it makes little sense, and the Government wants the Court to rely upon it, even though the Defendant has not been given the recording of the call.

The Government argument on flight dwells on the desire of Mr. Dibee to return to Russia, but ignores the practical reality of that process. According to the Government, Mr. Dibee will manage to leave electronic monitoring, enter Canada secretly (since he has no valid travel documents), get to a Syrian embassy and apply to renew his passport (while evading authorities) then wait around for the passport to be renewed (while still evading authorities) and eventually board an international flight out of Canada even though he is wanted by the US Government. Even then, there is still the Russian residency problem, which the Government Opposition ignores. Mr. Dibee's residence permit for Russia is no longer valid. A Russian residence permit is cancelled, if the permit holder is outside Russia for more than six months. Russian Federal Law 115-FZ Article 9-11.[7] Mr. Dibee has been in custody in the United States since August of 2018. He will have to re-apply for residence. To do that successfully, Mr. Dibee cannot have an INTERPOL warrant. Mr. Dibee is available to testify on this point.[8] He is also available to testify that when he initially applied for his Russian residency permit, there was no INTERPOL warrant. It is true that Mr. Dibee wants to return to Russia. To do that, he knows he has to resolve this case.

---

[7] The law has been published in English here: https://www.wto.org/english/thewto_e/acc_e/rus_e/WTACCRUS58_LEG_102.pdf.
[8] Under current circumstances, it is extremely difficult to get an affidavit from Mr. Dibee; however, he could testify by phone, if the Court has a hearing on this issue.

## Transportation Risk

The Government has also argued that transporting Mr. Dibee and placing him on electronic monitoring creates a COVID-19 infection risk, with Mr. Dibee as the carrier apparently. This is a bit strange, since the Government also contends that there are no infected people in the Inverness Jail, where Mr. Dibee is housed. Leaving aside the inconsistency, undersigned counsel asked Dr. Maha Coles, the sister of Mr. Dibee and the owner of the home where he would reside, if granted pretrial release to address the issue of COVID-19 and transportation. This was Dr. Coles response:

> "Protocol for transport from Inverness jail back to Seattle to minimize risk of exposure or transmission of COVID-19 to the surrounding community.
>
> 1. Transport vehicle will be disinfected including door handles, steering wheel, gear shift, radio controls, etc.
>
> 2. Seats will be covered in plastic.
>
> 3. A Plastic partition will be set up between front and back seats.
>
> 4. The car will be fueled up before picking up Joe so that we will not need to stop to get gas on the way home.
>
> 5. We will use bathrooms before heading back to Seattle.
>
> 6. I will have masks and gloves for everyone in the vehicle. I will also have plenty of disinfectant wipes and hand sanitizer for everyone in the car.
>
> 7. Joe will sit in the back with a mask on and I will sit in the front with a mask on with the plastic partition between us to limit potential exposure.

8. Inverness Jail is about 180 miles from my house. It takes approximately three hours to make the drive (without traffic which should be minimal at this time). We have no planned stops along the way.

9. If a stop is needed to use the restrooms, we will be wearing masks, liberally washing hands (according to CDC guidelines), using hand sanitizer and disinfectant wipes to clean any areas that are touched.

10. Any property that Joe brings home with him will be put into large plastic bags to avoid direct contact with the inside of the vehicle.

11. Upon arrival at my house, the shoes will be left in the entrance area/staging area. We will each go to separate bathrooms to take showers and change into clean clothing. The bathrooms will then be sanitized and the clothes and the towels that are used will all be washed on the sanitize cycle.

12. Joe will be in quarantine within my house according to CDC guidelines until he is cleared or he develops symptoms."

<u>E-mail from Dr. Coles to Defense Counsel</u>, April 1, 2020.

Dr. Coles also commented on the COVID-19 risk at the Inverness Jail as compared to the risk of COVID-19 spread due to pretrial release of Mr. Dibee:

> "First of all, let me say that the Government's presumption that they would be able to control all the points of potential exposure in a jail that has two expansion units that hold up to 75 inmates each, 150 inmates total, and a staff of up to 400 corrections deputies, sergeants, and lieutenants that manage day to day operations at the facility-any number of whom are going in and out of the facility is simply unrealistic. (The above numbers we're taken from the Multnomah County Sheriff's Office website).

"Let's assume that the number of inmates and who they are stays unchanged. Looking only at the staff members that go in and out of the jail on a daily basis, you have to consider their risk of potential exposure outside of the jail. That potential risk arises from everywhere that they have been outside of the jail and everyone they have come in contact with. I am sure many of the staff members have family, partners, and or roommates. Anyone of those people could transmit the virus to correctional staff. That staff member could then bring the virus into the jail. And they would not have to be showing overt signs to do it. We know that asymptomatic individuals can spread the virus. The more people you have going in and out of the facility, the greater the risk.

"You can try to argue that the staff is following all of the CDC guidelines to prevent exposure. But do you really know for sure that every one of them is washing his/her hands for a full 20 seconds? Are they washing their hands between every single inmate that they touch and every new surface that they encounter? Are they disinfecting all of the high traffic surfaces they come in contact with between every single individual that touches it? You can argue that they are wearing gloves. But if they are not changing the gloves out between every single surface that they touch, the gloves themselves can transmit the virus. And I know for a fact that they are not wearing gloves, or at least not wearing them all the time. I witnessed this on a video visit with my brother. There was a guard walking in the background who was not wearing gloves and had no mask on. In addition, he was wearing his uniform. Does he have a fresh clean uniform that he puts on every single day that he comes to work? If not, that uniform is a potential vector.

"If the virus gets into the jail, there will be no stopping it. Inmates don't have access to hand sanitizer. They're not wearing masks. (For goodness sake, they have

communal razors in the jail!) It's unrealistic to believe that you can control every single thing that they touch and to ensure that cleansing is happening after each individual touch. There is a reason that many of the prisons around the country are releasing inmates. They are fully aware that it would be a catastrophe to have the virus make it into a prison. It would be like taking a lighted match and dumping it into a tub of gasoline. There is no way it's not going up in flames.

"The government's position is that they could better control risk in that environment then I would be able to control the risk in my household of four. I am a trained medical professional whose job it is to deal with this pandemic. I have only three other people living in my household that have been in social Isolation for the past 3 to 4 weeks. All the high traffic surfaces in the house are cleaned and disinfected multiple times a day. Everyone in the house is trained how to properly wash hands. Clothing is worn once and washed. I check daily for symptoms that could indicate exposure and/or infection.

"Statistically speaking, the Government's argument that they are better able to control their environment than I am my environment doesn't hold water. I am controlling a much smaller environment with a much smaller population. And I have had years of training and practice in the area of infection control."

E-mail from Dr. Coles to Defense Counsel, April 1, 2020.

Undersigned counsel has previously quoted Dr. Coles to this Court. Her statements demonstrate knowledge and detailed precautions. The Government argues that transportation is a risk and placing an electronic monitoring device on Mr. Dibee is a risk. Those risks are much

less significant than the risk of COVID-19 inside the jail.  Even the Multnomah County Sheriff's Office recognizes that release of some inmates may be necessary.

## Conclusion

There is a safer and readily available alternative to detention: house arrest with electronic monitoring.  The Court has already found that Mr. Dibee is not a danger to the community.  Nothing presented by the Government in its Opposition should change that.  As to the issue of flight, Mr. Dibee has presented more than enough evidence to rebut the initial presumption in favor of detention and preclude the Government from meeting the ultimate burden of persuasion on that issue.  Finally, the Government and this Court have a duty to protect Mr. Dibee.  At the start of this week, the Government told this Court that there were no COVID-19 infections at any Oregon correctional institutions housing federal detainees.  It took four days for that claim to become obsolete.  The risks of detention for Mr. Dibee are real and will get worse.  Words like "speculative" and not "uniquely vulnerable" will not change that reality.

DATED this 3rd day of April 2020.    Respectfully submitted,

/s/ Paul Hood
PAUL HOOD, OSB No. 132271
Attorney for Joseph Dibee