MATTHEW SCHINDLER, OSB# 964190
501 Fourth Street #324
Lake Oswego, OR 97034
Phone: (503) 699-7333
E-mail: mas@schindlerdefends.com

ATTORNEY FOR DEFENDANT JOSEPH DIBEE

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>                                    Plaintiff,<br><br><br>                          vs.<br><br><br>JOSEPH DIBEE,<br>                          Defendant(s)<br>                          . | Case No. 6:06-cr-60011-AA-1<br><br>**DECLARATION OF MATTHEW SCHINDLER IN SUPPORT OF MOTION FOR RELEASE** |

The undersigned, as counsel for Mr. Dibee, does swear under penalty of perjury that the following is true:

1. On June 11, 2020 I was appointed successor counsel to represent Mr. Dibee under the Criminal Justice Act. *See* ECF #322.

2. Mr. Dibee is charged with various federal crimes relating to a series of arsons that took place in the late 1990s and early 2000's. *See* ECF #115.

3. The posture of the case, as well as the underlying facts and circumstances, are well known to the court.

4. This declaration supplements Mr. Dibee's now pending motion for release. It sets forth the circumstances surrounding Mr. Dibee's infection with COVID-19 at the Multnomah County Inverness Jail.

5. On February 24, 2020 the Court ordered the USM to place Mr. Dibee in a segregated medical unit because of a serious assault that left Mr. Dibee with a broken jaw and lingering health issues. ECF #293. The Court further ordered that he not be moved from there without an order from the Court. *Id.*

6. On April 24, 2020 after denying Mr. Dibee's motion for release, the Court ordered the government to provide a status report each week about COVID cases in the jail. *See* ECF #314. Each week since then, the government has reported that there were no COVID-19 cases at Inverness Jail. *See e.g.* Status Reports of October 5, 2020, October 26, 2020, December 21, 2020.

7. On December 3, 2020 Chief Deputy Chad Gaidos of the Multnomah County Sheriff's Office sent an email per the Court's order of February 24, 2020. In it he stated that they anticipated needing to move Mr. Dibee out of the medical unit because:

    a. "Mr. Dibee has been identified as someone who is located in our medical infirmary, who no longer needs a higher level of care

than can be provided in any of our other housing units. Infirmary beds are essential to our ongoing efforts to ensure the safety of our staff and adults in custody during the COVID-19 pandemic, as each of them provides negative air pressure cells used for respiratory isolation.

b. With an increase of community cases in Multnomah County, and the State of Oregon, we have seen a higher demand for respiratory isolation cells needed to effectively isolate and monitor our population. To ensure we have adequate capacity in our infirmaries, we are moving anyone who does not have a medical need for these highly specialized rooms to more appropriate housing units. As such, Mr. Dibee will be placed on a classification move list to be moved from Dorm 18 to our Protective Custody dorm at the Inverness Jail."

8. The Court responded by holding a status conference the next day, December 4, 2020. *See* ECF #363. During that hearing, the Court expressed skepticism about the need to move Mr. Dibee. Given that the government had been reporting there were no coronavirus cases at Inverness Jail, I raised the question of why the MCSO suddenly needed beds in the medical unit. Because the government was unable to answer

that question, another status conference was scheduled for the following Monday, December 7, 2020. *See* ECF #364.

9. On December 5, 2020 I spoke with a member of Mr. Dibee's family who informed me that the jail was preparing to move him.

10. At December 7 status hearing, the Court again expressed significant doubts about the Sheriff's office claimed exigency and the need to move Mr. Dibee immediately. The Court noted it had worked in a hospital and a hospital room could be turned over very quickly. The U.S. Marshal reported that MCSO intended to move him to a protective custody dorm generally populated by sex offenders who are vulnerable in general population. The Court stated that it did not feel that was an appropriate placement because of the assault that Mr. Dibee had previously suffered in a dormitory setting. Despite the Court's questioning and doubts, it was clear to me that the Court had no power to prevent the Multnomah County Sheriff's office from transferring Mr. Dibee to a different unit despite its order.

11. I spoke to Mr. Dibee on December 7, 2020 after the status conference and told him to expect to be moved. He responded by saying that they had him pack up all his personal items that morning and then suddenly

they told him he would not be moving after all. He was still in the medical unit at the end of the day.

12. I contacted the U.S. Marshal and explained that Mr. Dibee could not go into an open dorm like the protective custody unit because he had more discovery than they would allow.

13. On December 11, 2020 I received an email from Supervisory Deputy Nordquist of the U.S. Marshals Service reporting that Mr. Dibee would be moved because "the medical unit at Inverness had reached capacity today and it was deemed necessary to move Mr. Dibee to accommodate more medically acute inmates in the infirmary."

14. I called Mr. Dibee on December 11, 2020. He reported that he had been moved into a mental health unit. It is a unit where the inmates are segregated from the general population because serious mental illness renders them unsuitable for placement in general population. He further reported that, contrary to what the MCSO had represented to the Court, the medical unit was not at capacity when he was moved. In Mr. Dibee's opinion, based on numerous discussions with the inmates and staff, there was one "medically acute" inmate in medical at the time. Mr. Dibee told me that the occupants of the medical unit were as follows:

    a.  A female inmate detoxing off drugs

    b.  A female inmate without any apparent medical issues.

    c.  A man with an injured thumb

    d.  An empty cell.

    e.  A man requiring a CPAP machine.

    f.  Another man requiring a CPAP machine.

    g.  Mr. Dibee.

    h.  Another CPAP user about to be released on bail.

    i.  A very sick inmate.

    j.  An inmate who injured his Achilles heel playing basketball.

Based on his contact with the other residents and staff of Dorm 18, the medical unit, Mr. Dibee believed that only one inmate was seriously sick at the time he was moved. I reported this information to the U.S. Marshal's service, the USAO, and the Court on December 15, 2020 because it was inconsistent with MCSO statements to the Court.

15. When Mr. Dibee was removed from the medical unit, an egg crate pad that he had been relying on to sleep was taken from him. When Mr. Dibee asked to be allowed to continue to use it because of his back problems, the corrections officer responded by throwing it away. Mr. Dibee was given the impression that the MCSO did not appreciate being

told what to do by a federal judge. An inmate in the mental unit, Kyle Shinn, helped Mr. Dibee move his discovery boxes. Mr. Shinn, like Mr. Dibee is being held under a detainer from the U.S. Marshals and a federal court order. He was in a cell next to Mr. Dibee and he too now has COVID-19.

16. In the other cell next to Mr. Dibee was an inmate named Leon Willisflowers. Obviously experiencing an acute mental health crisis, Mr. Willisflowers screamed for help all night long, night after night. He too would soon be diagnosed with COVID-19.

17. On December 13, 2020 Mr. Dibee began to feel ill. He was experiencing chills, chest tightness, and a severe headache. This was three days after his transfer into the mental health unit. He reported this to medical personnel who took his temperature and claimed he did not have a fever. Nothing was done to isolate him or further treat him.

18. On December 17, 2020 I spoke with Mr. Dibee and learned for the first time that he was ill. I immediately expressed concern to him about Coronavirus which he discounted. Mr. Dibee told me he had a history of sinus infections and he suspected he had a sinus infection. Given the reports that we have been receiving from the government that there was no coronavirus in the jail, it was difficult to see how he could get

COVID-19 inside an isolated, locked down prison unit. For that reason, I did not contact the medical at Inverness immediately.

19. On December 18, 2020, the Court held another status conference, the first since Mr. Dibee's move. *See* ECF #368. I reported to the Court, the AUSA, and the USM that Mr. Dibee had developed respiratory illness and that he had a history of such illnesses. The Court again admonished the USM and the MCSO for moving Mr. Dibee without a true exigency to justify it. "You can't kid a kidder," the Court said. I also explained that we had not been able to resolve the issue of how to have client review discovery at Inverness.

20. That same day, December 18, 2020, defense investigator Erin Howell spoke to Mr. Dibee on the phone. He reported that he had a respiratory infection. Later that day he was moved back into the medical unit less than seven days after being moved out of it.

21. On December 19, 2020 investigator Jay Myers had a non-contact visit at Inverness Jail with Mr. Dibee who reported that he was ill and likely had a respiratory infection. Mr. Myers told me that Mr. Dibee "looked like shit." It had now been three days since Mr. Dibee first reported his illness to the jail and there had been no effort to test him for COVID-19.

22. On December 19, 2020 I received a text message from Dr. Maha Coles saying that Mr. Dibee had lost his sense of taste and smell. I immediately emailed the Court, the U.S. Marshal, the AUSA, and Captain Morrison at Inverness Jail to report this obvious sign of COVID-19. I also immediately called the medical unit at Inverness to report the same to them. I provided them Mr. Dibee's name and SWIS#812133 and told the nurse that Mr. Dibee had been experiencing respiratory illness since before December 17, 2020 and today had lost his sense of taste and smell. I was told that they would deal with it immediately.

23. On the morning of December 20, 2020, I spoke with Mr. Dibee who confirmed that he had lost his sense of taste and smell. When I asked him what the jail had done besides put him in quarantine, he told me the jail had done nothing. He had not been tested for COVID-19. I immediately emailed the Court, the U.S. Marshals, the AUSA, and Captain Morrison to report the same. Later that afternoon the Court responded by email that it had been expecting to hear the result of a test not that a test had not been given.

24. On the morning of December 21, 2020, defense investigator Erin Howell spoke with Mr. Dibee at Inverness Jail. She reported that he

was struggling to speak because he was coughing so badly. According to Ms. Howell, Mr. Dibee sounded horrible. Mr. Dibee reported that he had been tested for strep throat, but not coronavirus. At 11:49 a.m. I sent an email to the Court, the U.S. Marshal, and the AUSA to inform them that Mr. Dibee had still not been tested. At 11:56 the U.S. Marshals responded that "Mr. Dibee will be seen by the provider this morning to be evaluated. I am waiting on the results of that appointment." The Court responded via email: "I certainly hope the evaluation includes a COVID-19 test or I will have to order one."

25. Upon learning from investigator Howell that day that Mr. Dibee had not been tested for coronavirus, Dr. Maha Coles called me and demanded to know why her brother had not been tested despite his obvious symptoms.

26. The U.S. Marshal provided me an update at 2:28 p.m. on December 21, 2020 saying that he did not know if a COVID test would be administered. He further stated that Inverness Jail had confirmed that it had no "active COVID cases." Mr. Dibee was tested for Coronavirus during the afternoon of December 21, 2020. 50 hours passed between when I reported to Jail medical that Mr. Dibee lost his sense of taste and smell and when they finally tested him.

27. The morning of December 22, 2020 I spoke with Mr. Dibee at Inverness Jail. He reported that he had tested positive for COVID-19. He was very ill. He felt exhausted and was suffering from skull crushing headaches. We spent some time discussing scenarios that could encompass how an individual held in isolation inside the jail with no coronavirus cases could wind up positive for coronavirus. We could arrive no other conclusion than the negligence of the jail. Mr. Dibee's infection with a life-threatening respiratory virus could only have resulted from corrections staff's failure to follow the written protocols and guidelines established by the county health department. It was also evident that since Mr. Dibee had been reporting a respiratory illness since at least December 13, 2020 there was no rapid testing being done at the jail. Rapid testing is done in bus stations in Indonesia and not a single rapid test has been performed in the Multnomah County Jails since this pandemic began. From my perspective, the only reason that Mr. Dibee was tested was because the Court threatened to order it. Since I had been receiving weekly reports that there were no coronavirus cases at Inverness Jail, we further inferred that Mr. Dibee must be the first positive coronavirus test at Inverness Jail in the entire pandemic. Neither of us could believe that was true unless no one was being tested.

28. I immediately emailed the Court, the USM, and the AUSA to inform them that Mr. Dibee had tested positive for COVID-19. At that point, I had heard nothing about the test from anyone in government. I asked that Mr. Dibee be released. There was no response from the Court or the government.

29. On December 23, 2020 I spoke with Mr. Dibee who reported he was having difficulty breathing and was wracked by coughing fits. He was developing sores in his mouth and throat. At night he would awaken repeatedly in a panic because he thought he was choking. The only medication he had was his asthma inhaler. Mr. Dibee said that he was told that both the prisoners in the cells next to him had tested positive. He said no one from the Jail had spoken to him about it. There had been no effort to identify how he got sick or from whom.

30. Having heard nothing from the Court or the government, at 3:52 p.m. on December 23, 2020 I sent the Court an email explaining Mr. Dibee's current status, the severity of the illness Mr. Dibee was experiencing, and my frustration about how this could have occurred absent negligence by the jail.

31. On December 23, 2020 the Oregonian published an article about Mr. Dibee's positive COVID-19 test that raised questions about the Jail's

commitment to the protocols outlined by county health officials in sworn declarations.

32. At 7:45 p.m. on December 23, 2020 the government said it would submit a report with the facts "we are able to report" by the close of business the next day. No report was submitted to me.

33. Later on the night of December 23, 2020, apparently in response to the Oregonian article, I received an anonymous email from an employee of Inverness Jail reporting gross deviations from the county health department's COVID-19 written protocols for the jail that had been occurring since the beginning of the pandemic. Employees were not wearing masks. Employees would sit in small enclosed rooms eating and drinking and talking without masks for extended periods of time. Inmates were allowed on walk for periods longer than called for under the guidelines while the officers were without masks. The employee further reported that "MCSO is afraid of you, afraid of the media coverage you are able to obtain and afraid of the liability Mr. Dibee holds while in custody." That same night at 9:13 p.m. I sent an email to the Court, the AUSA, and the U.S. Marshal providing them this information.

34. This is the last time I was able to speak to Mr. Dibee. Since then various members the defense team have been told that Mr. Dibee is not on walk and to call back later. When we call back later, we are told to call back later, and then when we call back later, we are told to call the next day. The explanation that I have received several times is that this is the result of a shortage of available staff due to illness.

35. On December 24, 2020 defense investigator Howell spoke to Mr. Dibee over the phone. Mr. Dibee reported he had a sore throat and a respiratory infection. Mr. Dibee was coughing throughout the duration of the phone call. Mr. Dibee said he has had a severe headache for 2 weeks straight. Mr. Dibee said he sleeps most of the day. He is exhausted. He continues to experience serious respiratory problems and coughing fits that last hours. The jail is currently giving him decongestant and ibuprofen. He is only allowed out of his cell for 15 minutes a day for phone calls. Mr. Dibee reported that when he was in the mental health unit, they did not have hot water to wash their hands, only cold. According to Mr. Dibee, nobody in the mental health unit has access to hand sanitizer. Mr. Dibee never saw any of the common phones be sanitized. Since he has been diagnosed with COVID, nobody has attempted to talk to Mr. Dibee about who he had contact with. There

has been no contact tracing. Prior to being diagnosed, Mr. Dibee told staff he was sick, and he asked for medicine. He told the staff that he was sick in a way that included COVID symptoms to the staff. They gave him Tylenol. He was sick for several days in the mental health unit exposing others to COVID. Mr. Dibee reported that during that time in the mental health unit he had contact with between 6-10 people at a time. The 6-10 people would rotate in and out of that unit because that is where incoming inmates with mental health issues would be triaged. Mr. Dibee guesses that he may have had contact with 30 or more different people during those days. The Jail has made no effort to figure out who they are.

36. On December 24, 2020 the Court responded to my various emails for the first time since December 20, 2020 by saying: "Judge Aiken wanted both you and AUSA Barrow to know that she has been in contact with Deputy Nordquist about Mr. Dibee's medial concerns. The Judge wished to communicate to you that she has been assured that Mr. Dibee is receiving appropriate care and will be transported to a hospital for more intensive medical attention should that become necessary. Specifically, the Judge is aware that Mr. Dibee is now being housed in the medical unit at Inverness which was and is her preference.  Judge

Aiken expects that he will remain there until his current medical concerns have been completely resolved and a hearing can be held on this matter.  The Judge will continue to monitor the situation closely. [The clerk] will contact you regarding a hearing to be set sometime next week.  Judge Aiken also asked me to convey that she has dealt with numerous motions for compassionate release throughout the pandemic and takes COVID-19 concerns very seriously."

37. On December 27, 2020, I received additional emails from an anonymous employee of the jail. In one the person said: "Covid testing was being done prior to Mr. Dibee's positive test results but it was being done on only symptomatic inmates and it took at least 5 days to get the results." If this is true, the it is completely inconsistent with what was being reported to the Court: there are no active cases at the jail. The email went on to state: "As far as I know, Corrections Heath was not using the rapid testing until after Mr. Dibee's positive results. This is what I was being told by many different Corrections Health employees over a several month period.  Corrections Health employees were frustrated about the lack of rapid testing." The employee provided specific examples of at least three senior corrections deputies currently out on leave because of Coronavirus as well as specific examples of

failures to wear masks by employees with the tacit approval of supervisors. The employee also noted that for the first-time since the pandemic additional cleaning supplies arrived immediately after Mr. Dibee tested positive. The employee noted that the first rapid tests began to be used immediately in the aftermath of Mr. Dibee's positive test and the ensuing attention from the media. I have not provided all the information from this employee because they have repeatedly expressed concern over retaliation and the possibility that they could be identified by the very nature of the information.

38. On December 28, 2020 investigator Erin Howell was able to contact Mr. Dibee again for the first since Christmas eve. He continues to be extremely ill and experiencing respiratory distress.

39. On December 29, 2020 the Court contacted me to set a hearing for January 6, 2020 at 11 am.

Respectfully submitted under penalty of perjury on December 30, 2020.

*s/Matthew Schindler*
Attorney for Joseph Dibee, OSB#964190