KARIN J. IMMERGUT, OSB #96314
United States Attorney, District of Oregon
KIRK A. ENGDALL, OSB # 81215
STEPHEN F. PEIFER, OSB # 74252
JOHN C. RAY, OSB # 72319
Assistant United States Attorneys
701 High Street
Eugene, Oregon 97401
(541) 465-6771

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CR 06-60069-AA |
| | ) | Case No. CR 06-60070-AA |
| v. | ) | Case No. CR 06-60071-AA |
| | ) | Case No. CR 06-60078-AA |
| JOSEPH DIBEE, aka "Seattle," | ) | Case No. CR 06-60079-AA |
| CHELSEA DAWN GERLACH, aka | ) | Case No. CR 06-60080-AA |
| "Country Girl," | ) | Case No. CR 06-60120-AA |
| KENDALL TANKERSLEY, aka | ) | Case No. CR 06-60122-AA |
| "Sarah Kendall Harvey," | ) | Case No. CR 06-60123-AA |
| DANIEL GERARD MCGOWAN, aka | ) | Case No. CR 06-60124-AA |
| "Sorrell", and "Jamie," | ) | Case No. CR 06-60125-AA |
| STANISLAS GREGORY MEYERHOFF, | ) | Case No. CR 06-60126-AA |
| aka "Country Boy" and "Jack," | ) | |
| JOSEPHINE OVERAKER, | ) | **GOVERNMENT'S** |
| aka "Maria, | ) | **SENTENCING** |
| JONATHAN MARK CHRISTOPHER PAUL, | ) | **MEMORANDUM** |
| aka "J.P.," | ) | |
| REBECCA RUBIN, aka "Kara," | ) | |
| SUZANNE SAVOIE, aka "India," | ) | |
| DARREN TODD THURSTON, | ) | |
| KEVIN TUBBS, aka "Bob" and "Dog," | ) | |
| NATHAN FRASER BLOCK, aka "Exile" and | ) | |
| "Hassan," and | ) | |
| JOYANNA L. ZACHER, aka "Sheba" and | ) | |
| "Sabina," | ) | |
| Defendants. | ) | |

Page 1  -  **Government's Sentencing Memorandum**

**EXHIBIT 2**
**Page 1 of 150**

The United States of America, by Karin J. Immergut, United States Attorney for the District of Oregon, and Kirk A. Engdall, Stephen F. Peifer, and John C. Ray, Assistant United States Attorneys, hereby submits the following sentencing memorandum in the above-entitled cases.

## I. INTRODUCTION

### A.    <u>Status of Case</u>

All of the above-named defendants have been charged in a superseding indictment by a federal grand jury.  On July 20 and 21, 2006, defendants Chelsea Dawn Gerlach, Kendall Tankersley, Stanislas Gregory Meyerhoff, Suzanne Savoie and Kevin Tubbs each entered pleas of guilty to separate informations charging them with conspiracy, in violation of 18 U.S.C. § 371, and multiple counts of arson, in violation of 18 U.S.C. § 844(f) and (i).  Defendants Meyerhoff, Gerlach and Tubbs also pleaded guilty to destruction of an energy facility in violation of 18 U.S.C. 1366(a).[1]  Additionally, defendant Darren Todd Thurston pleaded guilty to conspiracy, in violation of 18 U.S.C. § 371.[2]  Sentencing has been set in May 2007 for each of these defendants.

On October 9, 2006, defendants Daniel Gerard McGowan, Jonathan Mark Christopher Paul, Joyanna L. Zacher and Nathan Fraser Block entered pleas of guilty to conspiracy, in violation of 18 U.S.C. § 371, and multiple counts of arson (except Paul, who pleaded guilty to

---

[1]  On December 14, 2006, Gerlach and Meyerhoff also entered pleas of guilty to eight counts of arson in an indictment which had been transferred to Oregon from the District of Colorado.

[2]  On January 8, 2007, Thurston also pleaded guilty to conspiracy and arson in an indictment which had been transferred to Oregon from the Eastern District of California.

EXHIBIT 2
Page 2 of 150

only one count), in violation of 18 U.S.C. § 844(i).  Sentencing for these defendants has been set in June 2007.

**B.**    **Format**

This case involved a wide-ranging conspiracy over an extended period of time with numerous and different participants at various times.  The nature of the conspiracy, the overt acts committed in furtherance of same, and the co-conspirators are best understood if discussed in a comprehensive fashion, as opposed to piecemeal with respect to each defendant.  Because of this, the United States is submitting this single sentencing memorandum, with individual sections for each defendant.

## II.  STATEMENT OF FACTS

**A.**    **Background**

Between December 25, 1995, and October 15, 2001, at least 20 different arsons and attempted arsons and the destruction of a BPA high voltage tower occurred in five western states, causing property damage in excess of $40 million.  Despite extensive multi-agency investigative efforts, these crimes remained unsolved until the government was able to secure a cooperating witness who knew about and indeed was a participant himself in many of the events.  The identity of this individual has now been released.  He is Jacob Jeremiah Ferguson, 34.

Once Ferguson began cooperating, the government used him pro-actively to gain corroboration of his statements regarding each of the events.  Specifically, he was asked to wear a "body wire" and to seek out and engage other known participants in the events in an attempt to secure recorded statements from them with respect to their participation.  Different meetings were arranged, at different times, with Kevin Tubbs, Stanislas Meyerhoff, Kendall Tankersley,

Page 3  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 3 of 150

William C. Rodgers (now deceased), Daniel McGowan, Jonathan Paul, Darren Thurston and Chelsea Gerlach.  As a result, recorded incriminating statements were obtained from many of these individuals, which led to their arrests and indictment.  These initial arrests occurred in early December 2005 and led, in turn, to further cooperating witnesses and later arrests.

Information from the cooperating witnesses not only identified the perpetrators of all the above arsons and attempted arsons and the destruction of a BPA high voltage tower, but also disclosed the existence of a group of persons calling themselves "the Family," acting loosely under the mantles of the "Animal Liberation Front" and the "Earth Liberation Front" (ALF/ELF).  In so doing, they conspired with each other to influence the conduct of government, business and private citizens by means of violence, sabotage, widespread destruction, and intimidation.  It was also learned that these individuals took elaborate steps to avoid discovery of their criminal acts, which they termed "actions."  These steps included careful planning, wearing gloves, masks and dark clothing to disguise their appearance during the perpetration of their crimes, using "clean rooms" while constructing incendiary devices, concealing or destroying evidence, using code words and numbers, code names and nicknames when communicating among themselves, producing or obtaining false identification documents to conceal their true identities, fleeing to foreign countries to avoid detection and arrest, and maintaining an intricate web of secrecy and security within their own ranks, even to the point of not discussing events with each other.

The so-called "Book Club" is an example of the elaborate means they took to avoid detection.  Nine of the co-conspirators attended a series of five Book Club meetings held in four different states in which they received instruction about numerous subjects which would assist

Page 4  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 4 of 150

them in their underground criminal enterprise.  These meetings were held in Eugene, Tucson, Santa Cruz, Olympia, and Sisters.  Examples of classes being taught included lock picking, reconnaissance of targets, computer security, encrypted messaging, and manufacture of mechanical and electrical timing devices used to initiate incendiary devices.

The participants kept these meetings secret by holding them in different states and using a code system to communicate among themselves outside the meetings.  They shared e-mail addresses in which members wrote draft messages and never sent them, but shared them in the draft file.  People were expected to check this e-mail site frequently, and the messages were supposed to be deleted after a week.  This coding system started with using a series of numbers and a chosen book (hence the name, the "Book Club") to code and decode the messages, and progressed into using PGP encryption software to keep their messages confidential.

While at each of the meetings, the attendees were expected to explain how they arrived, what countermeasures they used to avoid detection, and what alibi and alias they were using as cover for the meeting.  This extraordinary "wall of silence" is what kept their identity from being discovered by law enforcement for such a long time.

Ultimately, this "wall" crumbled.  One by one the perpetrators, faced with the prospect of lengthy prison sentences, began to tell of their and others' involvement in the numerous acts of arson and destruction, more specifically described below.

Page 5  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 5 of 150

B.        <u>Criminal Acts</u>

**1.  Dutch Girl Dairy arson, Eugene, Oregon, December 25, 1995**



**Participant:**

Kevin Tubbs

During the night of December 24, 1995, Kevin Tubbs assembled three incendiary devices and walked to the Dutch Girl Dairy, located at 885 Grant Street, Eugene, Oregon, to start a fire. The incendiary devices were two one-liter plastic bottles filled with a flammable liquid and a timing device, consisting of paper matches wrapped around an incense stick which was placed into a fuel-soaked kitchen sponge.  When Tubbs arrived at the location, he climbed a chain link fence, which had the barbed wire cut, and made entry into the site.  Tubbs placed one device on each of three trucks and ignited them.  Prior to igniting the incendiary devices, Tubbs spray-painted "A.L.F.," "Go Vegan" and "Dairy = Death" on other trucks.  Tubbs left the facility and returned to his residence.

On December 25, 1995, at approximately 4:09 a.m., security guard Matthew Rhodes discovered the fire in one of the trucks and tried to extinguish it.  After emptying three fire extinguishers, Rhodes was able to put the fire out.  The Eugene Fire Department arrived and extinguished another truck which was on fire.  The third incendiary device was discovered in the

Page 6  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 6 of 150

wheel well of a third truck (see above photo). The device had failed to function. The Eugene

Police Bomb Squad responded to the scene and rendered the incendiary device safe. The two

other incendiary devices had ignited and caused over $15,000 damage to the two trucks.

**2. Detroit Ranger Station arson and attempted arson, Detroit, Oregon, October 28, 1996**





**Participants:**

Jacob Ferguson

Josephine Overaker

 

In the early morning hours of October 28, 1996, Phillip Ray Adams, a paper carrier with

*The Statesman Journal*, was delivering papers on his route when he observed a U.S. Forest

Service (USFS) truck on fire in the parking lot of the Detroit Ranger Station. Subsequent

investigation determined this to be an arson fire. Graffiti, including the words, "Earth Liberation

Front," were spray-painted on several trucks and some of the walls of one of the USFS

Page 7  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 7 of 150

buildings.[3]  The damage to the trucks and the buildings was approximately $21,500.  Two days later, a second incendiary device was found on the roof of one of the office buildings at the Detroit Ranger Station.  That device had failed to function.

Jacob Ferguson and Josephine Overaker were responsible for the arson and attempted arson at the Detroit Ranger Station.  Approximately 10 days prior to the arson, Ferguson and Overaker traveled  to "Anpo," a special use permit area in the Mount Hood National Forest where environmental protesters were residing.  On the way their vehicle broke down near Detroit, where Overaker made several phone calls from a pay telephone booth, in which she left an address book and some papers.  These were subsequently discovered and turned over to law enforcement.  With the help of toll records, investigators verified phone calls made to locations in Eugene where Overaker resided and to an auto parts store in search of a part for the disabled vehicle.  Because their vehicle could not be repaired at the time, Ferguson and Overaker obtained a ride from Detroit to Anpo.

After spending some time at Anpo, Ferguson and Overaker made two incendiary devices which they planned to use to set fire to the Detroit Ranger Station in Detroit, Oregon.  They placed the devices in backpacks, and then got a ride with Elisha Dimatteo to Detroit.  Ferguson and Overaker asked Dimatteo to stop at a state park across the street from the Detroit Ranger Station.  Ferguson and Overaker transported the incendiary devices in their backpacks while Dimatteo waited for them in the car.  Overaker helped Ferguson onto the roof of one of the buildings of the ranger station and handed him one of the devices, which he placed on the roof.  Overaker lit the incense sticks and handed them to Ferguson, who placed them on the device on

---

[3]  This was the first time an arson in the United States was attributed to ELF.

Page 8  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 8 of 150

the roof.  Ferguson and Overaker placed the other device in the back of one of the USFS pickup trucks.  They also spray-painted the graffiti on the trucks and walls of the building.  In addition to "Earth Liberation Front" and the anarchist "A," the graffitti read, "STOP RAPING OUR FORESTS U.S.F.S."  They then ran back to the car but did not tell Dimatteo what they had done.  Dimatteo then drove them to Eugene.

### 3.  Oakridge Ranger Station arson, Oakridge, Oregon, October 30, 1996



**Participants:**

Jacob Ferguson
Kevin Tubbs
Josephine Overaker

In the early morning hours of October 30, 1996, Russell Toney, a newspaper carrier, was making deliveries on his route when he observed a glow of fire and smoke emanating from the Oakridge Ranger Station.  He reported the fire by calling 911 on his cell phone.  Investigation determined it to be an arson fire, caused by the introduction of gasoline which was subsequently ignited near the ranger station's computer room.  Damage was estimated to be $3,316,150 to replace the building, and $1,758,039 for the contents, for a total loss of $5,074,189, in addition to a vast amount of lost research material.

Page 9  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 9 of 150

Jacob Ferguson, Kevin Tubbs and Josephine Overaker were responsible for the arson at the Oakridge Ranger Station.  The site was selected because of their familiarity with it during their opposition to the Warner Creek timber sale.  Ferguson and Tubbs had disrupted a timber auction there sometime earlier, and Ferguson had also been involved in gluing locks and spreading compost at the ranger station on an earlier date.  As a result he and Tubbs knew the ranger station lacked security and would be an easy target.

The three of them drove to Oakridge in the Subaru borrowed from Elisha Dimatteo.  On the way, they stopped beside the road on Highway 58 near a "Welcome to the Willamette National Forest" sign.  The components of the incendiary devices had already been assembled.  Ferguson poured fuel into the jugs and placed them in backpacks.  They got back inside, and Tubbs drove the vehicle.  He parked across the street from the ranger station on a dead-end gravel road and remained in the car as a lookout.  Ferguson and Overaker ran with the backpacks across the street and to the back of the ranger station.  Ferguson placed one incendiary device in a recycling dumpster at the southwest corner of the ranger station.  He placed the other device on the outside of one of the walls.  Overaker was supposed to but did not spray paint graffiti on the walls of the ranger station.  She and Ferguson ran back to the car, and on the way, Ferguson threw nails onto the driveway in an attempt to slow down responding emergency vehicles.  They then drove west on Highway 58 and stopped at the Lowell Bridge, where they discarded in the reservoir the gloves they had worn during the arson.  They drove on back roads to Eugene and slept at Tubbs' house.  The next day, Ferguson purchased new tires for the Subaru and discarded the old tires at various locations.  They did not tell Dimatteo about her vehicle being used in the arson.

Page 10 - **Government's Sentencing Memorandum**

EXHIBIT 2
Page 10 of 150

## 4.  Cavel West arson, Redmond, Oregon, July 21, 1997



**Participants:**

Jonathan Paul

Jennifer Kolar

Joseph Dibee

Kevin Tubbs

Jacob Ferguson

Cavel West was a horse meat processing plant located at 1607 S.E. Railroad Blvd. in Redmond, Oregon.  Purchased in 1988, it was owned by Velda NUSA Corporation, Zele, Belgium, whose principal business was exporting horse meat to Europe.

On July 21, 1997, at approximately 4:00 a.m., Michael Swift, a Franz Bread route salesman, was loading his delivery vehicle parked behind the bread store in Redmond.  He looked up and saw flames and smoke coming from the Cavel West plant.  Running into the Franz store, he called 911 dispatch and reported the fire.

Within minutes, the Redmond Fire Department responded to the fire.  Redmond Police Officer Larry Prince, the first law enforcement officer to arrive at the scene, videotaped a portion of the fire with his dashboard camcorder.  Subsequent investigation determined this to be an arson fire, caused by introduction of an incendiary device containing an ignitable liquid.  Two other incendiary devices had also been placed at the facility but did not function.  The buildings at Cavel West were completely destroyed, with the loss estimated to exceed the insured value of

Page 11  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 11 of 150

$1,211,388.76.  A few days after the fire, a communique was issued attributing responsibility for the arson to the Animal Liberation Front.

Approximately four months before the arson, Kevin Tubbs surveilled and selected Cavel West as a target and recruited others to join him in the crime.  About a week before the fire, Tubbs and Jacob Ferguson met Jonathan Paul, Joseph Dibee and another person to conduct a "dry run" in preparation for the arson.  Tubbs and Ferguson drove to Central Oregon in Tubbs' Dodge van, registered under the false name of Ron Calloway, to look for a staging area.  They found a site on BLM property near Redmond.  Once there, they were joined by Paul, Dibee and another person, all of whom got into Tubbs' van and drove to Cavel West for the dry run.

As the agreed upon date grew closer, the other person advised she would be unable to participate.  Paul then recruited Jennifer Kolar, a girlfriend from Colorado, to participate in the arson, and reimbursed her for her travel.  Once she arrived, Kolar and Paul purchased numerous bars of a glycerine type soap, which they cut into small pieces.  They added the soap to a fuel mixture of gasoline and diesel, mixed the ingredients in blenders into a gel, and tested it at Paul's house in Williams, Oregon.  Dibee was responsible for preparing the timing devices.

The night of the arson, Ferguson and Tubbs met Paul, Kolar and Dibee in Eugene to discuss their plan.  Tubbs drove his van and Paul drove his Blazer to a staging area west of Redmond.  Everyone dressed in dark clothing, ski masks, dark shoes and gloves, and then dug a large hole in which to bury their clothes after the crime.  They got into Tubbs' van and drove to Cavel West, leaving Paul's vehicle at the staging area.

Tubbs dropped everyone else off near the McDonald's restaurant.  Tubbs, Paul and Ferguson each had radios.  Ferguson, Paul, Kolar and Dibee crossed the railroad tracks, with

Page 12  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 12 of 150

Ferguson carrying buckets of fuel, and Dibee had the timing devices. Dibee began drilling holes behind the refrigeration units, using nearby noise to muffle the sounds of the drill. He poured ignitable liquid into the drilled holes, stuffed rags into the holes and placed buckets under the rags. Three separate incendiary devices were placed in and around the buildings. As Dibee was preparing one of the incendiary devices, it ignited prematurely, causing them to abandon the remainder of their plan.

They all ran back to the van, drove to the staging area, took off their clothes, shoes, masks and gloves and put them in the previously-dug hole, poured muriatic acid on them, and covered the hole with dirt. As they were leaving the area, they concealed their tire tracks by sweeping them with branches.

Tubbs wrote the communique at a public library and sent it to Craig Rosebraugh in Portland and to the ALF press office. In addition to detailing how the arson was committed, the communique bragged that the event "would bring to a screeching halt what countless protests and letter writing campaigns could never stop." It boasted that $1,000,000 in damages resulted and "the entire plant is currently closed and out of operation!"

### 5.  Burns BLM Wild Horse Corrals arson, Burns, Oregon, November 30, 1997



**Participants:**

Jacob Ferguson

Kevin Tubbs

Josephine Overaker

William Rodgers

Rebecca Rubin

At approximately 8:00 a.m. on Sunday, November 30, 1997, Wendy Catterson, a BLM livestock handler, arrived at the BLM Wild Horse Corrals near Burns, Oregon, to feed the horses.  She observed a new lock on the main gate, and another lock which had been cut open lying on the ground nearby.  Minutes later, Lester Duke, another BLM employee, arrived to assist Catterson.  He also saw the lock which had been cut off and observed that a new one had replaced it.  Unable to enter the corrals area, both got into Catterson's pickup and drove to her residence to use the telephone.  She called Dean Bolstad, the BLM Burns District Wild Horse Specialist, who told her to cut the new lock off the gate.  On their way back to the corrals at approximately 8:45 a.m., Catterson and Duke noticed smoke and observed the barn on fire.  Catterson contacted the police.  Once entry was gained into the corrals, she observed the fire was smoldering with just a few flames remaining.  A Burns Police Department reserve officer and tracker responded to the scene and determined that at least one vehicle had been used and at least four persons had entered the corrals facility.   Fire investigators determined this to be an arson fire, caused by several incendiary devices in the barn.  The damage was estimated at $120,987.61

EXHIBIT 2
Page 14 of 150

for the equipment and $72,110.69 for the building, for a total of $193,098.30.

Jacob Ferguson and Josephine Overaker chose the Burns BLM Wild Horse Corrals because they had read an article about an auction of wild horses in which some buyers would adopt the horses and sell them at a higher price to slaughterhouses.  Ferguson recruited Joseph Dibee, who agreed to make the timers for the incendiary devices.  Ferguson, Overaker and Tubbs were to obtain the buckets and fuel for the devices.

Shortly before the arson was to occur, Dibee left a message for Ferguson that he would not be able to participate.  William Rodgers (now deceased) and Rebecca Rubin were recruited at the last minute, and they obtained the necessary items to make the timing devices.[4]

On the day of the arson, Ferguson, Tubbs, Overaker, Rodgers and Rubin traveled to a staging area near Burns, where they assembled the incendiary devices and checked the radios they would be carrying.  They then drove to the BLM Wild Horse Corrals facility and dropped off Ferguson approximately a mile away.  Ferguson hiked to the corrals and observed the front gate was locked.  He cut the lock with bolt cutters and radioed the others in the van to drive into the corrals.  Once inside, Overaker, Rodgers and Rubin got out and carried the devices and buckets with them.  Tubbs drove the van out of the area, and parked about a quarter mile away, awaiting a radio call to return.

Ferguson, Overaker, Rodgers and Rubin proceeded to set up the incendiary devices, which were placed at three locations in the barn and at two other locations, next to and inside a new tractor parked near the barn.  During this same time, they opened the corrals and released

_____

[4]  William Rodgers was initially charged by complaint in this case but committed suicide while in custody awaiting transportation back to Oregon.  Dibee, Overaker and Rubin are fugitives.

Page 15  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 15 of 150

the horses. As they left the facility, Ferguson placed a new lock on the access road gate so as to impede the first responders. They then radioed Tubbs, who picked them up in the van and drove to the staging area. There they buried their clothes, shoes and bolt cutters, after first pouring acid on them.

Tubbs later wrote the communique, attributing the arson to ALF/ELF. The communique gave details of how the crime occurred and stressed it was an effort "to help halt the BLM's illegal and immoral business of rounding up wild horses from public lands and funneling them to slaughter." Accusing BLM of "hypocrisy and genocide against the horse nation," the communique demanded, "The practice of rounding up and auctioning wild horses must be stopped. The practice of grazing cattle on public lands must be stopped."

**6. USDA APHIS and ADC arsons, Olympia, Washington, June 21, 1998**



**Participants:**

Jacob Ferguson

Kevin Tubbs

William Rodgers

Joseph Dibee

Josephine Overaker

Page 16 - **Government's Sentencing Memorandum**

EXHIBIT 2
Page 16 of 150

On June 21, 1998, buckets of fuel were placed outside the Forest Land Mangement Center, 9701 Blomberg Street SW, Olympia, Washington, which housed offices of the U.S.D.A. Animal Plant Health Inspection Service (APHIS).  At approximately 2:39 a.m., the buckets ignited and fire spread to the building.  The fire caused an estimated $1,200,000 damage to the building and contents.

Kevin Tubbs, Jacob Ferguson, William Rodgers, Joseph Dibee and Josephine Overaker were responsible for this arson.  Prior to June 21, 1998, all of them participated in research, planning, and reconnaissance for the arson, which was planned to be done simultaneously with an arson at the U.S.D.A. Animal Damage Control (ADC) facility, also in Olympia.  Dibee was to provide the timer and igniter assembly for the incendiary devices.  Ferguson, Tubbs and Overaker acquired five-gallon plastic buckets and fuel.  The buckets were wiped down to remove fingerprints.

On the afternoon before the arson, Overaker was arrested in Tacoma for shoplifting items for that night's arson.  Tubbs and Ferguson attempted unsuccessfully to contact Dibee to call off the action as a result of Overaker's arrest.  The van used by Ferguson and Tubbs broke down. Overaker met up with Rodgers, and they drove to where Ferguson and Tubbs were with the broken-down van.   They told Overaker she could not participate in the arson because of her arrest and she should go somewhere to establish an alibi.  Dibee failed to show up with the timing devices, so Rodgers, Ferguson and Tubbs decided to perform the arson without them. Rodgers purchased some fire-starters for igniting the buckets of fuel.  Tubbs drove Rodgers and Ferguson to the facility.  Rodgers and Ferguson took six five-gallon buckets of fuel to the building.  Tubbs acted as a lookout down the street in the vehicle.  Rodgers and Ferguson placed

Page 17  -  **Government's Sentencing Memorandum**

**EXHIBIT 2**
**Page 17 of 150**

the buckets of fuel in three separate areas on the exterior of the building.  Rodgers ignited a fire-starter and threw it into a bucket of fuel.  Ferguson ignited a fuel-soaked sponge and threw it into a bucket of fuel. Rodgers and Ferguson radioed Tubbs, who then picked them up.  They disposed of their clothing in a trash container in Olympia and then went back to the disabled van where they met Overaker.

On June 21, 1998, and within hours of the APHIS arson, two incendiary devices were placed outside the ADC facility in Olympia.  At approximately 4:20 a.m., each device functioned and ignited the buildings.  Each device consisted of two five-gallon plastic buckets filled with a mixture of gasoline, heavy petroleum distillate and detergent.  The devices had sophisticated delayed igniters in which an alarm clock functioned to complete an electric circuit between a 9-volt battery and a lamp filament, which heated up and ignited matches.  The fire spread to a wood fiber/paraffin solid fuel mixture and then to the bucketed fuel.

The fire caused approximately $500,000 in damage to the ADC building and contents. A communiqué from ALF and ELF claimed responsibility for setting both fires.  The communique claimed the targeted government research facilities "make it a daily routine to kill and destroy wildlife."  Accusing the government of taxpayer-funded "genocide," the communique demanded, "This war on wildlife and nature must end!  We will not stop until it does."

Page 18  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 18 of 150

**7. Redwood Coast Trucking Company arson, Arcata, California, September 21, 1998**



**Participants:**

Jacob Ferguson

Kendall Tankersley

Prior to September 20, 1998, Jacob Ferguson and Kendall Tankersley discussed plans to burn logging trucks at two different sites near Arcata, California. Ferguson tried to arrange the arson to vouch for Tankersley with other cell members. On September 20, 1998, Ferguson and Tankersley traveled to Arcata in a pickup truck that belonged to Kevin Tubbs. Late at night, they stopped at the Redwood Coast Trucking Company at 2210 Peninsula Drive, Arcata, California. Ferguson poured fuel from large containers into 11 one-gallon plastic milk jugs while Tankersley held them. Ferguson took three timing devices, consisting of wooden matches wrapped around an incense stick and held in place by a rubber band, and placed them into a single sponge soaked with fuel. Ferguson then placed the sponge in the handle of the one-gallon plastic milk jugs. Ferguson placed one incendiary device in each of ten logging trucks located in the parking lot, while Tankersley placed another device in one logging truck. After Ferguson ignited the timing devices, he and Tankersley left the business.

On September 21, 1998, at approximately 2:50 a.m., a night watchman for Redwood Coast Trucking Company discovered a logging truck engulfed in flames and called the Arcata

Page 19 - **Government's Sentencing Memorandum**

EXHIBIT 2
Page 19 of 150

Fire Department.  The burning truck was located in the middle of a row of 12 logging trucks, and was completely destroyed, causing a loss of $40,000.  Upon searching the other 11 logging trucks in the row, investigators discovered ten of them had single incendiary devices placed in them.  All of the devices failed to function.

## 8.  Wayne Bare Trucking Company arson, Arcata , California, September 21, 1998

<b>Participants:</b>

**(No Photo Available)**    Jacob Ferguson

Kendall Tankersley

During the night of September 20, 1998,  Jacob Ferguson and Kendall Tankersley left the Redwood Coast Trucking Company after placing incendiary devices in 11 logging trucks and traveled to the Wayne Bare Trucking Company at 5550 West End Road, Arcata, California. Ferguson cut a hole in the chain link fence that encircled the business and crawled into the yard where numerous logging trucks were parked.  He had an incendiary device consisting of a one-gallon plastic milk jug filled with fuel, and a timing device consisting of wooden matches wrapped around an incense stick, placed in the handle.  Ferguson used a cigarette lighter to ignite the incense stick.  His fuel-soaked gloves accidentally caught on fire, causing the incendiary device to ignite prematurely.  Tankersley was crawling through the hole in the fence when Ferguson came back telling her to leave because of the premature ignition.

On September 21, 1998, at approximately 2:30 a.m., the Arcata Fire Department responded to the fire at the Wayne Bare Trucking Company, and extinguished the flames quickly.  The fire had burned pine needles and grass along the ground inside the fenced area of the business but caused no monetary loss.  Investigators discovered several timing devices,

Page 20  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 20 of 150

consisting of wooden matches wrapped around an incense stick, in the driveway to the business

and on the ground in the fenced lot.  A burned remnant of a kitchen sponge was discovered in the

burned area, along with a cigarette lighter.

### 9.  BLM Wild Horse Corrals attempted arson, Rock Springs, Wyoming, October 11, 1998



**Participants:**

Jacob Ferguson

Josephine Overaker

Kevin Tubbs

William Rodgers

Stanislas Meyerhoff

Chelsea Gerlach

Rebecca Rubin

Sometime between late August and mid-September 1998, William Rodgers, Rebecca Rubin,

Kevin Tubbs, and two other individuals attempted a horse release and arson at the Bureau of

land Management (BLM) Wild Horse Holding Facility, Rock Springs, Wyoming.  After being

contacted by a law enforcement officer, the subjects buried some of their incendiary components

at a remote location overlooking the highway near Rock Springs.  The crime was aborted.

On October 11, 1988, at approximately 1:00 a.m., the Sweetwater County (Wyoming)

Sheriff's Office received a report of several horses running loose in the vicinity of the Rock

Springs BLM facility.  Subsequent investigation revealed that a locked gate at the facility had

been opened, and horses had been herded from the corrals.  Later that morning at approximately

8:45 a.m., a gas can and several containers with fuel were discovered at different locations

Page 21  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 21 of 150

throughout the facility.   The horses were recovered and physical damage at the facility was minimal.

On the same night, Ferguson, Tubbs, Overaker, Gerlach, Rodgers, Rubin and Meyerhoff all traveled to the Rock Springs Horse Corrals in Ferguson's red truck.  Tubbs drove the truck and dropped the others at the location with their gear.  He waited in a parking lot in a nearby park and maintained contact with the rest of the group via radio.

They began placing devices close to buildings or vehicles, specifically targeting a truck used to transport the horses.  Rubin prematurely opened one of the gates before all the devices were set up, and the horses started running loose.  Because of the confusion and disruption, the crime was immediately aborted.  Ferguson began shoving the timing devices into a duffle bag, but there was too much gear to carry out quickly.  Consequently, sponges and full containers of fuel were left behind.  Overaker, Gerlach and Rubin began hiking back to where Tubbs was waiting.  Ferguson, Rodgers and Meyerhoff stayed behind to hide the timing devices because they did not want to get caught with the components if they were stopped fleeing the scene.  The group eventually made their way back to the truck at the park and left the scene.

On November 13, 1998, a press release was issued on the Animal Liberation Front website containing a communique.  Both ALF and ELF claimed responsibility for the attempted arson.  As in the case of the Burns BLM crime, the communique targeted the Rock Springs facility for "slaughtering horses for foreign dinner plates."  It threatened future action if BLM did not "cease its campaign" against wild horses.

BLM incurred approximately $2,426.00 in aviation expenses during the ensuing round up of the escaped horses.

Page 22  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 22 of 150

**10.  Vail Ski Resort arson, Vail, Colorado, October 19, 1998**



**Participants:**

Jacob Ferguson

Josephine Overaker

Kevin Tubbs

William Rodgers

Stanislas Meyerhoff

Chelsea Gerlach

Rebecca Rubin

On October 19, 1998, at approximately 3:45 a.m., local residents observed fires at the Vail Ski Resort and reported them to the fire department.  Eight fires burned simultaneously. The fires caused structural damage to radio towers, ski lift towers, restaurants, and the ski patrol office.  The damage was to two separate sites located over a mile apart.  Five structures were damaged at one site and three structures at the second.

Chelsea Gerlach, Stanislas Meyerhoff, William Rodgers and Rebecca Rubin participated in assembling timers to be used in the Vail arson and transported gasoline and diesel to the mountain using Gerlach's truck.  They had to stop part way up the mountain because the truck got stuck in the snow.  They unloaded the fuel containers and placed them in white plastic trash bags to conceal them in the snow.  Gerlach, Meyerhoff, Rodgers and Rubin then met with Jacob Ferguson, Josephine Overaker and Kevin Tubbs, who joined them to assist in the Vail arson. They discussed their plan and the difficulties involved with an arson at the Vail Ski resort and decided to temporarily postpone the arson.

**EXHIBIT 2
Page 23 of 150**

Later, after Meyerhoff, Rubin, Ferguson, Tubbs and Overaker had returned to Oregon, Gerlach drove Rodgers' truck to Vail and dropped him off at the mountain area where the fuel was hidden. Rodgers spent several days by himself, hiking the fuel up the mountain. Gerlach parked on a logging road approximately one hour from the resort and stayed in the truck for two days. They met at a predetermined site, and Gerlach drove Rodgers to a store some distance away from Vail. Rodgers purchased barbeque lighter sticks, sponges, and several hand-held road flares.

Gerlach drove back to Vail and dropped Rodgers off on the mountain. The fires occurred that night. Rodgers first placed the gas cans next to the buildings. Next, he ran along the ridge to each fuel container, lighting them by hand. Rodgers told Gerlach he could see the fire of the previous containers start while running to other locations where he had placed more containers. Rodgers found that one of the buildings was heated, and when he opened the door, he observed two hunters sleeping. He closed the door and did not set that building on fire.

After setting the fires, Rodgers ran down a trail that turned into a bike path that led to a park. Gerlach was waiting for him when he arrived at the park around 7:00 or 8:00 a.m. Rodgers badly injured his ankle during the process.

Gerlach and Rodgers then drove to Denver. They wrote the communique and sent it via e-mail to the Liberation Collective in Portland. In the communique ALF and ELF claimed responsibility for the arson, stating that it was to protect the lynx habitat and they threatened a future action:

> Putting profits before Colorado's wildlife will not be tolerated. This action is just a warning. We will be back if this greedy corporation continues to trespass into wild and unroaded areas. For your safety and convenience, we strongly advise skiers to choose other destinations until Vail cancels its inexcusable plans for

Page 24  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 24 of 150

expansion.

The loss suffered by Vail Associates was approximately $24,500,485.28.

**11.  U. S. Forest Industries arson, Medford, Oregon, December 26 - 27, 1998**



**Participants:**

Jacob Ferguson

Kevin Tubbs

Kendall Tankersley

Rebecca Rubin

Sometime after midnight on Sunday, December 27, 1998, Larry Dean Asher was driving by the area and observed a fire behind some bushes in front of the U.S. Forest Industries building, a private forest products company with headquarters in Medford.  At approximately the same time, an alarm company received an alarm from inside the building and notified the fire department.

Upon discovering the fire, Asher ran to the front of the building and observed a bucket on fire under a window.  Attempting to suppress the fire, he knocked over the bucket, which was filled with a flammable liquid.  He then attempted to assure there were no occupants in the building, and while doing so, the fire spread rapidly, breaking out a window.  Despite prompt response by the Medford Fire Department, the loss to the building was estimated at $990,220.  Subsequent investigation determined this to be an arson fire, caused by an incendiary device at

Page 25  -  **Government's Sentencing Memorandum**

**EXHIBIT 2**
**Page 25 of 150**

the front of the building, under the computer room window facing the street.

Sometime before Christmas, Jacob Ferguson, Kevin Tubbs and Kendall Tankersley performed a "dry run" of the U.S. Forest Industries building in Medford.  Afterward, they picked a date for the arson, but decided they needed a fourth person to assist them.  Tubbs was friends with Rebecca Rubin at the time, so he recruited her to assist.

Ferguson prepared the timed incendiary devices, and on the night or early morning of the arson, Ferguson, Tubbs, Tankersley and Rubin drove to the agreed upon site in Medford.  Tankersley was given a radio to communicate with the others and was dropped off approximately a block away to serve as the "lookout."  She ran across the highway and hid in a nearby ditch.  Tubbs, the driver of the vehicle, a van, parked up the street from the office.  Ferguson and Rubin carried the incendiary devices to the office where Ferguson set up one device with two five- gallon buckets filled with a fuel mixture, and placed them in front of the building behind some bushes, while Rubin stood nearby and watched for others.  Ferguson was going to place another device under a nearby stairwell but decided against it, fearing it might be seen by passersby.  They then called Tankersley to alert her they were coming, picked her up where they had let her off, and drove back to Eugene.

Having heard or read nothing in the news media about a fire at U.S. Forest Industries, Ferguson decided to drive by the business while en route to Sacramento to visit his mother over Christmas.  As he did so, he observed that the buckets of fuel were still in place.  Once he arrived in Sacramento, Ferguson called Tankersley and asked her to retrieve the device, which had apparently malfunctioned.  She agreed and asked another person to drive to Medford with her.  Once they arrived, Tankersley saw the five-gallon buckets behind the bushes in front of the

Page 26  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 26 of 150

building, but did not remove them.  She did not tell the other person why they were there.

Shortly after Christmas, Ferguson again called Tankersley, asking her to meet him in Ashland.  She did so and met Ferguson, who had his son with him.  Tankersley parked her vehicle, a pickup truck, and the three of them drove to the U.S. Forest Industries building in Ferguson's Subaru.  Tankersley parked on a street in a nearby residential area.  Ferguson walked to the front of the U.S. Forest Industries building and found the two buckets still there, although the fuel had evaporated significantly.  He created a new ignition device consisting of sponges, matches and a cigarette.  This time the device worked, and the fire spread very quickly. Tankersley and Ferguson drove to Dunsmuir, California, with Ferguson driving the pickup truck and Tankersley, the Subaru.  When they arrived in Dunsmuir, Tankersley rented a room under a false name in a local motel, and Ferguson sneaked inside.

In mid-January, a communique was issued attributing the arson to the ELF.  Bragging that ELF had cost "these greedy bastards" a half-million dollars, the communique added:

This was done in retribution for all the wild forests and animals lost to feed the wallets of greedy fucks like Jerry Bramwell, U.S.F.I. President.  This action is payback and it is a warning, to all others responsible[,] we do not sleep and we won't quit.  For the future generations we will fight back.

**12.  Childers Meat Co. arson, Eugene, Oregon, May 9, 1999**

Page 27  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 27 of 150



**Participants:**

Jacob Ferguson

Stanislas Meyerhoff

Kevin Tubbs

Josephine Overaker

Chelsea Gerlach

Another person

In the early morning hours of May 9, 1999, Mike Siewert, a passing motorist, observed a fire at the Childers Meat Company located at 29476 Airport Road in Eugene, Oregon. Siewert immediately called 911, and the Lane Rural Fire Department responded within minutes, assisted shortly afterward by the Eugene Fire Department. Firemen initially discovered flames were extending out the second floor east windows, and the east entrance to the office was fully engulfed in flames. Despite prompt response and vigorous attempts by firemen to suppress the fire, the building was a total loss, with the damage estimated at $1,177,000.

Investigation determined this to be an arson fire, caused by the placement of two incendiary devices on the exterior of the office, one in the southwest corner of the entrance alcove and one on the west side at the junction between the single and two-story buildings.

Page 28  -  **Government's Sentencing Memorandum**

**EXHIBIT 2**
**Page 28 of 150**

Jacob Ferguson, Stanislas Meyerhoff, Kevin Tubbs, Chelsea Gerlach, Josephine Overaker and another person were involved in the arson at the Childers Meat Company.[5]  The arson was Tubbs' idea, and he and Ferguson did an initial "recon" by driving by the location.

On the day of the arson, Tubbs drove the group in a van to the area.  Ferguson, Overaker and the other person were dropped off across the street and ran to the meat company to set up the incendiary devices, which Ferguson had helped make.  They had to cut through a fence, which was the responsibility of Overaker and the other person.  Ferguson placed the devices and set the timers on both to go off at the same time.  The other person assisted while Overaker stood nearby as a lookout.  Meyerhoff and Gerlach also served as lookouts.

After setting up the incendiary devices, the other person called Tubbs on the radio, signaling him to pick them up.  Once in the van, Ferguson, Overaker and the other person removed their clothes and placed them in plastic bags, disposing of them in various dumpsters around Eugene.  As they reached the Beltline Highway, they heard on their scanner that the fire had been reported.

Afterward, a communique was prepared which attributed the arson to ALF.  The communique described the specifics of the arson, including the observations that incendiary devices were "strategically placed . . . near a natural gas line."  It added:

> As long as companies continue to operate and profit off of Mother Earth and Her sentient beings, the Animal Liberation Front will continue to target these operations and their insurance companies until they are all out of business.

---

[5] Although identified, the "other person" has not yet been indicted.

EXHIBIT 2
Page 29 of 150

### 13.  Boise Cascade arson, Monmouth, Oregon, December 25, 1999



**Participants:**

Jacob Ferguson

Stanislas Meyerhoff

Josephine Overaker

Chelsea Gerlach

In the early morning hours of December 25, 1999, a fire broke out at the Boise Cascade regional headquarters located at 450 N. Pacific Highway, Monmouth, Oregon.  Boise Cascade is a large wood products company.  Its building was protected by an intrusion alarm system monitored by Sonitrol, which called 911 at 4:47 a.m. to report an alarm in the break room.  Monmouth Police Officer J.J. Mandujano responded to the scene and, as he approached, he observed smoke in the air and flames coming through the roof.  Polk County Fire Department responded soon thereafter and discovered the roof assembly fully engulfed in flames.

Investigation determined this to be an arson fire, caused by placing two time-delayed electric incendiary devices on the building's exterior, one at the corner by the east side of the southwest entrance, and the other at the corner by the east side of the northwest entrance.  Damage was estimated to be $1,689,593.

Jacob Ferguson, Stanislas Meyerhoff, Chelsea Gerlach and Josephine Overaker were responsible for the arson at Boise Cascade.  Kendall Tankersley had mentioned Boise Cascade as

Page 30  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 30 of 150

a potential target to Ferguson and Kevin Tubbs, and the three of them drove to Boise Cascade to check it out.  Ferguson and Meyerhoff agreed on Boise Cascade for the arson because it was a large corporation involved in timber sales and it was a wooden structure that would burn easily. Tubbs opted out, believing it would be risky because Monmouth was the site of a law enforcement training institution.

Ferguson, Meyerhoff and Gerlach first "reconned" Boise Cascade, and afterward Ferguson attempted to get William Rodgers to participate.  Rodgers declined because he wanted to take a break after committing the arson at the Vail ski resort.

Ferguson and Meyerhoff made the timing devices, and Overaker and Gerlach prepared the buckets of fuel, which they put in black garbage bags and then in large boxes wrapped in Christmas paper to further conceal them.

On the day of the arson, Ferguson, Meyerhoff, Overaker and Gerlach drove to Monmouth in a van, arriving between 12:30 and 1:00 a.m.  When they were close to the site, they opened the Christmas-wrapped boxes and tore off the garbage bags around each bucket.  Overaker had a radio and was dropped off to be a lookout.  Gerlach remained in the vehicle, while Ferguson and Meyerhoff ran across a field to the Boise Cascade office.  Meyerhoff set his device at the south back end of the office, and Ferguson set his device at the north back end of the office.  They then ran back to the van and picked up Overaker.  En route to Salem on Highway 99, they heard over their scanner that the fire had been discovered.

Gerlach prepared the communique for Boise Cascade, attributing it to the ELF.  The communique accused Boise Cascade of "ravaging the forests of the Pacific Northwest," and looking toward "the virgin forests of Chile."  The communique warned:  "Let this be a lesson

Page 31  -  **Government's Sentencing Memorandum**

**EXHIBIT 2**
**Page 31 of 150**

to all greedy multinational corporations who don't respect their ecosystems.  The elves are watching.  Earth Liberation Front."

### 14.  Destruction of BPA Transmission Tower, Bend, Oregon, December 30, 1999



**Participants:**

Jacob Ferguson

Stanislas Meyerhoff

Josephine Overaker

Chelsea Gerlach

At approximately 8:53 p.m. on Thursday, December 30, 1999, only five days after the Boise Cascade arson, a Bonneville Power Administration (BPA) electrical power transmission tower southeast of Bend, Oregon, was toppled and rendered inoperable.  The affected power line was a major direct current line feeding the Los Angeles, California area, and had a maximum capacity of one million volts.  No significant electrical service was interrupted because the current was automatically switched to an alternate power transmission line.  Nonethless, the loss to BPA was estimated at $126,000 because of the need to bring special equipment to the site as well as the amount of time required to restore the power line to service.

Investigation determined that the toppling of the tower was an act of sabotage caused by the dismantling of two of the tower's supporting guy wires, making it fall.  Three different sets of footprints were located in the vicinity, as well as the tire tracks of one vehicle.

Page 32  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 32 of 150

Jacob Ferguson, Stanislas Meyerhoff, Chelsea Gerlach and Josephine Overaker were responsible for the toppling of the BPA tower.  Gerlach had talked with William Rodgers about "Y2K," and he had suggested they take advantage of the time and do an "action" involving the disruption of power or electricity.  Gerlach went to the University of Oregon library, located maps of the power grid, identifed several major high voltage transmission lines, and located road access to the site, outside Bend, Oregon.

Gerlach and Myerhoff first did a "recon" of the area and then asked Ferguson and Overaker to assist them.  On December 30, 1999, they drove to the selected area in Gerlach's pickup truck, parking on a nearby dirt road.  Meyerhoff, Ferguson and Overaker got out and walked to the tower, while Gerlach remained in the truck.  Wearing gloves, the three of them worked for some time on loosening the nuts securing two of the supporting guy wires to the tower, using wrenches Meyerhoff had brought with him.  They finally succeeded in loosening them to the point where the tower began to fall.  As it did so, an arc erupted "like lightning," and they all ran from the scene, with Gerlach flashing the truck lights to help them locate her whereabouts.  As they were leaving the area in the truck, Ferguson discovered that the crescent wrench he was carrying still had one of the nuts lodged inside.  Overaker removed it and threw it out the window.  They drove back to Eugene, got rid of the tools, and Gerlach replaced the tires on her truck to make certain no one could trace the tire tracks left at the scene.  No communique was issued because they did not want to link the event with ELF.

EXHIBIT 2
Page 33 of 150

**15.  West University Public Safety Substation arson, Eugene, Oregon, September 6, 2000**





**Participants:**

Stanislas Meyerhoff

Kevin Tubbs

Chelsea Gerlach

At approximately 4:15 a.m. on September 6, 2000, a small fire was observed on the west side of the West University Public Safety Substation at 791 East 13th Avenue in Eugene.  Harold Allen Snider, an employee of Pinkerton Security Company, ran to the location and saw a bicycle leaning against the west wall of the substation, just beneath a window.  In a basket behind the bicycle seat was a burning container.  Snider grabbed the handle bars and attempted to pull the bicycle away from the building.  The front tire was locked to the frame, causing it to fall over as Snider attempted to drag the bicycle away from the building.  As he did so, liquid spilled from

Page 34  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 34 of 150

the container and burst into flames, engulfing the bicycle and almost burning Snider. Moments later, Celso Jacquez, a Sacred Heart Hospital security officer, responded to the scene and used a fire extinguisher to put out the fire.

Investigation determined this to be an arson fire, caused by placing an incendiary device on the back of the bicycle against the west wall of the substation. Because of the quick response by Snider and Jacquez, damage was minimal, estimated to be $1,750.00, for replacement of the broken window of the substation and damage to a nearby vehicle. A backpack was found near the northeast corner of the substation. It contained a second incendiary device which had failed to function as intended.

Chelsea Gerlach, Stanislas Meyerhoff and Kevin Tubbs were responsible for the arson and placement of the incendiary device which failed to function as intended. They selected the target because they believed the Eugene activist community would deem it popular, particularly after police reaction to recent street protests and similar activities, and in order to test a new design for an incendiary device.

Gerlach and Meyerhoff built and placed the incendiary devices. They wore painters' suits, hair nets and two or three pairs of gloves to avoid leaving fingerprints or DNA on the devices. On the morning of the arson, Gerlach, Meyerhoff and Tubbs parked a vehicle near 28th and Alder in Eugene, and rode their bicycles to the area of the substation. They each had radios and Tubbs was the lookout, stationed just south of 13th and Alder near the 7-11 store. Meyerhoff rode his bicycle to the substation, placed it against the building, and walked away. Gerlach had the second incendiary device in her backpack. She parked her bicycle in an alley just north of 13th and Alder and walked to the substation. She placed the backpack behind a bush near the

Page 35  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 35 of 150

northeast corner of the building. She then walked back to the alley, got on her bicycle and rode

to where they had parked the car. Although the second incendiary device did ignite, the fire

extinguished itself inside the backpack.

No communique was issued because one of the devices did not function as intended and

the other caused only minimal damage.

**16. Superior Lumber Company arson, Glendale, Oregon, January 2, 2001**



**Participants:**

Jacob Ferguson

Stanislas Meyerhoff

Kevin Tubbs

Suzanne Savoie

Daniel McGowan

At approximately 2:00 a.m.

on Tuesday, January 2, 2001, Thomas John Denys, a resident of Glendale, Oregon, left his home

and observed flames coming from the west side of the Superior Lumber Company at 2695

Glendale Valley Road. He promptly called 911. The Glendale Rural Fire Department responded

at 2:29 a.m. and discovered fire coming out of the windows and roof on the east and west sides

of the main office building. Despite prompt response and vigorous fire suppression efforts, the

damage to the building was $1,041,696.00.

**EXHIBIT 2
Page 36 of 150**

Investigation determined this to be an arson fire, caused by two incendiary devices containing ignitable liquids.

Jacob Ferguson, Stanislas Meyerhoff, Kevin Tubbs, Suzanne Savoie and Daniel McGowan were responsible for the arson at Superior Lumber Company, which was targeted because of its involvement in the purchase of timber. Meyerhoff prepared the timing devices beforehand. On the day of the arson, the five of them, dressed in dark clothing and carrying radios, drove from Eugene to Glendale in two vehicles. They stopped at a rest area and left one of the vehicles. Tubbs was the driver of the vehicle they took to Glendale. Once they arrived, Tubbs first let out Savoie, who acted as a lookout at a telephone booth on the south side of Superior Lumber Company. McGowan served as a lookout on the north side and hid in the bushes. Tubbs then dropped Meyerhoff and Ferguson off near the main office and parked north of the facility while he waited for their call. Ferguson set up his incendiary device on the west or back side of the office, underneath a window. Meyerhoff set up the other device. As soon as they were finished, they called Tubbs to pick them up. Tubbs drove to the facility, first picking up Savoie, then Meyerhoff and Ferguson, and finally, McGowan. They then left the area and drove back to the rest stop where they picked up the other vehicle. On the way back to Eugene, they heard on their scanners about the emergency calls for the fire at Superior Lumber Company.

McGowan and Savoie spent the night in her van in Eugene. The next day they drove to Portland, where the two of them wrote the communique, attributing the arson to ELF. Calling Superior Lumber a "typical earth raper contributing to the ecological destruction of the Northwest," the communique concluded:

Page 37  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 37 of 150

What happened should shock no one.  This year, 2001, we hope to see an escalation in tactics against capitalism and industry.  While Superior Lumber says, "Make few items, and do it better than anyone else," we say, "choose an earth raper, and destroy them."

**17.  Romania Chevrolet Truck Center, Eugene, Oregon, March 30, 2001**



**Participants:**

Stanislas Meyerhoff

Kevin Tubbs

William Rodgers

Nathan Block

Joyanna Zacher

At approximately 2:40 a.m. on March 30, 2001, Perry Arnold Williams, Jr., a driver for Sani-Pac who was on his assigned route, observed a fire in one of the vehicles on the Romania Chevrolet Truck Center lot at 1425 Walnut Street in Eugene.  He immediately called 911, and the Eugene Fire Department responded to the scene within minutes.  On arrival, the first fire engine reported 10 vehicles on fire.  Despite vigorous fire suppression efforts, the fire continued to build, ultimately destroying or damaging 35 sport utility vehicles (SUVs) in two rows along the sidewalk on the east side of Walnut Street.  All the vehicles were new 2001 Chevrolet Suburbans or Tahoes.  The damage to the vehicles totaled $959,000.

Investigation determined it was an arson fire, caused by an incendiary device under the left rear portion of one of the vehicles. Upon ignition, the fire spread from the device through connected cloth "trailer" material to additional containers holding flammable liquids.

Page 38  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 38 of 150

Stanislas Meyerhoff, Kevin Tubbs, William Rodgers, Nathan Block and Joyanna Zacher were responsible for the arson at the Romania Chevrolet Truck Center.  The site was chosen as a "statement of defiance," in honor of Jeffrey Luers, who had been charged for an earlier arson at the same location.[6]  The participants decided to use only "outsiders," that is, persons not living in Eugene, so Jacob Ferguson, a Eugene resident at the time, did not participate.

Several "recons" were done of the Romania Chevrolet Truck Center prior to the arson, during which particular attention was paid to the security guard's routine, trying to determine an established pattern and schedule.  On the night of the arson, Rodgers drove the van, and Tubbs and Zacher were the lookouts.  After the security guard made his pass by the area, Meyerhoff and Block crawled under the SUVs and set the device attached to "trailers," i.e., sheets soaked in gasoline joining the vehicles.  They set the device to ignite before the guard returned.  They quickly left the area and met near Interstate 5 where they had parked their other vehicles.  Rodgers, Block and Zacher then returned to Olympia, Washington, where they were living at the time.

Following the arson, an anonymous communique was issued which made no reference to ELF.  The communique was a group effort and was shown to Daniel McGowan, who, during a later consensual recording, acknowledged he had seen the communique and regretted he had not taken out its reference to Jeffrey Luers.  The communique tied the arson to the upcoming trial of Luers and his co-defendant.  Alleging they were being "persecuted," the communique said, "The

---

[6] Luers first trial resulted in a mistrial because of the death of his defense attorney.  His second trial was scheduled to begin on April 5, 2001.  He was subsequently convicted and sentenced to 266 months' imprisonment for the first Romania arson and an attempted arson at another site.  An appeal of that case has recently resulted in a reversal by the Oregon Court of Appeals with respect to sentencing issues.

Page 39  -  **Government's Sentencing Memorandum**

**EXHIBIT 2**
**Page 39 of 150**

techno-industrial state thinks it can stop the growing resistance by jailing some of us, but they cannot jail the spirit of those who know another world is possible."  It spoke out against "the prison system," and called for others to "strike out," lest all be "held captive by the state."

**18.  Jefferson Poplar Farm arson, Clatskanie, Oregon, May 21, 2001**





**Participants:**

Stanislas Meyerhoff

Suzanne Savoie

Daniel McGowan

Nathan Block

Joyanna Zacher

Jefferson Poplar Farm, located at 79114 Collins Road, is an isolated rural area approximately five miles north of the town of Clatskanie, Oregon.  It has two sites encompassing approximately 7,000 acres and several outbuildings, all having the same address but separated by

Page 40  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 40 of 150

approximately a quarter mile on opposite sides of Collins Road.  The farm is used to grow and harvest hybrid poplar/cottonwood trees used in the manufacture of paper.

At approximately 2:23 a.m. on Monday, May 21, 2001, Terry Powell, a neighbor on Collins Road, heard what he thought was a gun shot and observed flames surrounding three of the buildings of the farm.  He immediately called 911, and the Clatskanie Fire and Police Departments were the first responders to the scene.  Despite vigorous fire suppression efforts, two buildings and a total of 18 vehicles and a trailer were destroyed by the fire.  In addition, a storage facility was spray-painted with graffiti, including the words  "ELF" and "YOU CANNOT CONTROL WHAT IS WILD!"  The total damage to the farm from the fire and vandalism was approximately $994,412.42.

Investigation determined this to be an arson fire, caused by time-delayed incendiary devices placed at or near the two buildings destroyed by fire.  In addition, three intact devices which failed to ignite were found at a third building, which was undamaged.

Stanislas Meyerhoff, Suzanne Savoie, Daniel McGowan, Nathan Block and Joyanna Zacher were responsible for the arson at the Jefferson Poplar Farm.  In addition, Jacob Ferguson, Chelsea Gerlach and Kevin Tubbs each participated in at least one "recon" of the farm.

The arson at Jefferson Poplar Farm was to be part of a "double whammy," that is, the arson at Clatskanie was to be committed on the same day as an arson at the University of Washington, by two separate teams acting on behalf of the Earth Liberation Front.[7]

On the day before the arson, Savoie drove to Olympia, where she met with McGowan, Block, Zacher and Meyerhoff at Zacher's residence.  It was decided that Savoie would be the

---

[7]  Meyerhoff attributes the idea for the "double whammy" to William Rodgers.

Page 41  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 41 of 150

driver, and she drove to Jefferson Poplar Farm, dropped everyone off, and drove to a pullout where she parked and served as a lookout.  Meyerhoff, McGowan and Block were dropped off at the office, where Meyerhoff set at least two devices, one near the steps to the office and another outside underneath a window.  McGowan carried the buckets of fuel and set one of the devices himself.  After setting the devices at the office, Meyerhoff and McGowan ran to the barn area where Meyerhoff set the timers.  Meyerhoff also placed a timing device on a bucket which one of the others had placed near what Meyerhoff thought was a natural gas valve or meter. "Trailers," i.e., fuel-soaked strips of fabric similar to those used at the Romania Chevrolet Truck Center arson, were also connected among the vehicles in the pole barn.  After the devices were set, Savoie was radioed to pick them up, and they drove back to Olympia.

Afterward, a communique prepared by McGowan and others attributing the Jefferson Poplar Farm arson to ELF was sent by Gerlach.  The communique stated the motive for the crime:

> We torched Jefferson Poplar because hybrid poplars are an ecological nightmare threatening native biodiversity in the ecosystem.  Our forests are being liquidated and replaced with monocultured tree farms so greedy, earth raping corporations can make more money.
>
> Pending legislation in Oregon and Washington further criminalizing direct action in defense of the wild will not stop us and only highlights the fragility of the ecocidal empire.

Page 42  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 42 of 150

**19.  University of Washington Horticulture Center arson, Seattle, Washington, May 21, 2001**



**Participants:**

William Rodgers

Justin Solondz

Briana Waters

Jennifer Kolar

Lacey Phillabaum

On May 21, 2001, at approximately 3:20 a.m. police and fire units responded to the University of Washington Center for Urban Horticulture, Seattle, Washington, and observed flames coming from Merrill Hall. Merrill Hall was the largest of three separate buildings which were connected by breezeways and situated to create a central courtyard.  Merrill Hall contained office and laboratory space along with a library.  Responding fire personnel initially employed a defensive operation due to the size and intensity of the fire as well as concerns about hazardous materials.  Fire damage to the interior of Merrill Hall was extensive, and all contents of the structure sustained extensive heat, charring, smoke, and water damage.  Merrill Hall was considered a total loss, with damages estimated at $3,312,434.95.

Investigators determined  the fire was the result of arson and recovered remains of at least one timed-incendiary device from the office of Professor Toby Bradshaw.  The device was

EXHIBIT 2
Page 43 of 150

composed of a digital timer, a roadside-type flare, an ignition system involving matches, and gasoline stored in plastic containers.

Cooperating defendants have placed responsibility for the attack on Merrill Hall with William C. Rodgers, Briana S. Waters (who has pleaded not guilty and has trial scheduled for September 2007 in the Western District of Washington),  Justin F. Solondz (fugitive), Jennifer L. Kolar (pleaded guilty in the Western District of Washington in October 2006), and Lacey A. Phillabaum (pleaded guilty in the Western District of Washington in October 2006).

A communique was released to the news media, approximately one week later, claiming the arson in the name of ELF.  The communique advised that the cell had targeted Professor Bradshaw because of his research on the genetic engineering of poplar trees.  It mocked the firefighters for their allegedly "slow and poorly coordinated response" to the fire.  The communique also stated the attack was coordinated with the arson at the Jefferson Poplar Tree Farm in Clatskanie, Oregon, which occurred on the same day.  Citing an earlier arson at Michigan State University, the communique warned that "universities [that] continue to pursue this reckless 'science' . . . run the risk of suffering severe losses."

EXHIBIT 2
Page 44 of 150

**20.  Litchfield BLM Wild Horse Corrals arson, Litchfield, California, October 15, 2001**



**Participants:**

Stanislas Meyerhoff

Joseph Dibee

Jennifer Kolar

Darren Thurston

Rebecca Rubin

Kevin Tubbs

On October 15, 2001, four incendiary devices were placed at the BLM Wild Horse Corrals in Litchfield, California.  The device placed in the hay storage pole barn ignited, and the resulting fire destroyed the 35' x 135' barn.  Damages were estimated to be $207,497.60.

Each incendiary device consisted of a five-gallon plastic bucket which contained a mixture of gasoline and a heavy petroleum distillate.  The devices had sophisticated delayed igniters with redundant dual timers.  The timers consisted of an electronic alarm clock functioning to complete an electric circuit between a 9-volt battery and a rocket igniter.  The igniter was placed between matches surrounding a road flare.  The road flare was on a lid above the bucket of fuel and served to ignite it.

Joseph Dibee, Stanislas Meyerhoff, Darren Thurston, Jennifer Kolar, Rebecca Rubin, Kevin Tubbs, and others were responsible for the arson.

EXHIBIT 2
Page 45 of 150

In late summer 2001, Dibee and Gerlach performed a reconnaissance of the facility. Gerlach dropped Dibee off near the facility, and he went inside to look around.

Dibee asked Tubbs to assist in the arson at the Litchfield BLM and Tubbs agreed. In October 2001, Dibee and Rubin contacted Thurston via email and asked Thurston to be involved as well. He also agreed.

On October 11, 2001, Thurston and Rubin, both residents of Canada, illegally crossed the United States border near the Cultus Lake region of Canada and were picked up by Dibee and Kolar. They went to Dibee's residence in Seattle where they met Meyerhoff. The five of them then planned the arson of the Litchfield BLM facility. Meyerhoff constructed the incendiary devices at Dibee's residence.

On October 12, 2001, Rubin and Thurston washed Dibee's truck to assure it would have no trace evidence or fingerprints. Dibee purchased a roof rack for carrying equipment, and he and Thurston installed it on top of the truck at Dibee's residence. Rubin and Thurston gathered equipment including backpacks, water bladder bags, flashlights, pepper spray and tools for the crime. In Dibee's residence, Thurston washed the equipment and tools to be used. The washing was to remove any trace evidence and fingerprints. Thurston and Dibee went to Kolar's residence in Seattle, where she gave them sets of "clean" (i.e., DNA and fingerprint-free) maps of the Litchfield area. Dibee and Meyerhoff mixed the fuel at Dibee's residence. Thurston assisted others in loading the fuel on top of Dibee's truck.

On October 13, 2001, Thurston, Rubin and Dibee got in Dibee's truck and Meyerhoff in his car, and they all drove to Olympia, where several more people joined their group. They then drove to Eugene, where Tubbs also joined the group. They all traveled in three vehicles to near

Page 46  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 46 of 150

the Litchfield BLM corrals and gathered on a large mound overlooking the facility.  Thurston
and others tested out Dibee's night-vision scope.  They next drove to an area nearby and camped
for the night.

About midnight on October 15, 2001, Thurston and the others dressed in black clothing
and gloves, and placed socks over their shoes.  Tubbs, Meyerhoff and Dibee had two-way radios.
Thurston, Rubin, Meyerhoff and others got into Dibee's truck, and Tubbs drove them to the
Litchfield facility.  Thurston and Rubin got out of the truck and went to the horse corrals.  They
cut and removed parts of the fences.  They used a rope and plastic tarps to try to funnel the
horses out of the corrals.

Tubbs drove Kolar, Dibee and Meyerhoff closer to the buildings.  Tubbs acted as a
lookout.  Meyerhoff and Kolar placed the incendiary devices, one at a hay building, another on
the porch of a building, and one under a vehicle.

After the devices were set up and the horse release completed, Tubbs picked up Thurston
and Rubin.  Tubbs then picked up Dibee, Kolar and Meyerhoff.  They stopped on their way
home and discussed the contents of the communique.  Thurston got into Dibee's truck and
traveled to Olympia, where several people were dropped off.  Dibee, Thurston and Rubin drove
back to Dibee's residence in Seattle.

On October 16, 2001, Thurston and Rubin washed Dibee's truck and the roof rack, as
well as the equipment used in the crime.  Kolar picked up Thurston and Rubin and drove them to
an area near the United States-Canadian border.  Thurston and Rubin then re-crossed the border.

EXHIBIT 2
Page 47 of 150

On October 17, 2001, Thurston prepared the final copy of the communique and sent it to several groups, including his own ALF website.  ELF claimed credit for cutting the fence and setting four incendiary devices at the BLM facility.

On October 19, 2001,  Dibee returned the roof rack to the store where he had purchased it.  On October 30, 2001, Thurston posted the communique on the ALF website.  As with the Burns and Rock Springs crimes, the communique criticized BLM policies regarding wild horses, including their "slaughter."  It threatened future targeting of  "industries and organizations that seek to profit by destroying the earth."

### III.  APPLICABLE LAW AND SENTENCING GUIDELINES

**A.**    **Maximum Penalties:**

  1.    Conspiracy, 18 U.S.C. § 371:  5 years; $250,000 fine;

  2.    Arson or attempted arson, 18 U.S.C. § 844(f) and (i): 20 years with 5 year minimum; $250,000 fine;

  3.    Destruction of energy facility, 18 U.S.C. § 1366(a): 20 years; $250,000 fine.

**B.**    **Sentencing Guidelines:**

  **1.**    **Offense Conduct**

  **a.  Conspiracy (18 U.S.C. § 371)**

Appendix A (Statutory Index) of the 2000 edition of the United States Sentencing Guidelines Manual (U.S.S.G.) references § 2X1.1 as the applicable guideline section for 18 U.S.C. § 371.  That section provides, in pertinent part, as follows:

EXHIBIT 2
Page 48 of 150

    (a)      Base offense level: The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty.

    (b)      Special Offense Characteristics:  . . .

        (2)      If a conspiracy, decrease by 3 levels, unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the person was about to complete all such acts but for apprehension or interruption by some similar event beyond their control.

### b.  Arson (18 U.S.C. §§ 844(f) and (i))

Appendix A of the guidelines manual references 2K1.4 as the applicable guideline section for 18 U.S.C. §§ 844(f) and (i).  That section provides, in pertinent part, as follows:

    (a)      Base Offense Level (Apply the Greatest):

        (1)      **24**, if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly; or (B) involved the destruction or attempted destruction of a dwelling;

        (2)      **20**, if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense; (B) involved the destruction or attempted destruction of a structure other than a dwelling; or (C)  endangered a dwelling, or a structure other than a dwelling; . . . or

        (4)      **2** plus the offense level from §2B1.13 (Property Damage or Destruction).

### c.  Destruction of an Energy Facility (18 U.S.C. § 1366(a))

Appendix A of the guidelines manual references § 2B1.3 as the applicable guideline section for 18 U.S.C. § 1366(a).  That section provides, in pertinent part, as follows:

Page 49  -  **Government's Sentencing Memorandum**

**EXHIBIT 2**
**Page 49 of 150**

    (a)      Base offense level:  4

    (b)      Specific Offense Characteristics:

        (1)      If the loss exceeded $100, increase by the corresponding number of levels from the table in § 2B1.1. . .

        (3)      If the offense involved more than minimal planning, increase by **2** levels.

    (c)      Cross Reference

        (1)      If the offense involved arson, or property damage by use of explosives, apply § 2K1.4 (Arson; Property Damage by Use of Explosives).

**2.**    **Terrorism Adjustment**

All ten defendants' plea agreements specify that the applicable sentencing guidelines are those that went into effect on November 1, 2000.  That version of U.S.S.G. § 3A1.4 provides (as it does in the current version (November 1, 2006)):

**<u>Terrorism</u>**

    (a)      If the offense is a felony that involved, or intended to promote, a federal crime of terrorism, increase by **12** levels; but if the resulting offense level is less than level **32**, increase to level **32**.

    (b)      In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

This guideline section is applicable to each defendant, and enhances each defendant's offense level to 38VI, calculated as follows:

EXHIBIT 2
Page 50 of 150

2K1.4:     2  (plus the offense levels from 2B1.3)

2B1.3:     24  (base offense level of 4 + 18 levels for greater than $20 million, plus 2 for more than minimal planning)

3A1.4:     <u>12</u>

38VI

This guideline level is, however, subject to other adjustments, which will be discussed separately for each defendant under section IV below. The terrorism guideline applies because of the following reasoning:

The Commentary applicable to the 2000 version (which is different from the current Commentary) provides:

<u>Application Notes</u>:

1.     Subsection (a) increases the offense level if the offense involved, or was intended to promote a federal crime of terrorism. "Federal crime of terrorism" is defined at 18 U.S.C. § 2332b(g).

2.     Under subsection (b), if the defendant's criminal history category as determined under Chapter Four (Criminal History and Criminal Livelihood) is less than Category VI, it shall be increased to Category VI.

The version of 18 U.S.C. § 2332b(g) applicable on November 1, 2000, defined what is meant by "federal crime of terrorism":

(5) the term "Federal crime of terrorism" means an offense that–

(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B) is a violation of–

(i) section 32 (relating to destruction of aircraft or aircraft facilities), 37 (relating to violence at international airports), 81 (relating to arson within special maritime and territorial jurisdiction), 175 (relating to biological weapons), 351 (relating to congressional, cabinet, and Supreme Court assassination, kidnapping,

Page 51  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 51 of 150

and assault), 831 (relating to nuclear materials), 842(m) or (n) (relating to plastic explosives), 844(e) (relating to certain bombings), 844(f) or (i) (relating to arson and bombing of certain property), 930(c), 956 (relating to conspiracy to injure property of a foreign government), 1114 (relating to protection of officers and employees of the United States), 1116 (relating to murder or manslaughter of foreign officials, official guests, or internationally protected persons), 1203 (relating to hostage taking), 1361 (relating to injury of Government property or contracts), 1362 (relating to destruction of communication lines, stations, or systems), 1363 (relating to injury to buildings or property within special maritime and territorial jurisdiction of the United States), 1366 (relating to destruction of an energy facility), 1751 (relating to Presidential and Presidential staff assassination, kidnapping, and assault), 1992, 2152 (relating to injury of fortifications, harbor defenses, or defensive sea areas), 2155 (relating to destruction of national defense materials, premises, or utilities), 2156 (relating to production of defective national defense materials, premises, or utilities), 2280 (relating to violence against maritime navigation), 2281 (relating to violence against maritime fixed platforms), 2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States), 2332a (relating to use of weapons of mass destruction), 2332b (relating to acts of terrorism transcending national boundaries), 2332c, 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations), or 2340A (relating to torture);

  (ii) section 236 (relating to sabotage of nuclear facilities or fuel) of the Atomic Energy Act of 1954 (42 U.S.C. 2284); or

  (iii) section 46502 (relating to aircraft piracy) or section 60123(b) (relating to destruction of interstate gas or hazardous liquid pipeline facility) of title 49.

The government's position is that the terrorism enhancement of § 3A1.4 applies to all ten defendants because each of them committed one or more federal crimes of terrorism, in terms of their substantive crimes as well as their § 371 conspiracy. Discussion of this issue requires examination of the history of U.S.S.G. § 3A1.4, the applicable case law, and application to individual offenses and defendants before the court.

Page 52  -  **Government's Sentencing Memorandum**

**EXHIBIT 2**
**Page 52 of 150**

a.    History of U.S.S.G. § 3A1.4

Prior to 1994, the main sentencing provision that related to terrorism offenses was a policy statement in U.S.S.G. § 5K2.15 (November 1, 1989), which originally read, "If the defendant committed the offense in furtherance of a terroristic action, the court may increase the sentence above the authorized guideline range."  The terms "terrorism" and "terroristic action" were not defined, but the amendment promulgating the section noted the purpose "concerning consideration of an upward departure."  See U.S.S.G.  App. C, Amend. 292 (1989).

This policy statement remained until 1994, when Congress passed the Violent Crime Control and Law Enforcement Act of 1994 (VCCA), Pub. L. 103-322 (1994).  Section 120004 of that act directed the Sentencing Commission to:

> amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime.

Pub. L. 103-322 § 120004 (1994).

The Commission gave effect to this requirement by deleting the upward departure policy statement at § 5K2.15 and by promulgating the first version of § 3A1.4 (effective on November 1, 1995) which provided in pertinent part:

> (a)  If the offense is a felony that involved, or was intended to promote, international terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

> (b)  In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

Page 53  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 53 of 150

Application Notes:

    1.  Subsection (a) increases the offense level if the offense involved, or was intended to promote, international terrorism.  "International terrorism" is defined at 18 U.S.C. § 2331.

See U.S.S.G. App. C, Amend. 526 (1994).

    Section 3A1.4 was amended shortly thereafter by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132 (1996).  Section 730 of AEDPA stated:

    The United States Sentencing Commission shall forthwith, in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987 . . . amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code.

    Accordingly, the Commission promulgated an emergency amendment, Amendment 539.  The commentary to that amendment stated:

    This amendment implements section 730 of the Antiterrorism and Effective Death Penalty Act of 1996.  That section requires the Commission to amend the sentencing guidelines so that the adjustment in § 3A1.4 (relating to international terrorism) applies more broadly to a "Federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g), and provides that the Commission shall have the authority to promulgate this amendment as an emergency amendment under procedures set forth in section 21(a) of the Sentencing Act of 1987. . . .

U.S.S.G. App. C, Amend. 539 (citations omitted).

    Amendment 539 was re-promulgated without change, effective November 1, 1997.  See U.S.S.G. App. C, Amend. 565.  Under the Amendment, the term "international terrorism" was replaced with the term "federal crime of terrorism."  The amended § 3A1.4 is the same

Page 54  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 54 of 150

version quoted above that was in effect on November 1, 2000, and is the applicable version for this case by virtue of the plea agreement.[8]

  b.  Applicable Case Law

  Several court decisions have interpreted § 3A1.4 in ways favorable to the government's position here.  As noted, the guideline was broadened in 1996 to make it equally applicable to domestic as to international terrorism, subject to the narrow statutory definition of "federal crime of terrorism."  As the court held in *United States v. Harris*, 434 F.3d 767, 773 (5th Cir. 2005), *cert. denied*, 126 S. Ct. 1897 (2006) (footnote omitted), the definition of "federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5)

> encompasses many offenses, none of which has as an element requiring conduct transcending national boundaries.  All that section 3A1.4 requires for an upward adjustment is that one of the enumerated offenses was " calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

  In *Harris* the court upheld consecutive sentences of 240 and 120 months for arson of a municipal building with a Molotov cocktail, a domestic terrorism crime.  *United States v. Dowell*, 430 F.3d 1100 (10th Cir. 2005), *cert. denied*, 127 S. Ct. 44 (2006), involved a 360-month sentence for the arson of an Internal Revenue Service office, purely a domestic act of terrorism.  Defendant in *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001), *cert. denied*, 535 U.S. 1026 (2002), received a 55-year sentence, affirmed on appeal, for numerous offenses, including plans to attack domestic government sites.  *United States v. Hale*, 448 F.3d 971 (7th Cir. 2006), *cert. denied*, 127 S. Ct. 1020 (2007), upheld a domestic terrorism enhancement to

---

  [8]  The current version of § 3A1.4 is identical to the 2000 version, except the former has a more extensive commentary, which is discussed *infra*.  See U.S.S.G. App. C, Amend. 637 (November 1, 2002).

Page 55  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 55 of 150

480 months for involvement in a plot to murder a federal judge.  In one of the most notorious domestic terrorism cases, the 1996 Oklahoma City bombing, the Tenth Circuit noted that, but for ex post facto concerns, Terry Nichols "no doubt" would have been subject to the terrorism enhancement, even with no international connections.  *United States v. Nichols*, 169 F.3d 1255, 1270 n.3 (10th Cir. 1999).[9]

Section 3A1.4 applies if the felony offense "involved, or was intended to promote, a federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g)(5).  Because of this language, phrased in the conjunctive, courts have applied § 3A1.4 where a defendant was not convicted of a substantive offense enumerated in § 2332b(g)(5).  This is because the guideline includes an offense either involving <u>or</u> intending to promote a federal crime of terrorism.

In *United States v. Graham*, 275 F.3d at 517 (footnote omitted), the Sixth Circuit held:

> Based on our interpretation of the word "involved" and the phrase "intended to promote," as well as our understanding of the relevant conduct provision, we believe that this statement of law is correct: the defendant need not have been convicted of a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5) for the district court to find that he intended his substantive offense of conviction or his relevant conduct to promote such a terrorism crime.  In sentencing the defendant under § 3A1.4, we hold that the district court must, however, identify which enumerated "Federal crime of terrorism" the defendant intended to promote, satisfy the elements of § 2332b(g)(5)(A), and support its conclusions by a preponderance of the evidence with facts from the record.

---

[9]  But see *United States v. Salim*, 287 F. Supp. 2d 250, 330-54 (S.D.N.Y. 2003) (concluding that §3A1.4 may not apply to purely domestic activities).

EXHIBIT 2
Page 56 of 150

Specifically, *Graham* approved the application of the terrorism guideline to the general conspiracy statute, 18 U.S.C. § 371, as long as the conspiracy was "intended to promote" one or more of the federal crimes of terrorism listed in 18 U.S.C. § 2332b(g)(5)(B).

To the same effect are *United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004) ("the terrorism enhancement does not hinge upon a defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation. Rather, it is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered"); *United States v. Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005) ("§ 3A1.4 must be considered when a defendant is convicted of a federal crime of terrorism as defined by 18 U.S.C. § 2332b(g)(5)(B) or when a defendant's felony conviction or relevant conduct has as one purpose the intent to promote a federal crime of terrorism"); and *United States v. Hale*, 448 F.3d at 988 (citing *Arnaout*, *Mandhai*, and *Graham*, and holding, "[t]hat Hale did not commit a federal crime of terrorism is irrelevant; the district court found that the purpose of his soliciting Evoloa was <u>to promote</u> a federal crime of terrorism – the murder of a federal officer or employee").

As the Eleventh Circuit stated in *Mandhai*, 375 F.3d at 1247, the Sentencing Commission "unambiguously cast a broader net by applying the enhancement to any offense that 'involved' or was 'intended to promote' a terrorism crime." In its ordinary usage the Seventh Circuit said in *Arnaout*, 431 F.3d at 1002, "promote" means "to help or encourage" (citing Random House Webster's College Dictionary 1042 (2d ed. 1997)). Thus, "the word 'promote,' as used in § 3A1.4, signifies that where a defendant's offense or relevant conduct helps or encourages a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5)(B), then § 3A1.4

Page 57  -  **Government's Sentencing Memorandum**

**EXHIBIT 2**
**Page 57 of 150**

is triggered." *Id.  See also Mandhai*, 375 at 1248 (applying § 3A1.4 "if a goal or purpose was to bring into being a crime listed in § 2332b(g)(5)(B)).

Also, the term "government" in § 2332b(g)(5)(A) is not limited to the United States government.  *United States v. De Amaris*, 406 F. Supp. 2d 748, 750-51 (S.D. Tex. 2005), contains an excellent discussion of this issue and holds that "government" is broad enough to include foreign governments.  *De Amaris* notes that, when Congress wants to limit the term "government" to the United States, it does so explicitly, as in 18 U.S.C. § 2332b(b)(1)(C), where "United States Government" applies to the separate criminal offense of terrorism transcending national boundaries.  *Id.*, 406 F. Supp. 2d at 750.  Similarly, § 2332b(g)(5)(A) was applied by the Fifth Circuit to destruction of a municipal government building in *Harris*, 434 F.3d at 774, where the intent was to retaliate against or to intimidate city police officers.

Because, as noted, § 371 conspiracies can incur the terrorism enhancement, it is important to apply the concept of foreseeability common in conspiracy law under *Pinkerton v. United States*, 328 U.S. 640 (1946), and its progeny.  That case holds that conspirators are criminally liable for substantive crimes committed by their co-conspirators in furtherance of the conspiracy, unless the substantive crime "did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Id.*  at 647-78.  Under *Blumenthal v. United States*, 332 U.S. 539, 557 (1947), a defendant's knowledge of the scope and details of a conspiracy can be limited.  The prosecution does not have to show that a defendant knew the details of the plan, the identity, number, or function of the co-conspirators.  *Id.  Accord*, *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979) (each conspirator need not know what other

Page 58  -  **Government's Sentencing Memorandum**

**EXHIBIT 2**
**Page 58 of 150**

participants are doing and why); *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir. 1977)

([i]t need not even be shown that [defendant] knew all the purposes of and all the participants in

the conspiracy").

> In sum, the terrorism enhancement applies if:
>
> (1)  the offense is a felony (either a conspiracy or a substantive offense)
>
> (2)  that either (a) involved <u>or</u> (b) was intended to promote (i.e., help or
> encourage)
>
> (3)  a federal crime of terrorism, which means an offense that is
>
>> (a)  calculated to influence or affect the conduct of government by
>> intimidation or coercion <u>or</u> to retaliate against government conduct, and
>>
>> (b) is a violation of any of the numerous statutes itemized in 18 U.S.C.
>> § 2332b(g)(5)(B).

c.        <u>Application to Individual Offenses</u>

The version of § 2332b(g)(5)(B) in effect contemporaneously with the November

1, 2000, version of the guidelines (expressly applicable under the plea agreement) includes four

substantive crimes applicable to the conduct in this case:  18 U.S.C. § 844(f), arson of

government property; § 844(i), arson of property used in or affecting interstate commerce; §

1361, injury or attempt to injure U.S. Government property; and § 1366, destruction of an energy

facility.  Each of the ten defendants pled guilty to a § 371 conspiracy count which specified

(emphasis added):

> The general purposes of the conspiracy were to <u>influence and affect the
> conduct of government</u>, commerce, private business and others in the
> civilian population by means of force, violence, sabotage, mass destruction,
> intimidation and coercion, and by similar means <u>to retaliate against the</u>

Page 59  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 59 of 150

conduct of government, commerce and private business.

Beginning with that overall (but nonetheless specific) purpose of all ten defendants' conduct, it is clear that the object encompassed numerous completed, substantive crimes that qualify as "federal crimes of terrorism."

(1)  Oakridge Ranger Station:  This massive arson destroyed U.S. Forest Service property in violation of 18 U.S.C. § 844(f) and, coincidentally, 18 U.S.C. § 1361.  It occurred after years of angry confrontation between protestors (many from Eugene) and the Forest Service over the hotly contested Warner Creek timber sale.  One of those dedicated protestors was Kevin Tubbs, an arsonist at Oakridge.  The fire was directly linked to the Warner Creek controversy and was calculated to retaliate against the Forest Service's conduct, as well as to influence or affect the Forest Service's conduct by intimidation or coercion.

(2)  Burns BLM Wild Horse Corrals:  This arson destroyed BLM property in violation of 18 U.S.C. §§ 844(f) and 1361.  According to the communique, written by Tubbs, the crime was aimed at halting BLM's "illegal and immoral business of rounding up wild horses from public lands and funneling them to slaughter."  The communique specifically referred to a January 1997 Associated Press article linking BLM's wild horse program to private slaughterhouses.  Plainly, the Burns BLM arson and property destruction was calculated to retaliate against the government program and to intimidate and coerce the government into stopping it.  Indeed, the communique stated, "The practice of rounding up and auctioning wild horses must be stopped."

Page 60  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 60 of 150

(3) <u>Rock Springs BLM Wild Horse Corrals</u>:  Much the same applies to the attempted arson and destruction of BLM's Rock Springs facility, which involved and promoted violations of 18 U.S.C. §§ 844(f) and 1361 (both of which contain an attempt provision).  The communique referenced BLM's effort "to continue their genocide against American's Wild Horse Nation" by "slaughtering horses for foreign dinner plates."  It warned BLM to cease its activity or face a further campaign which "will only intensify."  Again, the crimes involved and promoted specific offenses listed in 18 U.S.C. § 2332b(g)(5)(B) and were calculated to retaliate against government conduct and to intimidate or coerce the government into changing its conduct.

(4) <u>Litchfield BLM Wild Horse Corrals</u>:  Again, the conspiracy succeeded in committing substantive violations of 18 U.S.C. §§ 844(f) and 1361.  The conduct of defendants demonstrably involved and promoted those substantive offenses.  According to the communique (written by Darren Thurston), BLM "rounded up thousands of wild horses and burros to clear public land for grazing cattle," and many of the animals were "sent to slaughter."  The communique threatened continued targeting of "industries and organizations that seek to profit by destroying the Earth."  The message again was clear:  the arson and destruction of property was in retaliation for government action and was meant to coerce or intimidate a change in government policy.

(5) <u>BPA Transmission Tower</u>:  This conduct succeeded in violating 18 U.S.C. §§ 1366 (destruction of an energy facility) and 1361 (injury of government property), both enumerated crimes under § 2332b(g)(5)(B).  The offense targeted a government agency and was designed to cripple the government's distribution of electric power generated at government

EXHIBIT 2
Page 61 of 150

facilities. The participants calculated it to influence and affect government conduct by physical intimidation and coercion and to retaliate for existing government conduct.

(6) <u>Cavel West Horse Rendering Plant</u>: This conduct specifically violated an enumerated statute under § 2332b(g)(5)(B), namely, 18 U.S.C. § 844(i) (arson of property in interstate commerce). Although the government was not a direct victim, it was nonetheless a federal crime of terrorism because of the offenders' motivation. As noted above, the group on three occasions targeted government wild horse facilities specifically because they rounded up horses and sent them away for private slaughter. In their eyes, Cavel West was the most infamous of these slaughterhouses buying government horses. About six months before the Cavel West arson, Associated Press reporter Martha Mendosa published an article describing the BLM wild horse program and naming Cavel West as a purchaser of government horses. Kevin Tubbs has acknowledged he chose Cavel West as a target after carefully researching it. That was not difficult, since the business' notoriety was widespread, especially in the animal rights community. Indeed, the communique refers to the "countless protests and letter writing campaigns" that had been directed against it, especially after the AP article. The Cavel West arson was calculated to retaliate against the BLM horse program and to intimidate and coerce BLM into ceasing the program, as well as to put Cavel West, BLM's wild horse purchaser, out of business.

(7) <u>Vail Ski Resort</u>: The buildings burned in the massive fires at Vail were privately owned, and the substantive offense is arson affecting interstate commerce under 18 U.S.C. § 844(i), an enumerated statute in § 2332b(g)(5)(B). The land where the buildings, ski slopes and lifts sit, however, is within the White River National Forest of the U.S. Department of

Page 62  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 62 of 150

Agriculture.  The Vail Ski Resort was targeted because it expanded into this federal forest.  The arson occurred after years of heated controversy among developers, the government and vocal opponents.  Following considerable legal wrangling and many hearings, government action permitted the expansion to proceed, much to the dismay of environmental activists.  Unquestionably, this arson was in retaliation for the conduct of both government and private business.  The communique (authored by Chelsea Gerlach) also addressed the future, noting that Vail "now wants to expand even further" with "12 miles of roads and 885 acres of clearcuts."  That, of course, referred to development of National Forest land.  The communique called the huge fire "just a warning":   ELF "will be back if this greedy corporation continues to trespass into wild and unroaded areas," namely, the White River National Forest.  There is no question this was calculated not just to retaliate but also to intimidate and coerce future decisions by both the government and the Vail corporation.

(8)  <u>West University Public Safety Substation</u>:  This arson, albeit unsuccessful, was a violation of 18 U.S.C. § 844(i).  It served both as a training exercise for new timing devices prior to the Romania arson and as a retaliatory strike against the Eugene Police Department (EPD), a governmental agency.  The attack on the substation occurred after a long period of conflict between local anarchists and other activists involving numerous street confrontations and arrests, including what was called the "Seven Week Revolt."  Defendants in this case used the arson to send a message to EPD and the Eugene activist community that such government conduct would not stand without serious retaliation.  This arson therefore was a federal crime of terrorism under § 2332b(g)(5).

Page 63  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 63 of 150

    (9)   <u>U.S. Forest Industries</u>
   (10)  <u>Boise Cascade Corporation</u>
   (11)  <u>Superior Lumber Company</u>

These three completed arsons violated 18 U.S.C. § 844(i), thereby qualifying under the enumerated statutes in § 2332b(g)(5)(B). Each of the targets was well researched by defendants. At the time of the arsons, each timber company was a well known purchaser and harvester of trees from both government and private land. As in the case of Warner Creek, government timber contracts throughout Oregon were a matter of intense dispute during this time. Environmental activists strongly resisted and protested them. ELF, acting through defendants, carefully selected three businesses to retaliate against their private and government-related conduct.

The U.S. Forest Industries communique noted the arson "was done in retribution for all the wild forests and animals lost to feed the wallets of greedy fucks like Jerry Bramwell, U.S.F.I president." The "wild forests" necessarily refer to federal land in Oregon subject to timber sales. The fire was "payback," the communique said, but also "a warning" to "all others responsible" (e.g., the U.S. Government). This warning was calculated to influence or affect the future conduct of government and private business by intimidation or coercion under the standard of § 2332b(g)(5)(A).

The Boise Cascade communique accused that corporation of "ravaging the forests of the pacific northwest," which necessarily included Boise Cascade's timber purchases from the U.S. Government. The communique brought in a foreign government as well, by noting that "Boise Cascade now looks towards the virgin forests of Chile." See *United States v. De Amaris*, 406 F. Supp. at 750-51 ("government" under § 2332b(g)(5)(A) includes foreign governments).

Page 64  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 64 of 150

It went on to warn "all greedy multinational corporations who don't respect their ecosystems," i.e., who harvest virgin forests from government land and other sources.

Similarly, the Superior Lumber Company communique, authored by Daniel McGowan and Suzanne Savoie, characterized that business as "a typical earth raper contributing to the ecological destruction of the Northwest." That is a reference to what timber companies do – harvest trees – which at that time included trees on government land purchased through government contracts. Again, the arson was retaliation for conduct by both private business and government, thereby meeting the motivational test of § 2332b(g)(5)(A). And, once more, ELF warned, "This year, we hope to see an escalation in tactics against capitalism and industry." These "earth rapers" would be destroyed like Superior Lumber, should they follow suit and cut Northwest timber, be it private or government.

(12) <u>Romania Chevrolet Truck Center</u>: This arson involves 35 counts in violation of 18 U.S.C. § 844(i). They were committed in direct retaliation for local government activity in the prosecution and trial of Jeffrey "Free" Luers and Craig "Critter" Marshall for earlier arsons at the same location. The communique makes this clear:

> Romania Chevrolet is the same location that was targeted last June for which two earth warriors, Free and Critter, are being persecuted. The techno-industrial state thinks it can stop the growing resistance by jailing some of us, but they cannot jail the spirit of those who know another world is possible. The fire that burns within Free and Critter burns within all of us and cannot be extinguished by locking them up.

The communique goes on to criticize the "prison system" and urges people to "strike out" "before we are all either choking on smog or held captive by the state." While also an attack on the automotive industry, the Romania arsons were primarily directed against the local

Page 65  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 65 of 150

government, both in retaliation for the Luers/Marshall trial and imprisonment, and in influencing and affecting government's conduct in that regard by coercion and intimidation.

(13)  Jefferson Poplar Farm
(14)  University of Washington (UW)

As described in the factual summary above, these two arsons under 18 U.S.C. § 844(i) were closely interrelated. They were jointly planned and carefully coordinated. As the chosen date drew closer, arsonists met in Olympia and made final preparations, including construction of the timing devices. They had a common goal: to strike out against the perceived "evils" of genetic engineering and research (GE), both by a private business and by a state university.

Each arson had its own communique, but there was specific cross-reference between them. The UW communique (labeled "Part 1") stated the attack on UW Professor Toby Bradshaw's office occurred "at the same time another group set fire to a related target in Clatskanie, Oregon, 150 miles away." Clearly done in retaliation for a government institution's GE work, the UW arson was also related to a GE arson at another state institution, Michigan State University, the communique stated. It threatened "universities" performing GE work by warning, "they run the risk of suffering severe losses," and "we are determined to stop genetic engineering." In addition to retaliating, it was unquestionably calculated to change the future conduct of UW and other government institutions by intimidation and coercion.

The Jefferson Poplar Farm communique (labeled "Part 2"), originally drafted by Gerlach and McGowan, tied the arson to the need to stop "monocultured tree farms" and "greedy,

Page 66  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 66 of 150

earth raping corporations."  The communique made an additional, express warning to state

governments in Oregon and Washington:

> Pending legislation in Oregon and Washington further criminalizing
> direct action in defense of the wild will not stop us and only highlights
> the fragility of the ecocidal empire.

By linking the private poplar farms to the conduct of state governments under the umbrella

"ecocidal empire," the communique demonstrated the overall motivation of the crime, namely,

retaliating against government and private conduct and, by coercion and intimidation, attempting

to influence and affect their conduct in the future, the very standard for a federal crime of

terrorism under § 2332b(g)(5)(A).[10]

###### d.    Application to Individual Defendants

The court starts with the admission by all ten defendants, encompassed within

their guilty pleas, that each of them was part of an overarching conspiracy with the purpose,

among other things, "to influence and affect the conduct of government" and others by means of

violent acts, and "to retaliate against the conduct of government" and others.  That was the

conspiracy's *raison d'etre*, and it is attributable to each defendant both by virtue of the § 371

count and their individual conduct under the substantive counts.  That is, their conduct both

involved and promoted federal crimes of terrorism.

---

[10]  The government does not argue that the arson at Childers Meat Company qualifies as a
federal crime of terrorism, but that arson does fit within the alternative argument, if necessary,
for an upward departure for terrorism, as discussed below.

Page 67  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 67 of 150

(1)    <u>Stanislas Gregory Meyerhoff</u>

Meyerhoff was a participant in the § 371 conspiracy and in the individual arsons and attempted arsons at BLM Litchfield, Jefferson Poplar Farm, Romania Chevrolet, Superior Lumber, EPD Substation, Boise Cascade, Childers Meat, Vail, BLM Rock Springs, and the BPA tower toppling.  He had a leadership role in the conspiracy and in several of the substantive crimes.  All of his listed offenses of conviction (with the exception of Childers Meat) qualify as federal crimes of terrorism, and Meyerhoff was actively involved in and promoted them, thereby meeting the standards of U.S.S.G. § 3A1.3.

(2)    <u>Kevin Tubbs</u>

Tubbs was an active conspirator from 1996 onward and fully subscribed to the conspiracy's terroristic goals.  He shares heavy responsibility for crimes at the Oakridge Ranger Station, Cavel West, BLM Burns, BLM Rock Springs, Vail, U.S. Forest Industries (the attempt), Childers Meat, EPD Substation, the BPA tower, Romania Chevrolet, Superior Lumber, Jefferson Poplar Farm, and BLM Litchfield.  There is no question he had the requisite motivation and completed numerous crimes required for the terrorism enhancement.

(3)    <u>Chelsea Dawn Gerlach</u>

Gerlach became motivated at an early age to sabotage and destroy the property of both the government and private businesses (see further discussion of her life below).  She gave effect to this motivation as a busy member of the conspiracy and took part in many of the crimes that meet the requirements of federal crimes of terrorism:  Vail, BLM Rock Springs, Boise Cascade, BPA tower, EPD Substation, Superior Lumber, Romania Chevrolet, Jefferson Poplar Farm, and BLM Litchfield.

EXHIBIT 2
Page 68 of 150

(4)    <u>Daniel Gerard McGowan</u>

As described below in the section covering his extensive activities, McGowan was steeped in hostility toward government and private business from at least 1997 right up to the time of his arrest in 2005.  Time and again he used violence to retaliate for perceived grievances and to intimidate or coerce a change in government and private activities.  "Rabid" was more than just a nickname for him.  He meets the § 3A1.1 requirements in the conspiracy count and in the substantive counts of arson and attempted arson at Superior Lumber and Jefferson Poplar Farm.

(5)    <u>Nathan Fraser Block</u>
(6)    <u>Joyanna L. Zacher</u>

Even before their days in the Family, Block and Zacher were dedicated anarchists who, by definition, were anti-government.  They carried that animus within the conspiracy and in the anti-government, anti-business arsons at Romania Chevrolet and Jefferson Poplar Farm, thereby qualifying for the terrorism enhancement in all their counts of conviction.

(7)    <u>Suzanne Savoie</u>

Closely associated with McGowan, Savoie shared his deep hostility against government and business.  Both in the overall conspiracy and in her active participation in the substantive crimes at Superior Lumber and Jefferson Poplar Farm, Savoie furthered the prerequisites for the terrorism enhancement.

EXHIBIT 2
Page 69 of 150

(8)   <u>Kendall Tankersley</u>

As a vocal activist, Tankersley frequently and publicly spoke out against the government, particularly on television.  She researched U.S. Forest Industries and Boise Cascade, discovering ideological support for targeting them, including their timber sale contracts with the government.  In both the conspiracy count and the substantive counts relating to U.S. Forest Industries, Tankersley should receive the terrorism enhancement.

(9)   <u>Jonathan Paul</u>

A longtime, highly dedicated animal rights proponent, Paul demonstrated his anti-government animus long before the instant crimes by victimizing state universities in Oregon, California and Arizona (see discussion below).  If he did not like what they did, he targeted them for retaliation, intimidation, and coercion.  This ideology and motivation transferred easily to the present conspiracy and the substantive arson at Cavel West.  As noted, that arson was closely tied to the government's practice of selling wild horses to the company for slaughter, which spurred the participants' motivation.  It qualifies all of the Cavel West arsonists, including Paul, for the terrorism enhancement.

(10)   <u>Darren Todd Thurston</u>

Thurston had proved his anti-government, anti-business credentials for at least 11 years prior to the 2001 arson at BLM Litchfield.  Even before entering the conspiracy for that crime, Thurston associated with Family members, shared their ideological beliefs, espoused them over the Internet, and disseminated their highly charged literature.  One of his Canadian targets was a government university.  He aided in publicizing communiques for the U.S. Forest

EXHIBIT 2
Page 70 of 150

Industries and Jefferson Poplar Farm arsons.  His arson in this case burned a government facility. The anti-government motive is clear from the communique which he wrote and distributed.

The government anticipates Thurston may argue against the terrorism enhancement on the ground he pled guilty only to a § 371 conspiracy and a single count of § 844(f)(1), rather than §844(f)(2) or (3).  As noted above, § 371 conspiracies qualify for terrorism treatment if they promote a federal crime of terrorism, which definitely occurred here.  Also, Thurston agreed to the 2000 version of the guidelines, in which § 3A1.1 references the then-contemporaneous version of § 2332b(g), which listed § 844(i), with no limitation of any of its particular subsections.

     e.    <u>Upward Departure as an Alternative</u>

The facts and law present a strong argument for application of the § 3A1.4 enhancement to each of the ten defendants.  In the event this court disagrees as to any particular defendant, the government submits the same result should be reached through an upward departure, which the court has discretion to apply.

Application Note 4 of the current § 3A1.4 states:

4.  <u>Upward Departure Provision</u>.– By the terms of the directive to
the Commission in section 730 of the Antiterrorism and Effective
Death Penalty Act of 1996, the adjustment provided by this guideline
applies only to federal crimes of terrorism. However, there may be cases
in which (A) the offense was calculated to influence or affect the conduct
of government by intimidation or coercion, or to retaliate against
government conduct but the offense involved, or was intended to promote,
an offense other than one of the offenses specifically enumerated in
18 U.S.C. § 2332b(g)(5)(B); or (B) the offense involved, or was intended
to promote, one of the offenses specifically enumerated in 18 U.S.C. §
2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a
civilian population, rather than to influence or affect the conduct of
government by intimidation or coercion, or to retaliate against government
conduct.  In such cases an upward departure would be warranted, except

EXHIBIT 2
Page 71 of 150

that the sentence resulting from such a departure may not exceed the top
of the guideline range that would have resulted if the adjustment under this
guideline had been applied.

Although not contained in the 2000 guideline manual, its insertion as commentary

in a later manual serves to clarify and add understanding to the words of a guideline section that

did not change, much like subsequent case law clarifying the intent of a statute.  The retroactive

application of amendments to the guidelines depends on whether the amendment (1) is merely a

clarification, or (2) implicates the ex post facto prohibition.  As the court stated in *United States*

*v. Sanders*, 67 F.3d 855, 856 (9th Cir. 1995), "if a court applies an earlier edition of the

Guideline Manual, the court shall consider subsequent amendments, to the extent that such

amendments are clarifying rather than substantive changes."  In *Sanders* an amendment added a

provision to the commentary of the guidelines after defendant committed the offense.  Despite

the fact the amendment contradicted, and thus altered, Ninth Circuit case law on point, the court

still characterized the amendment as a clarification.  *Id.* at 857.  In doing so, the court relied

largely on the fact the change benefitted defendant and therefore did not raise ex post facto

concerns.  *Id.*

The ex post facto clause bars retroactive application of amendments if the

subsequently employed guideline leads to a harsher sentence.  *Johnson v. Gomez*, 92 F.3d 964,

968 (9th Cir. 1996).  *Gomez* held a defendant must demonstrate that a harsher sentence is a

certainty, rather than a possibility, before the ex post facto clause will prohibit the increase.  *Id.*

Defendants in this case cannot show that a harsher sentence is a certainty because of the

subsequent application note of § 3A1.4, since departures are by nature discretionary.  Even if

they could, however, the court could still consider the language of the later application note

Page 72  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 72 of 150

because the catch-all provision of the guidelines is certainly broad enough to allow such consideration.  Under 18 U.S.C. § 3553(b), the sentencing court can deviate from the guidelines to take into account any aggravating or mitigating circumstance that the guidelines did not adequately consider.  *United States v. Wells*, 163 F.3d 889, 899 (4th Cir. 1998).  In addition, the policy statement of the guidelines provides for departure in such circumstances.  See U.S.S.G. § 5K2.0 ("Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance").  *Id.*

All ten defendants engaged in terroristic conduct <u>both</u> under the terms of § 3A1.4 <u>and</u> under the departure formulation, be it under Application Note 4 or the more general departure authority that pre-existed Application Note 4.  By either theory, each defendant deserves the increased guideline range recommended by the government.

### 3.    Departure for Substantial Assistance (U.S.S.G. § 5K1.1)

This section provides, in pertinent part, as follows:

Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

(a)    The appropriate reduction shall be determined by the court for the reasons stated that may include, but are not limited to, consideration of the following:

(1)    the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2)    the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3)    the nature and extent of the defendant's assistance;

(4)    any injury suffered, or any danger or risk of injury to the defendant

Page 73  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 73 of 150

or his family resulting from his assistance;

(5)    the timeliness of the defendant's assistance.

**4.    Other Factors**

In addition to the above relevant factors under § 5K1.1 of the guidelines, the following factors were considered in the substantial assistance analysis:  background, role in the offense(s), relative culpability, and aggravating and mitigating factors for each defendant. Consideration of all these factors enabled the government to establish a fair and appropriate departure recommendation for each defendant.

## IV.  INDIVIDUAL DEFENDANTS

The defendants (and the aforementioned factors applicable to each) are listed in the order of their relative culpability, as follows:

**1.    <u>William Christopher Rodgers (deceased)</u>**



Born April 9, 1965, William Christopher Rodgers, also known as "Avalon" and "Mr. Green," was considered one of the principal leaders of the ALF/ELF movement and was a member of the cell known as the "Family."  He participated in at least six arsons over a four-year  period, causing over $30

Page 74  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 74 of 150

million in damage.  He grew and sold marijuana to help fund his and others' criminal acts.  The six arsons in which it is known he personally participated include the BLM Horse Corrals at Burns, Oregon, on November 30, 1997; the Animal, Plant Health Inspection Service office at Olympia, Washington, on June 21, 1998; the BLM Horse Corrals at Rock Springs, Wyoming, on October 11, 1998; the Vail Ski Resort at Vail, Colorado, on October 19, 1998; the Romania Truck Center at Eugene, Oregon, on March 30, 2001; and the University of Washington Horticulture Center at Seattle, Washington, on May 21, 2001.  Rodgers was the principal proponent of and the leader at the Vail Ski Resort and the University of Washington Horticulture Center arsons.

Many of the cell members viewed Rodgers as the principal leader, and he was responsible for recruiting at least six of them.  He was over ten years older than most of the other cell members and used his charisma and commitment to the ALF/ELF cause to convince others to join the cell.  Rodgers was one of the people responsible for forming the Book Club which consisted of 16 people who attended a series of instructional meetings.  As stated earlier, these meetings were held at five different sites around the West Coast, and participants were instructed in building improvised incendiary devices, computer security, performing reconnaissance, lock-picking, the use of codes for communication, and other subjects.  Nine members of the Book Club became members of the cell known as the "Family," and three other members are suspects in other acts of arson.

Rodgers authored several instructional manuals on how to perform malicious destruction and arson.  One of the first manuals was called *The Black Cat Sabotage Handbook* and another was *Setting Fires with Electrical Timers: An Earth Liberation Front Guide,* which was placed on

Page 75  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 75 of 150

the Internet with easy access for the public.  One of Rodgers' goals in life was to pass on his knowledge and expertise to others so they could continue to destroy property and intimidate  the government and the civilian population in the name of ALF/ELF.

Rodgers spoke to several of the cell members about escalating their tactics to include the assassination of certain business leaders.  During one meeting between Rodgers and Jacob Ferguson, Rodgers stated he would not show as much mercy as he had in the past.  He also talked of doing something larger than had previously been done.

A search warrant was served on Rodgers' business/residence in Prescott, Arizona, on December 7, 2005.  Items seized included timing devices, anarchist books, and numerous images of child pornography on his computer.  He was arrested during the service of the search warrant and taken to jail in Flagstaff, Arizona, for holding until he could be removed to Oregon.  On December 22, 2005, he was found unresponsive in his jail cell and was pronounced dead at the scene.  The cause of death, according to the official autopsy, was "asphyxia due to suffocation by plastic bags," and the manner of death was deemed suicide.

**2.**      <u>**Stanislas Gregory Meyerhoff**</u>



**a.      Background**

Born June 20, 1977, Stanislas Gregory Meyerhoff was known throughout the conspiracy as "Jack" and "Country Boy."  Beginning in October 1998 and continuing for nearly three years, Meyerhoff was involved in 21 criminal acts which ranged from road vandalism and plant destruction to arsons and conspiracy to commit murder.  His crime spree resulted in the loss of thousands of hours of scientific research, millions of dollars in property damage and jobs and family incomes of the personnel of affected businesses and government facilities.

During the years 1999 through 2001, Meyerhoff became a troubled and violent individual, and a career anarchist.  He began to research and develop newer and more effective destructive devices as well as participate in writing manuals which carefully described how to make homemade incendiary devices for use against businesses and government.  He also spent many hours traveling across the United States to teach others how to use such devices to destroy university research facilities.

During the final year of his criminal activity, he became frustrated with the lack of success resulting from his arsons and believed radical activists' efforts were not effectively

changing government policies or commercial endeavors.  He, along with William Rodgers, Joseph Dibee, Daniel McGowan and others, discussed escalating their level of violence.

Meyerhoff was also involved with a select group of ELF activists who met secretly to learn enhanced techniques of arson and sabotage, attending groups referred to as Book Club meetings.  As mentioned earlier, during these meetings the participants were trained in building timing devices to be used during arsons and security procedures to avoid detection by law enforcement authorities.  The group was also trained in the use of codes to communicate with each other without being detected.

Meyerhoff attended three of the Book Club meetings.  The final meeting he attended was in Sisters, Oregon.  It was there when Meyerhoff discussed the failure of the movement through its arsons.  He questioned whether more radical tactics should be employed, and urged it was time for the movement to take the next step and to escalate the violence.

As early as 2001, Meyerhoff began teaching others how to make timers for incendiary devices and assisted Rodgers in writing the how-to book for ELF arsonists titled *Setting Fires With Electrical Timers:  An Earth Liberation Front Guide.*  Meyerhoff's contributions to the manual were largely derived from his own research and his testing of incendiary device timers.

In the Spring of 2001, Meyerhoff had conversations with William Rodgers about assassinations.  Rodgers and Meyerhoff discussed the tactic of two riders on a motorcycle being able to weave in and out of traffic, shooting someone and then fleeing the scene and dumping the gun.

Meyerhoff and Chelsea Gerlach had earlier become interested in firearms and had purchased two MAK 91s.  Meyerhoff described these firearms as AK47 semi-automatic rifles

**EXHIBIT 2**
**Page 78 of 150**

with a modified pistol grip. The MAK 91s were greased, wrapped in plastic, placed in a box and buried by Meyerhoff and Gerlach at their Livewood residence near Eugene.

In September 2001, Tubbs and Rodgers gave Meyerhoff $1,000 and a police scanner and directed him to travel to the Midwest to instruct others in how to build incendiary devices and to plan other "direct actions." Meyerhoff did as he was told, traveled to the Midwest and trained another person in committing arsons.

Meyerhoff returned from the Midwest unemployed and out of money. Kevin Tubbs put Meyerhoff in contact with Joseph Dibee, and Meyerhoff was paid by Dibee to perform some engine work on a vehicle. While together, Dibee and Meyerhoff discussed Dibee's hatred for Jonathan Paul and discussed a plan to kill Paul. They dressed in black clothing, obtained a police scanner and a semi-automatic hand gun and drove in Meyerhoff's vehicle from Seattle to Southern Oregon.

The map they had was inadequate and they became lost in the rural area near Paul's residence. While stopped at a closed store to assess their situation, they were contacted by a local police officer and questioned about their presence in the parking lot. They told the officer that they were traveling from Seattle to San Francisco and had become lost. After the police contact, they decided to discontinue looking for Paul and return to Seattle.

In January 2005, Meyerhoff admitted to Lacey Phillabaum that he and Dibee had driven to Southern Oregon to shoot Jonathan Paul. When later asked about the incident by investigators, Meyerhoff stated that he and Dibee had only gone to do a "reconnaissance" of Paul and that the firearm was simply for self-defense because Paul was known to have firearms.

Page 79 - **Government's Sentencing Memorandum**

EXHIBIT 2
Page 79 of 150

### b.    Charges

Meyerhoff entered pleas of guilty to conspiracy, in violation of 18 U.S.C. § 371, 51

counts of arson in violation of 18 U.S.C.§ 844(i), in connection with the following sites:

> Childers Meat Company (1)
>
> Boise Cascade Corporation (1)
>
> Eugene Police Substation (1)
>
> Superior Lumber Company (1)
>
> Joe Romania Chevrolet Truck Center (35)
>
> Jefferson Poplar Farm (12), and

one count of attempted arson in violation of 18 U.S.C. § 844(i), for the Jefferson Poplar Farm

arson.  He has also entered a guilty plea to one count of destruction of an energy facility in

violation of 18 U.S.C. § 1366(a).

Finally, he entered guilty pleas to an indictment from the District of Colorado which has

been transferred via Rule 20 to the District of Oregon charging him with eight counts of arson in

violation of 18 U.S.C. § 844(i), for the Vail Ski Resort arson in Case Number CR 06-60122-AA.

### c.    Role in the Offense

Meyerhoff's roles in the crimes of conviction vary from being the technical "go-to guy"

in the design and manufacture of the incendiary devices to being a leader and organizer of

arsons.  The following briefly describes Meyerhoff's role in each offense:

Page 80  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 80 of 150

10/19/98        Vail, CO  – $24,500,485.28 loss

> Meyerhoff obtained the components and constructed the incendiary
> devices to be used, and helped carry the fuel to the stash site on the
> mountain.

05/09/99        Childers Meat Company, Eugene, OR – $1,177,000 loss

> Meyerhoff participated in the initial surveillance of this target and served
> as a lookout during the arson.

12/25/99        Boise Cascade Corporate Offices, Monmouth, OR. – $1,689,593 loss

> Meyerhoff constructed the incendiary devices and personally set one of
> them.

12/30/99        BPA High Voltage Tower, Bend, OR – $126,000 loss

> Meyerhoff researched the vulnerability and location of the transmission
> lines and stated that the purpose for the attack was to destabilize the
> government.  Meyerhoff believed the United States was "not going in the
> right direction."

09/09/00        EPD West Eugene Substation, Eugene, OR – $1,750 loss

> Meyerhoff chose the location for this arson believing that the police
> station would be a popular target with the Eugene "activist community."
> Having manufactured the incendiary devices, Meyerhoff wanted to test his
> new innovations in those devices.  He and Gerlach drove to Salem, rented
> a motel room under a false name, and carefully assembled timing devices
> using a "clean room" technique.  Meyerhoff personally placed a device on
> a bicycle next to the police station.

01/02/01        Superior Lumber Company – $1,041,696 loss

> Meyerhoff and others researched the company and determined that
> Superior Lumber had been involved in logging old growth timber. He
> manufactured the destructive devices and personally placed one of them
> next to the building.

**EXHIBIT 2**
**Page 81 of 150**

03/30/01       Romania II – $959,000 loss

> Meyerhoff and Rodgers selected this target.  Meyerhoff characterized this arson as the "big one" for him and that it was to be a "statement of defiance" honoring Jeffery Luers who was about to go to trial for the first arson committed at Romania.  Meyerhoff later described the arson as foolishly taking on the government, but admitted he meant to frighten and terrify the victims of the arson.  Meyerhoff personally recruited the co-conspirators and placed the devices beneath the vehicles with the help of Block.

05/21/01       Jefferson Poplar Farm, Clatskanie, OR – $994,412.42 loss

> Meyerhoff was the leader in this arson.  The Jefferson Poplar Farm and the University of Washington arsons were coordinated to occur simultaneously.  Meyerhoff participated in the surveillance and a "dry run."  He personally selected his crew and directed Savoie, Block, Zacher and McGowan while they worked at the target site.  Meyerhoff planned the arson, manufactured the incendiary devices, and personally placed several of the devices at or near buildings or structures, including placing a timing device on one of the buckets of fuel near the gas meter of a large liquid propane tank.

### d.    Restitution

The estimated loss resulting from Meyerhoff's substantive counts of arson and destruction of an energy facility is approximately $30,489,936.42.

### e.    Aggravating Factors

Meyerhoff was a leader and organizer during his tenure with his co-conspirators.  He specifically planned, organized and led the arsons at the Joe Romania Chevrolet Truck Center and at the Jefferson Poplar Farm.  He also recruited and directed the other participants involved in those arsons.

### f.    Mitigating Factors

None

### g.    Cooperation

Page 82  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 82 of 150

For safety and other reasons, each defendant's cooperation, if any, needs to remain

undisclosed to the public.  Because of this, a separate letter is being sent to the court setting forth

in detail the extent and value of each defendant's cooperation.

**h.    Specific Advisory Guidelines Calculations**

As stated in section III.B.2 above, Meyerhoff's base offense level is 38VI.  To that, the

following adjustments should be made:  Five levels should be added for combined offense level

(multiple offenses) under § 3D1.4, three levels should be added for aggravating role under

§ 3B1.1(b), and three levels should be subtracted for acceptance of responsibility under § 3E1.1,

for a total adjusted offense level of 43VI (life).

**i.    Sentence Recommendation**

Meyerhoff and the government understand and agree that the court will consider 18

U.S.C. § 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 12-level downward departure

pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with

§ 3553(a) factors, for an ultimate advisory guideline of 31VI (188 - 235).  The government

recommends a sentence at the low end of the advisory guideline range, **188 months**

**imprisonment**.  Meyerhoff is free to request other adjustments or departures, but the

government will oppose any such request.

The United States Attorney's Office for the District of Colorado is in agreement with the

anticipated 188-month sentence recommendation and recommends a sentence in Case Number

EXHIBIT 2
Page 83 of 150

CR 06-60122 (former District of Colorado Case No. 06-CR-00191-REB) of 188 months, to run

concurrently with the anticipated 188-month sentence in the District of Oregon.

**3.**    **Kevin Tubbs**



**a.**    **Background**

Kevin Tubbs was born on January 18, 1969, and was known throughout the conspiracy as

"Bob" and "Dog."  Beginning in December 1995 and continuing for nearly six years, Tubbs was

involved in multiple felonies ranging from burglary and animal thefts to arsons.  His five-year

criminal career resulted in the loss of thousands of hours of scientific research, millions of

dollars in property damage, and untold jobs and family incomes of personnel of the affected

businesses and government facilities.

During his early years, Tubbs was considered an introvert.  His father wanted him to

become involved in ROTC but Tubbs instead studied fine arts, and graduated from Humboldt

State University with a bachelor's degree in fine arts and theatre arts.  While at Humboldt State,

Tubbs began using marijuana on a regular basis, which continued until his arrest in this case, 15

years later.

After graduation, Tubbs became involved with People for the Ethical Treatment of

Animals (PETA).  While working with PETA, he wore animal costumes and engaged in

EXHIBIT 2
Page 84 of 150

confrontational protest activities.  He was arrested by police during some of the protests.  On one occasion he was convicted of simple assault for throwing urine at police officers, and another time he was convicted of criminal nuisance for throwing cat excrement at police.

In July 1995, Tubbs became involved with a group protesting logging at the Warner Creek timber sale near Oakridge, Oregon.  It was there that Tubbs met some of his co-conspirators.

In December 1995, he was successful in his first solo arson.  On Christmas Day, he manufactured three incendiary devices and placed them about the delivery trucks of Dutch Girl Dairy in Eugene.  He also wrote graffiti on the trucks, including "Dairy = Death, ALF."

In the fall of 1996, Tubbs and others burglarized a mink farm in Lebanon, Oregon, and released approximately 2000 mink.  Seven days later, he participated in the destruction of the Oakridge Ranger Station.

In September 2001, Tubbs and Rodgers gave Meyerhoff $1,000 and a police scanner and directed him to travel to the Midwest to instruct others in how to build incendiary devices and to plan other "direct actions."  As a result of this, Meyerhoff trained another person which resulted in the commission of additional arsons.

 The roles assumed by Tubbs during the arsons included researching and selecting targets, recruiting others to participate, providing support for the training of others, and transporting others during the commission of arsons.  Throughout his criminal activities and until his arrest, Tubbs used intense security measures to avoid detection by law enforcement.  After 2000, he maintained contact with many of his co-conspirators and arranged to assist those involved in the conspiracy to evade capture by law enforcement authorities.

Page 85  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 85 of 150

At the conclusion of his active life as an arsonist, Tubbs had participated in the destruction of more than $20,000,000 in real and personal property as well as obliterating irreplaceable scientific research materials.  His reign of destruction resulted in the loss of jobs and family income for those put out of work because of his criminal acts.

Notwithstanding the violent nature of his crimes, Tubbs professes to be a non-violent and peaceful person.  He ignores the fact that destruction of property constitutes violence and denies that during his years as an arsonist, he and his co-conspirators placed hundreds of people in harm's way.

**b.    Charges**

Tubbs entered pleas of guilty to conspiracy, in violation of 18 U.S.C. § 371, 53 counts of arson in violation of 18 U.S.C. § 844(i), in connection with the following sites:

> Oakridge Ranger Station (1)
>
> Cavel West (1)
>
> BLM Wild Horse Facility, Burns, Oregon (1)
>
> Childers Meat Company (1)
>
> Eugene Police Substation (1)
>
> Superior Lumber Company (1)
>
> Joe Romania Chevrolet Truck Center (35)
>
> Jefferson Poplar Farm (12), and

one count of attempted arson in violation of 18 U.S.C. § 844(i), for the U.S. Forest Industries arson, and one count of attempted arson for the Jefferson Poplar Farm arson.

EXHIBIT 2
Page 86 of 150

### c.    Role in the Offense

Tubbs' roles in the crimes of conviction vary from designing and manufacturing

incendiary devices to researching and organizing the crimes, and serving as a driver and lookout.

The following briefly describes Tubbs' role in each offense:

10/30/96        Oakridge Ranger Station  – $5,074,189 loss

> Tubbs assisted in selection of the target, made the incendiary devices, drove the transport vehicle and served as a lookout.

07/21/97        Cavel West, Redmond, Oregon – $1,211,388.76 loss

> Tubbs researched the target, performed surveillance on the facility and recruited others to participate in the arson.  He drove the transport vehicle and served as a lookout.

11/30/97        BLM Wild Horse Corrals, Burns, Oregon – $193,098.30 loss

> Tubbs drove the transport vehicle to and from the arson and served as a lookout.

12/20/98        U.S. Forest Industries, Medford, Oregon – $990,220 loss

> Tubbs and others conducted a "dry run" of the arson.  He recruited Rebecca Rubin to participate, and drove the transport vehicle to and from the arson.

05/09/99        Childers Meat Company, Eugene, OR – $1,177,000 loss

> Tubbs selected the target, did the initial reconnaissance, drove the transport vehicle and served as a lookout during the arson.

09/09/00        EPD West Eugene Substation, Eugene, OR – $1,750 loss

> Tubbs served as the lookout and maintained radio contact as Gerlach and Meyerhoff placed the devices.

EXHIBIT 2
Page 87 of 150

01/02/01        Superior Lumber Company – $1,041,696 loss

> Tubbs participated in the dry run and the arson.  He drove the transport vehicle and served as a lookout.

03/30/01        Romania II – $959,000 loss

> Tubbs was one of the lookouts for this arson.

05/21/01        Jefferson Poplar Farm, Clatskanie, OR – $994,412.42 loss

> Tubbs participated in the reconnaissance of this arson.

### d.    Restitution

The total estimated loss resulting from Tubbs' conspiratorial actions exceeds $20,000,000. The actual loss resulting from the substantive counts of arson and attempted arson for which he pleaded guilty is approximately $11,642,754.18.

### e.    Aggravating Factors

Tubbs was a leader and organizer during the conspiracy.  He planned and organized the arson at the Cavel West plant. He recruited others for the Burns BLM Horse Corrals and U.S. Forest Industries arsons.  Tubbs also induced Meyerhoff to travel across the country to teach others the techniques involved in committing arson.

### f.    Mitigating Factors

None.

### g.    Cooperation

As stated earlier, a separate letter is being sent to the court setting forth in detail the extent and value of each defendant's cooperation.

Page 88  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 88 of 150

#### h.    Specific Advisory Guidelines Calculations

As stated in section III.B.2 above, Tubbs' base offense level is 38VI.  To that, the following adjustments should be made:  Five levels should be added for combined offense level (multiple offenses) under § 3D1.4, two levels should be added for aggravating role under § 3B1.1(b), and three levels should be subtracted for acceptance of responsibility under § 3E1.1, for a total adjusted offense level of 42VI (360 - life).

#### i.    Sentence Recommendation

Tubbs and the government understand and agree that the court will consider 18 U.S.C. § 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 12-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 30VI (168 - 210).  The government recommends a sentence at the low end of the advisory guideline range, **168 months imprisonment**.  Tubbs is free to request other adjustments or departures, but the government will oppose any such request.

EXHIBIT 2
Page 89 of 150

4.    **Chelsea Dawn Gerlach**



a.    **Background**

In 1993, at age 16, Gerlach received from her father a copy of *Earth First! Journal*, which introduced her to the radical environmental movement.  With her parents' permission, she spent the summer of 1993 in Idaho at the Cove Mallard gathering of Earth First! activists. Among the 150 people there, she met William Rodgers, aka Avalon, who was an instructor.  At the end of the summer, she was arrested at Cove Mallard for blockading a road.

Her involvement with Earth First! continued while she attended South Eugene High School.  At the March 1994 E-Law Conference in Eugene, she met again with Cove Mallard participants, including Rodgers.  Notwithstanding their age differences, she developed a teenager's crush on him.

In the spring of 1994, she met Stanislas Meyerhoff at South Eugene High School, and they moved into an apartment that fall.  After graduation, they moved to Olympia in the summer of 1996.  After traveling together in Europe, they attended Evergreen State College in Olympia. She continued her involvement with Earth First! as Meyerhoff also became interested in extreme

EXHIBIT 2
Page 90 of 150

environmentalism.   In the spring of 1997 Gerlach took part in a blockade in the Olympic

National Forest and later visited the protest encampments at Warner Creek in Oregon.

Frustrated with her civil disobedience activities, Gerlach became more radical, dropped

out of school and lived with anarchists.  She became immersed in Rodgers' writings, which

included instructions on sabotage and incendiary devices.  In the fall of 1997 Rodgers told her

about an ALF cell that engaged in sabotage, but she was not yet invited to join.

In 1998 Gerlach and Rodgers went to the University of Arizona's Mount Graham

Observatory, which had been built in a forest clearcut.  Their attempt to damage the telescope

with a gun was aborted when they spotted a security guard.  After that, Gerlach became fully

involved with the ALF/ELF cell, as described below in the specific crime summaries.

Gerlach participated in numerous Book Club meetings at which clandestine strategies,

tactics and methods were discussed.  The Tucson meeting is particularly noteworthy in that

Gerlach, with the guidance of convicted arsonist Rodney Coronado, took part in the

reconnaissance of potential genetic engineering (GE) targets at the University of Arizona,

specifically experimental crop sites and greenhouses.  At the Olympia meeting, the group

discussed abusive sexual relationships among the members, particularly the activities of

Rodgers.

In addition to the arsons, Gerlach joined in criminal activity at various sites in the

group's campaign against genetic research.  She helped destroy experimental crops in Eastern

Washington.  After serving as the driver for a similar action near Boardman, Oregon, and the

tree-girdling at Oregon State University in Corvallis, Gerlach wrote the communiques covering

both.

Page 91  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 91 of 150

Page 92  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 92 of 150

Gerlach actively participated in the crimes at the BLM Wild Horse Facility near Rock Springs, Wyoming, in October 1998.  She drove her truck, helped in the reconnaissance, and released horses prior to the premature termination of the attempted arson.

In August 1999, Gerlach assisted in the burglary and theft of dogs at Bio Devices in Orange, California.  In 2000, Gerlach, along with Coronado and others, took part in a similar action at a primate research center in New Mexico.  She assisted as a driver for the tree-spiking at the Judie timber sale near Oakridge, Oregon, in February 2001.

In August 2001, Gerlach assisted Joseph Dibee in a reconnaissance of the future BLM target in Litchfield, California.  She performed another reconnaissance at the University of Arizona in September 2001.  In 2002, Dibee gave Gerlach $10,000 in cash, which she used for reconnaissance at nanotechnology and oil company sites in various U.S. locations.

From 2001 until her arrest in December 2005, Gerlach supported herself primarily by selling marijuana and ecstasy.  She became romantically involved with Darren Thurston, who assisted her in the drug trade.  They lived together in Portland prior to their arrest.  Searches revealed false identity evidence for both of them, and it is clear they were planning an escape to Canada if the need arose.

In cooperation with authorities, Gerlach took agents to the Siuslaw National Forest where she and Thurston had buried weapons, ammunition and other items.  The guns included two AK47s, a mini 14, two Glock 9mm handguns, and a Kel-tech.  Gerlach purchased the Kel-tech for Thurston (an illegal alien with felony convictions) at a Las Vegas gun show in 2003.  (See discussion of Thurston below for further information on their activities.)

Page 93  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 93 of 150

**b.      Charges**

Gerlach pleaded guilty to conspiracy, in violation of 18 U.S.C. § 371, 15 counts of arson

in the District of Oregon in violation of 18 U.S.C. § 844(i), in connection with the following

sites:

>        Childers Meat Company (1)
>
>        Boise Cascade Corporation (1)
>
>        Eugene Police Substation (1)
>
>        Jefferson Poplar Farm (12), and

one count of attempted arson in violation of 18 U.S.C. § 844(i) for the Jefferson Poplar Farm

arson.  She also pleaded guilty to one count of destruction of an energy facility in violation of 18

U.S.C. § 1366(a).  Finally, she pleaded guilty to an indictment from the District of Colorado,

transferred to the District of Oregon, encompassing eight counts of arson in violation of 18

U.S.C. § 844(i) for the Vail Ski Resort arson in Case Number CR 06-60122-AA.

**c.      Role in the Offense**

Gerlach's roles in the crimes of conviction ran the gamut and included research,

reconnaissance, lookout, device-assembler, driver, and communique-writer.

10/19/98        Vail, Colorado – $24,500,485.28 loss

>        Gerlach used her own truck to transport Meyerhoff and herself.  She
>        helped obtain supplies and took part in the assembly of devices in a Utah
>        motel room.  She drove her truck up the mountain as far as possible and
>        hid the fuel containers.  After others left, she remained with Rodgers and
>        helped him complete the crime.  In Denver she and Rodgers composed the
>        communique, which she distributed to the media via a library computer.

EXHIBIT 2
Page 94 of 150

05/09/99          Childers Meat Company, Eugene – $1,177,000 loss

Gerlach performed a pre-arson reconnaissance and, using two-way radios, acted as a lookout during the actual crime.  She typed the communique and distributed it to the media.

12/25/99          Boise Cascade Corporate Offices, Monmouth, Oregon – $1,689,593 loss

Gerlach researched Boise Cascade and discovered it was involved in a logging controversy.  She stayed in the van and acted as a lookout while the devices were set, and later sent the communique from an internet coffee shop in Portland.

12/30/99          BPA High Voltage Tower, Bend – $126,000 loss

Gerlach went to the University of Oregon and researched the state's power grids and located maps.  She found sites with good road access.  She and Meyerhoff surveilled the location.  She and the others traveled in her truck the night of the crime.  While others felled the tower, Gerlach waited in her truck and served as a lookout.  She flashed the truck's lights to assist the others to return to the truck. All four returned to Eugene in her truck. Afraid she might have left tire tracks, Gerlach bought new tires for the truck.

09/09/00          EPD West Eugene Substation, Eugene – $1,750 losss

Gerlach helped choose the target.  She and Meyerhoff drove to Salem, rented a motel room under a false name, and carefully assembled timing devices using a "clean room" technique.  With Meyerhoff and Tubbs, Gerlach dressed in dark clothes at an offsite location in Eugene.  She gave the "all-clear" signal and assisted in placing devices at the substation.  She carried an incendiary device in her backpack.

05/21/01          Jefferson Poplar Farm, Clatskanie, Oregon – $994,412.42 loss

Gerlach did research on both the Jefferson Poplar Farm and the University of Washington targets.  She attended meetings discussing why these were good targets and how the arsons should be performed.  With  Meyerhoff and McGowan, Gerlach conducted reconnaissance at Jefferson Poplar Farm.  Although not present when the crimes occurred, she sent a communique that tied the arsons together as anti-genetic engineering actions and warned the governments of Oregon and Washington.

### d.      Restitution

Page 95  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 95 of 150

The estimated total loss resulting from Gerlach's substantive counts of arson and destruction of an energy facility is $27,429,940.70.

### e.    Aggravating Factors

Gerlach engaged in a large array of criminal activities from her teenage years through her arrest in December 2005 at age 29.   She was a dedicated and loyal member of the ELF/ALF cell, followed directions carefully, assisted in any way she could, and encouraged others to do the same.  After the breakup of the cell, she remained an active drug dealer until her arrest.  She harbored an illegal criminal alien, purchased a firearm for him, hid several firearms for illegal purposes, and engaged in identity theft.

### f.    Mitigating Factors

None.

### g.    Cooperation

As stated earlier, a separate letter is being sent to the court setting forth in detail the extent and value of each defendant's cooperation.

### h.    Specific Advisory Guidelines Calculations

As stated in section III.B.2 above, Gerlach's base offense level is 38VI.  To that, the following adjustments should be made:  Five levels should be added for combined offense level (multiple offenses) under § 3D1.4, and three levels should be subtracted for acceptance of responsibility under § 3E1.1, for a total adjusted offense level of 40VI (360 - life).

Page 96  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 96 of 150

### i.    Sentence Recommendation

Gerlach and the government understand and agree that the court will consider 18 U.S.C.

§ 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 14-level downward departure

pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with

§ 3553(a) factors, for an ultimate advisory guideline of 26VI (120 - 150).  The government

recommends a sentence at the low end of the advisory guideline range, **120 months**

**imprisonment**.  Gerlach is free to request other adjustments or departures, but the government

will oppose any such request.

The United States Attorney for the District of Colorado is in agreement with the

anticipated 120-month sentence recommendation and recommends a sentence in Case Number

CR 06-60122 (former District of Colorado Case No. 06-CR-00191-REB) of 120 months, to run

concurrently with the anticipated 120-month sentence in the District of Oregon.

Page 97  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 97 of 150

5.     **Daniel Gerard McGowan**



a.     **Background**

McGowan, 33, born and raised in Brooklyn, New York, graduated from the State

University of New York at Buffalo.  Over the years he has gone by several monikers: Djenni,

Dylan Kay, Jamie Moran, Rabid, and Sorrell.  His activism began in the animal rights ideology

and evolved into extreme environmentalism, anti-genetic engineering and anarchism.

His criminal activities date from 1997 when, acting alone, he broke out windows at a

store in New York City that reportedly sold parts from endangered animals.   The same year,

again acting alone, McGowan broke out windows and spray-painted graffiti (including "ALF")

at a Macy's store in Brooklyn because it sold fur products.  He was the only participant in a

similar attack a little later at Zamir Furs in Manhattan.

In 1998 McGowan moved to the Bay Area in California to engage in environmentally

motivated crimes  On November 10, 1998, he performed his first action with the underground

"Biotic Baking Brigade," when, in San Francisco, he assaulted the President of the Sierra Club

by throwing a cream pie in his face at a board of directors meeting.  Several days later he did the

EXHIBIT 2
Page 98 of 150

same thing to the CEO of Novartis Seeds at the University of California (UC)–Berkeley.  He was arrested for this incident, which a communique attributed to the Biotic Baking Brigade.

Again in 1998, McGowan and others targeted Fidelity Investments in San Francisco because that company traded Occidental Petroleum stock. A nighttime effort to ruin windows with etching fluid was called off after limited damage when one of the participants got it on his skin.  On December 8, 1998, during a power blackout, McGowan was in a group that threw paint-filled balloons at a Bank of America in San Francisco.   They targeted it merely because it was a financial institution.  No one was arrested.  On April 30, 1999, in an action linked to the Biotic Baking Brigade, McGowan targeted for damage an animal researcher at UC-Berkeley. Again, no one was arrested.

In July 1999 McGowan, as part of the "California Croppers" underground group, performed reconnaissance at a UC–Berkeley research facility that worked with genetically modified plants.  He and others jumped a fence and, for about 45 minutes, located experimental corn which others later destroyed.  McGowan supplied them with a diagram specifying the targets.

McGowan did not take part in the UC–Berkeley destruction itself because on the same night he and a small group were busy attacking Eureka Seeds in Lodi, California.  Using scythes and loppers, they destroyed DeKalb corn fields on a private farm.  McGowan typed up a communique attributing it to the "Lodi Loppers" and distributed it to media.

 A similar destructive action occurred on September 15, 1999, at a UC-Berkeley professor's corn research tract.  McGowan did the reconnaissance.  He and others spent 30

Page 99  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 99 of 150

minutes pulling up young plants and causing other damage.  McGowan helped write and e-mailed the communique which attributed the action to "Reclaim the Seeds."

In the summer of 1999 McGowan moved to Seattle to take part in advance planning for the upcoming violent disruption of the World Trade Organization (WTO) meetings scheduled in December.  Before that occurred, he and others (including Suzanne Savoie) traveled to Washington State University (WSU) in Pullman, where they hoped to target potato research sites.  Their reconnaissance of the WSU sites ended abruptly when their vehicle broke down.

On November 27, 1999, a group calling itself the "Washington Tree Improvement Association" damaged a tree research site run by WSU at Puyallup.  McGowan participated in an hour-long reconnaissance of the site but did not take part in the action itself because he became sick.

From November 30 through December 2, 1999, McGowan and many others engaged in lawless, violent conduct in the streets of Seattle during the WTO events. They sought to disrupt meetings attended by President Clinton and other world leaders.  The public safety threat was substantial, and it incurred large expense to local and federal law enforcement.  McGowan, closely attached to the anarchist element, helped organize the activities and arranged accommodations for the many like-minded associates.

On November 30, McGowan and others planned to occupy and destroy property in the waterfront offices of the Cargill company.  Despite many reconnaissance trips to the site, it was called off, primarily because they decided not to tangle with longshoremen at the location. Instead, McGowan was part of the "Black Bloc" that went into the street and broke out windows, including those at Banana Republic, GAP, and Old Navy stores.  Using a tire iron, McGowan

Page 100  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 100 of 150

broke around 20 windows and damaged others with ball bearings hurled from a slingshot.  He also threw etching fluid up to ten times at banks' windows in the Capitol Hill area.  Avoiding arrest, he actively took part in the rioting and destruction through the WTO conference's conclusion on December 2.

In March 2000, McGowan moved to Eugene, where he worked for a short time at *Earth First! Journal.*  Although invited to attend the Family's Book Club meeting in March 2000, he was unable to do so.  In April he organized a group to commit vandalism in Eugene as a way of testing people for future crimes.  They damaged an Umpqua Bank and a health food store in Eugene.

McGowan was the prime organizer behind a major attack on the Pure Seed testing facility in Canby, Oregon, on June 5, 2000.  He researched the company and discovered it was developing genetically modified creeping bent grass for golf courses.  After a reconnaissance a week prior, he and the group pulled up test plots, turned over every planter and pot they could find, and caused substantial destruction.  McGowan was responsible for the communique, which attributed the crime to the "Anarchist Golfing Association."  Pure Seed suffered $500,000 in damages.

McGowan traveled to the Midwest in July 2000 to perform more crimes.  He acted with a group that defaced the building of Avantis, a human blood bank.  It was targeted simply because it supposedly outpriced other blood donation sites.  On July 20, 2000, McGowan and others sabotaged the U.S. Forest Service's North Central Forest Biotechnology Laboratory in Rhinelander, Wisconsin.  McGowan researched the facility, which genetically engineered trees, and he studied tree-girdling as a tactic.  With McGowan's active participation, the group spent a

Page 101  -  **Government's Sentencing Memorandum**

**EXHIBIT 2**
**Page 101 of 150**

few hours at the site and destroyed over an acre of trees.  He spray-painted "ELF" on a dozen Forest Service jeeps.  He typed and sent the communique, which claimed the crime for ELF. Damages at the Rhinelander facility were $1,000,000.

McGowan attended his first Book Club meeting in Santa Cruz, in September 2000. About a dozen people crowded into a motel room and discussed computer encryption and incendiary devices.  McGowan gave a presentation on biotechnology as a target.

In December 2000, McGowan took part in a reconnaissance of the Jefferson Poplar Farm, but time constraints prevented the crime from happening at that time.  Instead, McGowan participated in the arson at Superior Lumber Company on January 2, 2001.  He helped in a reconnaissance a week before the crime and stayed at a house in Eugene with Savoie and others in preparation for it.  Timing devices and buckets of fuel were kept at the house.  McGowan helped load the fuel into the van and rode with others to the site.  He changed into dark clothing, performed a radio check, and served as a lookout during the setting of the fire.  Afterwards McGowan went to Portland to compose and send out the communique.  He took the extra precautions of using a public computer, assembling the paper communique in a rest room at Powell's Books, handling it with latex gloves, and sending it out via U.S. Mail.  Damages at Superior Lumber were $1,041,696.

McGowan attended the January 2001 Book Club meeting in Olympia.  The meeting dealt with conflicts within the ELF/ALF cell, rumors concerning some members, and concerns about keeping the Family together.  With McGowan's support, the group survived to commit further crimes.

Page 102  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 102 of 150

McGowan took part in the tree-spiking at the Judie timber sale near Oakridge in March 2001.  After researching tree-spiking and learning how to stop timber sales, McGowan purchased 200 nails and 35-50 large spikes at a hardware store.  He personally recruited the other participants.  Using head lamps, they spent about 2 ½ hours in the woods at night placing nails and spikes at different heights on the trees.  They snipped the heads on some nails and drove them in deeper, which made them more difficult to detect and remove.  McGowan wrote and e-mailed the ELF communique for the crime.

McGowan participated in the planning and execution of the arson at Jefferson Poplar Farm on May 21, 2001.  His research mistakenly identified the owner as "James River" or a similar name, when in fact the facility had changed hands and was no longer owned by a firm involved in genetic engineering.  Plans for sabotage of the site developed into a full-fledged arson.

McGowan met several times with others in Olympia to plan the crime, with the knowledge there would be another simultaneous arson elsewhere committed by others.  McGowan was with others when fuel and device components were purchased.  He personally purchased radios, a scanner code book, and multiple Tupperware containers.  Assisting others, McGowan took part in the manufacture of timings devices used at both Jefferson Poplar Farm and the University of Washington (UW).  They wore full Tyvek plastic suits with hoods, dust masks, and multiple layers of plastic gloves while making the devices.

At Jefferson Poplar, McGowan made several trips carrying large fuel containers for the fire.  He set incendiary devices with the fuel at the office building and did the same at the garage building.  Going from one pickup truck to another, he placed the fuel and cloth "trailers" that

Page 103  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 103 of 150

connected the vehicles.  Before leaving, he helped spray-paint "ELF" on the side of a building.

Returning to Olympia, he dumped bags of clothing in suburban dumpsters.  He assisted in

writing the communique and was angry when someone (Craig Rosebraugh) later altered it to

excise the James River reference.

 Soon thereafter, McGowan attended a Book Club meeting near Sisters, Oregon, where

the group discussed the altered communique and other topics indicative of the group's

disruption.   Returning to Eugene, McGowan originated the idea of damaging logging equipment

at a local site and carried it out with the help of others on June 18, 2001.  They caused $20,000 in

damage to a log loader.  In July 2001 McGowan and a small group attempted unsuccessfully to

dig up and damage culverts at a BLM timber sale site near Oakridge.

McGowan founded the North American Earth Liberation Prisoner Support Network.

Through it and other means over several years McGowan actively supported and aided prison

inmates serving time for criminal acts similar to those he had committed.  McGowan in

particular led the defense of Jeff Luers, who was serving a lengthy sentence for arson in Eugene.

During this time, McGowan remained dedicated to the cause of violent action and cover-up, as

shown by his own words.

In 2005 McGowan made numerous incriminating statements to cooperating witness

Jacob Ferguson.  These conversations were recorded.  McGowan referred to their cell as the

"Family" and used code words and code names for their activities and participants.  Even though

it was four years after his final arson with the cell, McGowan repeatedly expressed deep concern

about all cell members maintaining silence and thwarting any investigation.  On April 2, 2005,

McGowan said he would take the lead in enforcing the code of silence:

Page 104  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 104 of 150

So it's like the whole thing with the grand jury. It's like the way you stop it, even if one person gets caught, if that one person shuts the fuck up and fuck it, you know. If someone goes down in our family and, I'm going to borrow a fuckin' load of money and, like, get a lawyer . . . Even though I'm not in contact with anyone really, except India [Suzanne Savoie]. You know, that's fact, you know. Like, that's like, we swore to each other that, and I mean it. I'm not fuckin' joking, man. If someone goes down, like, I will arrange for legal representation.

On August 15, 2005, McGowan said he would never go into the grand jury, but if he did, "basically, like, I would be lying . . . 100% of the time, so why would I ever, you know what I mean?" McGowan said, "The way that you live a normal life is to make sure that you and your friends don't fuckin' ever open up your mouth." The next day he said, "Everyone I've met with is totally solid. There's a few loose ends, but I think they probably, they probably also know, like, just cool out, you know."

McGowan expressed no remorse for the cell's activities, but, in fact, wanted to further its legacy. On August 15, 2005, he said:

But, uh, but I'm saying like the legacy of, of the Family is that like it has contributed to other stuff that we don't see necessarily or we don't wanna say that it has any connection to, but the sad thing is that like our main unit of, of the [Earth First!] Journal has not done the job on like how not to get caught.

Noting that "almost our whole Family retired," McGowan reflected on its legacy and lamented the present time without them:

. . . [Y]ou wanna look at why the Northwest is different now, it's 'cause our Family retired. You know, I mean, and the people that are doing stuff now, I mean I think some of the A [ALF] people are old, like distant family or, like . . . the same old peeps that have been doing shit forever, but I think the E [ELF] people . . . one a year and then go.

During the same conversation McGowan revealed his efforts in re-distributing Rodgers' book on electrical timing devices:

Page 105 - **Government's Sentencing Memorandum**

EXHIBIT 2
Page 105 of 150

> I was in a storage unit in New York recently, an old, uh, environmental office, and I found an old copy of that book he made, that zine he made . . . So I . . . made some clean copies, and I mailed it to some distros [distributors] and, and wrote a little note asking them to copy it, that it had fallen out of distro and that it really needs to be distroed again, you know."

Noting he had not seen any results yet, McGowan said he would try again.  He commented on the publication itself:

> It was great.  Too technical, though, man, too technical.  Too technical and scary . . . I was gonna, like, make 20 copies of them and just send them out from New York, uh, to like different distros that are into zines and, um, unfortunately, like . . .

> It used to be on line, but then the ELF site went down.  But I think the ELF site is gonna be put back up again.  And, hopefully, like it was PDF on that, you could download that shit.  And that's what's really needed, is you need to be as a downloadable file, you know.

McGowan then re-emphasized that he intended to reproduce and redistribute the clandestine publication.

On April 1, 2005, McGowan explained what motivated his dropping out of the cell after the Jefferson Poplar arson:

> I was kind of running out of air.  I feel like, sooner or later I was going to trip up really  hard.  And, you know, I don't want to fuckin' . . . I didn't want to end up in jail, man.

The next day McGowan reflected on the relative value of the "actions":

> Some actions are really stupid, and they don't do much.  And some actions are good, and maybe they're really awesome symbols.  I mean, they rebuilt Vail, but who cares, you know.  I mean, that ignited, like literally, you know . . . And don't lament.  Like, don't be upset about, like, the hype, like, lack of stuff going on in the Northwest.  It comes and it comes and goes, man.  And also when it left the Northwest, and it pretty much, in south L.A., you know, it's like . . .

Page 106  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 106 of 150

Similarly, on August 15, 2005, McGowan reiterated the value of his and the Family's prior actions:

> They haven't rebuilt everything, . . . but, you know, that should never be the barometer of victory, man. The victory is like the fuckin' publicity. That's what it is. It's the putting it on the map, man . . . And it, it's changed, man, like, you know, it's changed perception.

He specifically praised the recruitment value of the Vail fire:

> . . . Vail was like the recruitment drive, you know, and it worked. It got people's attention, man. It totally changed the extreme of eco-resistance. It made tree sits look calm, you know. It made fuckin' road working look like something kids can do, you know.

**b.    Charges**

McGowan entered guilty pleas to conspiracy, in violation of 18 U.S.C. § 371, and 13 counts of arson and one count of attempted arson in violation of 18 U.S.C. § 844(i), in connection with the following sites:

Superior Lumber Company (1)

Jefferson Poplar Farm (12 arsons and one attempted arson).

**c.    Role in the Offense**

Although McGowan came into the "Family" relatively late in its existence, for several years he had already committed increasingly serious criminal acts in his ideological quest. From 1997 until the arson at Superior Lumber Company in early 2001, McGowan had proven and endeared himself with many violent activists. When he joined the Family, he was already a veteran of many lawless actions with mounting damage totals and immeasurable losses to valuable research. The following briefly describes McGowan's role in the two arsons:

EXHIBIT 2
Page 107 of 150

01/02/01        Superior Lumber Company, Glendale, Oregon – $1,041,696 loss

        McGowan brought Suzanne Savoie along into this crime. He did reconnaissance and for several days literally lived with the fuel, equipment and cohorts. He helped transport the fuel. With the aid of radios, he successfully acted as a lookout as the destructive acts were performed. As in other instances, McGowan was responsible for the communique (so important in achieving success with publicity) and distributed it in a hyper-sensitive manner.

05/21/01        Jefferson Poplar Farm, Clatskanie, Oregon – $994,412.42 loss

        McGowan took part in early reconnaissance for this crime, long before it was deemed feasible. He researched the target, but apparently not well enough, since it had changed corporate hands by the time he hit it. He eagerly turned what started as a GE-style action into a huge arson. He helped plan it over several months' time, performed additional reconnaissance, purchased supplies, and assisted in manufacturing the timing devices. He also knew it was in conjunction with another arson at the same time. At the site McGowan performed essential roles in setting fuel and devices. Fortunately, the fire just barely missed a large propane tank that could have taken several lives if it had exploded. McGowan painted "ELF" graffiti at the scene and helped in the important publicity of the communique.

### d.    Restitution

The total estimated loss for the arsons personally committed by McGowan totals $2,036,108.42. It is unknown, however, precisely how much other damage he caused in the array of uncharged "actions" he committed over the years.

### e.    Aggravating Factors

Although he actively participated in only two of the Family's arsons, it is clear McGowan was a totally committed and dedicated lawbreaker from 1997 onward. He has avoided prosecution for numerous costly crimes in California, Washington, Wisconsin, Oregon, and New York. Where McGowan has gone, mindless destruction has followed. His candid recorded remarks in 2005 demonstrate continued commitment to the cause of violence and

Page 108  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 108 of 150

dedication, if not leadership, in enforcing the code of silence.  By encouraging the re-distribution of Rodgers' book on electrical timers in 2005, McGowan reaffirmed his interest in the Family's legacy right up to the time of his arrest.

> **f.    Mitigating Factors**

None.

> **g.    Cooperation**

As stated earlier, a separate letter is being sent to the court setting forth in detail the extent and value of each defendant's cooperation.

> **h.    Specific Advisory Guidelines Calculations**

As stated in section III.B.2 above, McGowan's base offense level is 38VI.  To that, the following adjustments should be made:  Two levels should be added for combined offense level (multiple offenses) under § 3D1.4, and three levels should be subtracted for acceptance of responsibility under § 3E1.1, for an adjusted offense level of 37VI (360 - life).

> **i.    Sentence Recommendation**

McGowan and the government understand and agree that the court will consider 18 U.S.C. §3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 14-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 23VI (92 - 115).  The government

Page 109  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 109 of 150

recommends a sentence at the low end of the advisory guideline range, **92 months imprisonment**.  McGowan is free to request other adjustments or departures, but the government will oppose any such request.

**6.    Nathan Fraser Block**



**a.    Background**

Nathan Fraser Block, 26, attended classes at Evergreen State College in Washington after dropping out of high school.  He applied for several student loans, and believed the world was coming to an end so he would never have to repay the loans.  Throughout the conspiracy he was referred to as "Exile" and "Hasson."

In November 1999, Block attended meetings in Seattle to prepare for illegal activities at the World Trade Organization (WTO).  There, he met co-conspirator Joyanna L. Zacher.  Block's participation in the WTO riots involved dressing in black and filling his backpack with rocks.  He boarded a bus in the University District of Seattle and traveled to the Capitol Hill area.  Once there he walked downtown and began throwing rocks at office windows and police officers.  He also worked with others in attempting to take over a three-story building.  Block avoided arrest during this crime spree.

Page 110  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 110 of 150

Shortly after the WTO riots, Block and Zacher traveled to the EarthFirst! rendevous in the Mojave Desert of California.  While at the rendezvous, they became involved in group discussions about tactics of property destruction.

In March 2000, Block and Zacher attended the E-Law Conference in Eugene.  During that conference, they attended the first of what were to become known as the Book Club meetings.  This first meeting occurred at a residence in Springfield.  The participants trained themselves in being more effective in acts of sabotage and arson.  Block continued to attend these meetings until the group disbanded in the summer of 2001.

During this time, Block began to associate with William Rodgers.  Block and Zacher assisted Rodgers in the growing and distribution of marijuana, the proceeds of which were used to finance continued arson operations.  Rodgers also trained Block in the construction of incendiary devices and electronic timing devices.

On August 1, 2000, Block was involved in the destruction of a research wheat crop in Dusty, Washington.  He and other members of the Book Club destroyed experimental wheat grown by the Monsanto Corporation.

Just prior to February 20, 2001, Block and Zacher traveled to Eugene to plan a tree spiking in the Judie timber sale area of the Willamette National Forest.  The planning included placing the nails and spikes at varying heights and then cutting off the heads of the spikes so they could not be detected.

On two separate nights, Block, Zacher and others hammered nails and spikes into more than 100 trees, damaging 39 acres of national forest trees.  Approximately a week later, this crime was claimed by ELF in a communique that warned, "All responsibility for worker safety

Page 111  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 111 of 150

now lies with the owner of the sale, Seneca Jones Corporation and their accomplices, the Forest Service."

One month later, on March 18 and 19, 2001, Block and others destroyed trees at the Oregon State University (OSU) poplar farm research facilities in Corvallis and Klamath Falls. These targets had been selected by Book Club members, and planning meetings occurred in December 2000.  Block conducted at least two reconnaissance missions at the facilities, during which he and others learned of nearby trails and established escape routes.  Block checked several of the research trees to confirm they had metal tags identifying them as genetically engineered poplar trees.  While their efforts resulted in extensive damage to OSU's poplar tree research program, Block and the others believed their work at OSU was inadequate and began planning for something better.

Ultimately, Meyerhoff suggested the Joe Romania Chevrolet Truck Center in Eugene, and provided hand-drawn diagrams of the car lot.  During the preparation for the arson, Meyerhoff suggested that cloth "trailers" soaked with gasoline be used to connect the pans of fuel which would be placed under the vehicles.

Block and Zacher gathered the materials necessary for the incendiary devices, being careful not to shop for the materials in stores which had surveillance cameras.  Block purchased road flares and oil pans from automotive stores, and sheets and towels from thrift stores.  They chose to buy everything they needed and did not shoplift anything because of what had happened to Family member Josephine Overaker when she was arrested for shoplifting while getting materials for the earlier APHIS arson in Olympia.

Page 112  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 112 of 150

A couple of days before the Romania arson, Block, Zacher and Rodgers traveled to Eugene where they met Meyerhoff, and obtained a van to haul the fuel and ignition devices to the site. The night before, Block, Zacher, Rodgers, Meyerhoff and Tubbs participated in a "dry run" for the arson. Block was not allowed to meet Tubbs, as Tubbs did not want Block to know his identity.

In the early morning hours of March 30, 2001, Block, Zacher, Rodgers, Tubbs and Meyerhoff executed their plan at the Romania Chevrolet Truck Center, placing the fuel, incendiary device and "trailers" which ultimately destroyed 35 vehicles, valued at approximately $959,000.

Approximately two months later, on May 21, 2001, and after extensive planning, Block and others committed the arson at Jefferson Poplar Farm, while others simultaneously burned Merrill Hall at the University of Washington. Block's role at Jefferson Poplar was to carry fuel and place the incendiary devices and cloth trailers beneath the vehicles. He also provided the location for meetings and extensive preparation.

On February 23, 2006, Block and his co-conspirator and girlfriend, Joyanna Zacher, were arrested at their residence in Olympia on charges of conspiracy to commit arson. A search warrant was executed which yielded documents promoting criminal activism. Also discovered was an indoor marijuana grow.

**b.    Charges**

Block entered pleas of guilty to conspiracy, in violation of 18 U.S.C. § 371, 47 counts of arson in violation of 18 U.S.C. § 844(i), in connection with the following sites:

EXHIBIT 2
Page 113 of 150

Joe Romania Chevrolet Truck Center (35)

Jefferson Poplar Farm (12), and

one count of attempted arson in violation of 18 U.S.C. § 844(i), for the Jefferson Poplar Farm

arson.

### c.    Role in the Offense

Block's roles in the crimes of conviction vary from planning and obtaining materials for

the arsons to actually placing the incendiary devices under vehicles and next to buildings.

Block's roles are briefly described in the following arsons:

03/30/01      Romania II, Eugene – $959,000 loss

> Block participated in the planning, testing and preparation for the arson. He assisted in collecting the necessary materials for the arson and, along with Meyerhoff, placed the individual incendiary devices and "trailers" under the vehicles.

05/21/01      Jefferson Poplar Farm, Clatskanie, Oregon – $994,412.42 loss

> Block and Zacher provided a meeting place for the conspirators during the planning of the arson and assisted in gathering the necessary materials. Block physically placed some of the incendiary devices and provided the meeting place for the conspirators to debrief afterward.

### d.    Restitution

The estimated loss resulting from Block's substantive counts of arson is approximately

$1,953,412.42.

### e.    Aggravating Factors

Block was involved in the planning and preparation and was a full participant in both the

Romania Truck Center arson and the Jefferson Poplar Farm arson.

Page 114  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 114 of 150

**f.      Mitigating Factors**

None

**g.      Cooperation**

As stated earlier, a separate letter is being sent to the court detailing the extent and value of each defendant's cooperation.

**h.      Specific Advisory Guidelines Calculations**

As stated in section III.B.2 above, Block's base offense level is 38VI.  To that, the following adjustments should be made:  Two levels should be added for combined offense level (multiple offenses) under § 3D1.4, and three levels should be subtracted for acceptance of responsibility under § 3E1.1, for an adjusted offense level of 37VI (360 - life).

**i.      Sentence Recommendation**

Block and the government understand and agree that the court will consider 18 U.S.C. §3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 14-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 24VI (92 - 115).  The government recommends a sentence at the low end of the advisory guideline range, **92 months imprisonment**.  Block is free to request other adjustments or departures, but the government will oppose any such request.

EXHIBIT 2
Page 115 of 150

7.    <u>Joyanna L. Zacher</u>



a.    **Background**

Joyanna L. Zacher, 29, is a self-proclaimed anarchist.  Throughout the conspiracy, she was known as "Sabina" and "Sheba."  In the spring of 1999,  Zacher lived in an apartment in downtown Seattle.  She became aware of the World Trade Organization (WTO) and joined others to take part in violent demonstrations at the WTO Conference.  It was with this group that she met Block and others who eventually became fellow arson cell members.

In preparation for the anti-WTO activities, Zacher's group developed a plan to enter and destroy the offices at the Seattle plant of the Cargill Corporation, an international corporation involved in food production.  Zacher performed  reconnaissance of the location while others planned confrontation strategies in the event they encountered Cargill guards.  Zacher also attempted to steal license plates to be placed on the group's rental van which was to be used to transport Zacher and others to the scene.

Zacher's group disagreed about the Cargill burglary plans, so that crime was abandoned. Instead, she and others drove their rented van to downtown Seattle and engaged in other

EXHIBIT 2
Page 116 of 150

destructive actions.  All in her group were dressed in black and wore masks, calling themselves the "Black Bloc."

Zacher's "Black Bloc" threw acid-filled eggs at department store windows.  As the eggs broke on the plate glass, the acid etched the windows with permanent splatter marks.  Others in her group used sling shots, hurling rocks at windows and buildings to damage as much as possible.  Zacher was ultimately arrested and detained by Seattle police.

While charges against her were pending, Zacher published handbills discussing her court case and her disgust with the government and its legal system.  In the fliers, she stated, "there can be no justice at the hand of the oppressors."  She went on to profess, ". . . Seattle as being the first definitive step in our struggle that is far from over."

Once released from jail, Zacher traveled with Block to California to attend the Earth First! rendezvous.  There she attended one of the Book Club meetings, where she learned advanced tactics in committing arsons.

In August 2000, Zacher and others chopped down a wheat crop at the Monsanto Corporation research facility in Dusty, Washington.  After the Monsanto crop destruction, Zacher continued with her Book Club meetings and learned how to construct incendiary devices using "clean rooms" to prevent DNA, latent print and trace evidence contamination.  She also learned  lock-picking and how to gain surreptitious access to buildings.

On February 20, 2001, Zacher and eight others spent two nights placing spikes in trees at the Judie timber sale in the Willamette National Forest near Oakridge.  The spikes were placed at various heights with the heads of the spikes cut off and camouflaged to prevent detection.  Afterward, a communique was prepared which stated in part, "all survey stakes have been pulled

Page 117  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 117 of 150

and destroyed . . .," and "we inserted 60-penny nails and 8 and 10 inch spikes both high and low in the trees . . . ."  It went on to warn, "[A]ll responsibility for worker safety now lies with the owner of the sale, Seneca Jones Corporation and their accomplices, the Forest Service."

Less than a month later, Zacher, Meyerhoff, Block, Rodgers and Tubbs planned and committed the March 30, 2001 Joe Romania Chevrolet Truck Center arson in Eugene, causing approximately $959,000 in damage.

Two months after the Romania arson, and after participating in the extensive planning for two simultaneous arsons, Zacher and others committed the Jefferson Poplar Farm arson on May 21, 2001, causing damage of approximately $994,412.42.

On February 23, 2006, Zacher and Block were arrested at their residence in Olympia on charges of conspiracy to commit arson.  At the time of their arrest, a search warrant was executed, yielding documents promoting criminal activism.  Also found in their residence was an indoor marijuana grow.

Once arrested, Zacher immediately contacted her estranged family and cautioned her mother not to speak to law enforcement officials about her case.

**b.**    **Charges**

Zacher entered pleas of guilty to conspiracy, in violation of 18 U.S.C. § 371, 47 counts of arson in violation of 18 U.S.C. § 844(i), in connection with the following sites:

Joe Romania Chevrolet Truck Center (35)

Jefferson Poplar Farm (12), and

one count of attempted arson in violation of 18 U.S.C. § 844(i), for Jefferson Poplar Farm.

EXHIBIT 2
Page 118 of 150

### c.    Role in the Offense

Zacher's roles in the crimes of conviction vary from planning and obtaining materials for the arsons to serving as a lookout and providing a meeting place for the conspirators.  Zacher's roles are briefly described in the following arsons:

03/30/01        Romania II, Eugene – $959,000 loss

>           Zacher participated in the planning and preparation of the arson.  She assisted in collecting the necessary materials and served as a lookout both during the "dry run" and on the night of the arson.

05/21/01        Jefferson Poplar Farm, Clatskanie, Oregon – $994,412.42 loss

>           Zacher provided a meeting place for the conspirators during the planning of the arson and assisted in gathering the necessary materials for its execution.  She served as a lookout and monitored the radio scanner after the arson had taken place.  She subsequently provided the meeting place for the conspirators to debrief about the arson.

### d.    Restitution

The estimated loss resulting from Zacher's substantive counts of arson is approximately $1,953,412.42.

### e.    Aggravating Factors

Zacher was involved in the planning and preparation and was a full participant in both the Romania Truck Center arson and the Jefferson Poplar Farm arson.  She was also an active participant in the WTO riots, the Monsanto wheat crop destruction, the Judie Timber Sale tree-spiking and the Book Club meetings.

### f.    Mitigating Factors

None

Page 119  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 119 of 150

**g.        Cooperation**

As earlier stated, a separate letter is being sent to the court setting forth in detail the extent and value of each defendant's cooperation.

**h.        Specific Advisory Guidelines Calculations**

As stated in section III.B.2 above, Zacher's base offense level is 38VI.  To that, the following adjustments should be made:  Two levels should be added for combined offense level (multiple offenses) under § 3D1.4, and three levels should be subtracted for acceptance of responsibility under § 3E1.1, for an adjusted offense level of 37VI (360 - life).

**i.        Sentence Recommendation**

Zacher and the government understand and agree that the court will consider 18 U.S.C. §3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 14-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 23VI (92 - 115).  The government recommends a sentence at the low end of the advisory guideline range, **92 months imprisonment**.  Zacher is free to request other adjustments or departures, but the government will oppose any such request.

EXHIBIT 2
Page 120 of 150

**8.** **Jennifer Lynn Kolar**



Jennifer Lynn Kolar, now 33, was born and raised in Spokane, Washington. She received her bachelor's degree in applied mathematics from the University of Colorado in Boulder and continued her studies there in atmospheric and oceanic physics. She left in 1999, just a few credit hours short of her Ph.D., and moved to Seattle. There she has had a successful career in computer software design, including a management position at America Online (AOL). She has owned a house and a boat, and has been the fleet coordinator at Seattle's Corinthian Yacht Club.

Notwithstanding her education and professional advancement, Kolar was an active member of the Family, participating in several arsons and Book Club meetings. Her activism started in the mid-1990s with simple protests and civil disobedience while she was in Boulder. She taught people how to resist federal grand juries and protested at the Vail Ski Resort (though she did not take part in the arson there). Becoming frustrated with the perceived ineffectiveness of non-violent activism, Kolar turned to violent criminal behavior.

In 1997 she met Jonathan Paul at an animal rights conference in Minneapolis. He was a celebrity among activists at the time, and they developed a long-distance dating relationship. The wealthy Paul helped the struggling student financially. He told her about his underground

EXHIBIT 2
Page 121 of 150

activity with ELF/ALF, specifically about a planned attack on Cavel West.  When the cell needed another participant, Paul recruited Kolar and paid her way to Oregon.

Kolar assisted Paul in producing the "Vegan Jell-O" fuel mixture consisting of glycerin soap and diesel.  They drove to Central Oregon together and joined the other participants. Although Dibee and Tubbs were outraged that Paul had brought along a stranger, Paul vouched for her, and they grudgingly accepted her.  In addition to being a lookout at Cavel West, Kolar assisted Dibee in pouring fuel into the holes he had drilled in the wall.

On October 4, 1998, Kolar and others targeted for arson the Wray Gun Club in Wray, Colorado.  The club offended them because of its organized prairie dog hunts.  Kolar built incendiary devices and helped set them up, but they failed and no fire occurred.

Kolar was an active participant in the arson at the University of Washington Center for Urban Horticulture on May 21, 2001.  By that time she was a trusted associate of Dibee, and in fact they had dated for awhile.  Her role was to carefully cut the window glass at Professor Toby Bradshaw's research office so the incendiary devices could be set there.  At the time she was aware of another simultaneous arson, Jefferson Poplar Farm, occurring that night in Oregon.

Initially Kolar thought the planned attack on the BLM Wild Horse Corrals in Litchfield, California, on October 15, 2001, was just to release the horses, but she willingly assisted in the arson when Meyerhoff proposed it.  She helped Thurston and Rubin after they crossed the border illegally, and provided "clean" maps of the targeted area.  At the facility Kolar helped Meyerhoff set up the incendiary devices.

In the fall of 1999, Dibee and Rodgers began to organize what came to be known as the Book Club, but which Kolar called  the "Incubator" group.  She participated actively in the Santa

Page 122  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 122 of 150

Cruz meeting, along with roughly nine others (including Rodgers, Meyerhoff, Gerlach, McGowan, Block, Zacher, Savoie, and Lacey Phillabaum). Kolar shared her extensive expertise in computers by providing encryption diskettes and instructing on their use, so the group could communicate secretly.  It was at this meeting that the Family decided to target biotechnology sites in the future.  Kolar later attended a similar meeting in Olympia, where the discussion shifted to violent attacks on researchers.  Meyerhoff, Gerlach, Rodgers, Block, Zacher, McGowan and Phillabaum were present.  Her final meeting was the one in Sisters, where it became apparent the Family had serious rifts among its members.

Kolar withdrew from Family-related activities after the Litchfield BLM arson.  She has acknowledged guilt in the overall conspiracy and substantive crimes at Cavel West, Wray Gun Club, the University of Washington, and Litchfield BLM.  Her case is pending sentencing in the Western District of Washington.  The government is recommending a reduction for substantial assistance to authorities and a total sentence of **84 months imprisonment**.

Page 123  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 123 of 150

9.    **Suzanne Nicole Savoie**



a.    **Background**

Suzanne Savoie, 29, aka "India," is a resident of Southern Oregon.  She grew up in California and attended San Diego State University (SDSU).  During her junior year in college, she traveled to Wales, United Kingdom, where she became involved with several different environmental and animal activist groups which were trying to stop fox hunts and performing anti-genetic engineering (GE) actions.  She continued her involvement in anti-GE activities when she returned to SDSU for her senior year.

In 1997 she met McGowan over the Internet, although they did not meet physically until the summer of 1999, when they taught an anti-GE workshop together at the Earth First! Rendezvous.  She became romantically involved with McGowan during this period, and they started to perform anti-GE crimes together.  She participated in at least four anti-GE crimes which caused over $1,000,000 in damage.

Savoie attended the Ruckus Society training camp near Seattle and then participated with the Black Bloc at the World Trade Organization (WTO) meetings there during December 1999.  She was part of a group which planned to occupy an office building and destroy property during the protests at WTO.  Sometime after WTO, Savoie attended an Earth First! Organizers

Page 124  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 124 of 150

Conference and participated in a meeting which was a forerunner of the Book Club meetings. She attended all five of the actual Book Club meetings held during a one and a half year period. As previously mentioned, participants at these meetings were instructed in a variety of covert measures, including the construction of incendiary devices, reconnaissance, computer security, codes, and lock-picking.

Savoie's first involvement in an arson was at the Superior Lumber Company in Glendale, Oregon, on January 2, 2001. Other participants in this arson were Ferguson, Meyerhoff, Tubbs and McGowan. They all met at a park in Eugene and drove to Glendale in two separate vehicles. They stopped at a rest area off I-5, left one of the vehicles there and all put on dark clothing. They then drove to the lumber company where Savoie was dropped off first at a telephone booth on the south side to serve as a lookout. Afterward, she and McGowan drove to Eugene and spent the night in her van. The next day they drove to Portland where she and McGowan wrote the communique together and sent it to the ELF press office and to the Umpqua Watershed.

Savoie's second arson was at Jefferson Poplar Farm in Clatskanie, Oregon, on May 21, 2001. The other participants were Meyerhoff, McGowan, Block and Zacher. Savoie and McGowan did some research about the business beforehand, and they all did a "dry run" of the selected site before the arson. Savoie served as the driver and lookout. She drove everyone to Jefferson Poplar Farm and dropped them off. She then drove to a pullout area where she could be a lookout and parked the vehicle until she received the signal to pick up the others. Afterward, they drove to Olympia, where she and the others spent the night.

Page 125  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 125 of 150

**b.      Charges**

Savoie pleaded guilty to conspiracy, in violation of 18 U.S.C. § 371, and 13 counts of

arson, in violation of 18 U.S.C. § 844(i), in connection with the following sites:

> Superior Lumber Company (1),
>
> Jefferson Poplar Farm (12), and

one count of attempted arson, in violation of 18 U.S.C. § 844(i) for the Jefferson Poplar Farm.

**c.      Role in the Offense**

Savoie's roles in the crimes of conviction are briefly described below:

01/02/01      Superior Lumber Company, Glendale, Oregon -- $1,041,696 loss

> Savoie served as a lookout and assisted McGowan in writing the
> communique afterward.

05/21/01      Jefferson Poplar Farm, Clatskanie, Oregon -- $994,412.42 loss

> Savoie did advance research about the target, participated in a "dry run"
> beforehand, and served as the driver and lookout at the arson.

**d.      Restitution**

The damage resulting from the arson at the Superior Lumber Company was

$1,041,696.00, and from Jefferson Poplar Farm, $994,412.42, for a total restitution figure of

$2,036,108.42.

**e.      Aggravating Factors**

A long-time activist, Savoie began participating at an early age in anti-GE actions, later

escalating to arsons. Although she served only as a lookout in both arsons (as well as the driver

at Jefferson Poplar Farm), she also did advance research about the latter, participated in the "dry

run" beforehand, and helped produce the Superior Lumber communique.

Page 126  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 126 of 150

**f.      Mitigating Factors**

Although Savoie was involved in anti-GE activities and all of the Book Club meetings, her role in the two arsons was minor, i.e. as a lookout in both (and driver at Jefferson Poplar). Hence the government is recommending a two level reduction for minor role.

**g.      Cooperation**

As previously mentioned, a separate letter is being sent to the court detailing the extent and value of each defendant's cooperation.

**h.      Specific Advisory Guideline Calculations**

As indicated in section III.B.2 above, Savoie's base offense level is 38VI.  To that the following adjustments should be made:  Two levels should be added for combined offense level (multiple offenses) under U.S.S.G. § 3D1.4, two levels should be subtracted for minor role under § 3B1.2(b) and three levels should be subtracted for acceptance of responsibility under § 3E1.1, for an adjusted offense level of 35VI (292 - 365).

**i.      Sentence Recommendation**

Savoie and the government understand and agree that the court will consider 18 U.S.C. § 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 16-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 19VI (63 - 78).  The government recommends a sentence at the low end of the advisory guideline range, **63 months imprisonment**.  Savoie is free to request other adjustments or departures, but the government will oppose any such request.

Page 127  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 127 of 150

10. __Kendall Tankersley__



a.    **Background**

Kendall Tankersley, aka Sarah Kendall Harvey, 30, moved to Eugene from Ohio in the

fall of 1995 to attend the University of Oregon.  In the spring of 1997, she joined Cascadia

Forest Defenders and began participating in environmental activism, including protests against

tree-cutting.  That summer she was arrested during a protest at the China Left timber sale in

Southern Oregon.  It was there she met Jacob Ferguson.

The next summer, Tankersley attended the Earth First! Rendezvous in Oregon and began

dating Ferguson.  Soon afterward, the two of them decided to escalate their protest activities to

arson.  Tankersley had spent some time in Humboldt County, California, so the two of them

decided to target two log trucking companies in the area.  On September 28, 1998, Tankersley

and Ferguson drove to the Redwood Coast Trucking Company in Arcata, California.  Upon

arrival, Ferguson poured fuel from large containers into 11 one-gallon plastic milk jugs while

Tankersley held them.  Ferguson placed one  incendiary device in each of 10 logging trucks

while Tankersley placed one device in a single truck.  Ferguson lighted the devices and they left

the site.  Only one device functioned, causing the total destruction of one logging truck at a cost

of $40,000.

Page 128  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 128 of 150

Tankersley and Ferguson then traveled to the Wayne Bare Trucking Company where Ferguson cut a hole in the chain link fence encircling the business, and crawled into the yard where numerous logging trucks were parked.  He lighted an incendiary device, but his fuel-soaked gloves caught fire, causing the device to prematurely ignite.  He ran back to the hole in the fence, which Tankersley was crawling through, and told her they had to leave because of the premature ignition.  The Aracata Fire Department responded quickly and extinguished the flames from the pine needles and grass on the ground inside the fenced area.  No monetary loss was suffered by the business.

Approximately three months later, Ferguson, Tankersley and Tubbs drove to Medford and did a "dry run" of the U.S. Forest Industries office.  Afterward, they decided they needed a fourth person to do the arson, so Tubbs recruited Rubin, a woman he was dating at the time, to assist.

On the date selected for the arson, Tubbs and Rubin picked up Tankersley and Ferguson, and they drove to U.S. Forest Industries.  Tubbs drove the vehicle and dropped off Tankersley a block from the business.  She ran across the highway and hid in a ditch to serve as a lookout. Ferguson and Rubin carried the incendiary devices to the office where Ferguson set them up while Rubin stood nearby as a lookout.  The devices failed to function.

Not hearing anything about a fire, Ferguson subsequently drove by U.S. Forest Industries and saw the buckets of fuel still in place.  He called Tankersley and asked her to retrieve the devices.  She agreed and drove to Medford with another person, saw the buckets of fuel in front of the building, but did not remove them.

Page 129  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 129 of 150

Shortly after Christmas 1998, Tankersley and Ferguson drove back to U.S. Forest Industries.  Tankersley parked on a nearby street, and Ferguson walked to the business, found the buckets, re-filled them with fuel and improvised a new ignition device.  He then lighted it, creating a fire which caused approximately $990,220 in damage.

**b.        Charges**

Tankersley pleaded guilty to conspiracy, in violation of 18 U.S.C. § 371, one count of attempted arson and one count of arson, in violation of 18 U.S.C. § 844(i), in connection with the U.S. Forest Industries arson.  She was not charged with the Redwood Trucking Company and Wayne Bare Trucking Company arsons in Arcata, California.

**c.        Role in the Offense**

Tankersley's role in the December 1998 U.S. Forest Industries arson was to serve as a lookout.

**d.        Restitution**

The damage resulting from the Redwood Trucking Company arson was $40,000, and from U.S. Forest Industries, $990,220, for a total restitution figure of $1,030,220.  As previously indicated, no monetary loss was sustained by the fire at the Wayne Bare Trucking Company.

**e.        Aggravating Factors**

Although principally serving as a lookout for each of the arsons, Tankersley did place one incendiary device herself in one of the logging trucks at the Redwood Coast Trucking Company.  It is unknown whether this was the device which functioned successfully.  She also performed research and reconnaissance on other targets, including Boise Cascade and Litchfield BLM Wild Horse Corrals.

Page 130  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 130 of 150

**f.        Mitigating Factors**

Although she was involved in three separate arsons, Tankersley's principal role was as a lookout.  Hence the government is recommending a four-level reduction for minimal role under U.S.S.G. § 3B1.1(a).   To the government's knowledge, Tankersley has not been involved in any illegal activities since her return to California to attend Humboldt State University.

**g.        Cooperation**

As previously mentioned, a separate letter is being sent to the court detailing the extent and value of each defendant's cooperation.

**h.        Specific Advisory Guideline Calculations**

As indicated in section III.B.2 above, Tankersley's base offense level is 38VI.  To that the following adjustments should be made:  Four levels should be subtracted for minimal role under § 3B1.2(a) and three levels should be subtracted for acceptance of responsibility under § 3E1.1, for an adjusted offense level of 31VI (188 - 235).

**i.        Sentence Recommendation**

Tankersley and the government understand and agree that the court will consider 18 U.S.C. § 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 14-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 17VI (51 - 63).  The government recommends a sentence at the low end of the advisory guideline range, **51 months imprisonment**.  Tankersley is free to request other adjustments or departures, but the government will oppose any such request.

EXHIBIT 2
Page 131 of 150

11. **Darren Todd Thurston**



a.      **Background**

Darren Todd Thurston, 27, was born and raised in Alberta, Canada.  In high school he became interested in animal rights issues and helped form a group called Citizens Organized for Animal Liberation.  In that protest group, Thurston became familiar with violent ALF activities in the United Kingdom, and he distributed ALF-UK literature.  In 1990 Thurston began his long-term association with Canadian ALF operative David Barbarash.  Thurston began the Western Canada ALF Support Group, which took over from Barbarash's Eastern Canada ALF group when it closed.

In 1990, at age 20, Thurston was arrested for spray-painting graffiti and damaging billboards.  With Barbarash in 1991, he became interested in targeting the University of Alberta for future animal releases.  He was frustrated that his protests and vandalism had not achieved results, so he turned to arson.  In December 1991, Thurston burned three trucks at a fish company, using ALF-UK publications on timing devices.  He attempted to re-print an arson primer, but the local printer called the police.  The publication ended up being distributed by others in Canada.

Page 132 -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 132 of 150

In June 1992, Thurston and Barbarash targeted a research station at the University of Alberta for an animal release.  They burglarized the facility and stole 29 cats.  After police tracked him down, Thurston pleaded guilty to the burglary and the 1991 truck arson, which led to a prison term.        In the spring of 1994, while released on appeal, Thurston traveled to Northern California for an Earth First! gathering, where he met Jonathan Paul and Kevin Tubbs. He then returned to Canada to serve the rest of his sentence.

In 1996 Thurston attended an anti-fur protest in Seattle, where he met Paul again, and began an association with Gina Lynn, founder of the Animal Rights Direct Action Coalition.  In late 1996, on his way to San Francisco, Thurston stopped in Eugene and visited Tubbs.  With Lynn, Thurston traveled around Oregon, California and Utah reconnoitering fur farms.  In 1996 Thurston completed the first edition of *The Final Nail: Destroying the Fur Industry–A Guided Tour*, in which he had invested 500 hours of research.  The pamphlet contained detailed information about numerous fur farms in Canada and the United States and included information on incendiary devices, including the type Thurston used to burn the fish trucks in 1991.  The publication was posted on the Internet and went through a second edition, also by Thurston, which added 40-50 more fur farms.  A later edition contained incendiary device instructions provided to Thurston by Joseph Dibee through encrypted e-mail.

In 1996-97 Thurston and Lynn targeted Bio-Devices, an Orange, California medical research laboratory.  They conducted surveillance and reconnaissance two or three times, particularly examining the types of alarms in place.  However, because of his trial in Canada, Thurston was not involved in the actual burglary and animal release at Bio-Devices.

Page 133  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 133 of 150

While again illegally in the United States in 1997, Thurston and others "reconned" a large taxidermy facility in Southern California, with plans to spray paint and glue locks, but it did not occur.  He and Lynn got closer to a planned arson of trucks at a meat company in San Diego.  While preparing incendiary devices, they noticed a homeless man in the vicinity, which caused them to abort the crime.  In February 1998, Thurston was arrested at a mall in California, leading to his six-week detention and voluntary removal to Canada.

Thurston was ALF's primary publicist from 1995 to about 2001.  During that time he received 100-200 communiques from all over the world, reporting a huge array of illegal activities.  Right up until the time of his arrest in 2005, Thurston hosted websites that taught internet security and anonymity for users.  From these, Dibee, Rubin, Tubbs and others learned how to use "dead drops" (anonymous e-mail accounts with unsent messages stored in the draft folder) for communicating secret messages.

As far back as 1990-91, Thurston authored *The ALF Primer:  A Guide to Direct Action and the Animal Liberation Front*.  In the late 1990s he posted it on the Internet in PDF format, thereby providing more advice to like-minded people in attacking targets.  Although he did not write *Arson-Around with Auntie ALF: Your Guide for Putting the Heat on Animal Abusers Everywhere*, Thurston re-formatted it and placed it on his website for others to use.  He spent weeks working on *Setting Fires with Electrical Timers: an Earth Liberation Front Guide*, transforming it from bulky multiple PDFs into one large version.  It was released on the Internet just after the Jefferson Poplar Farm arson and encouraged similar criminal acts in the future.

Thurston and ELF publicist Craig Rosebraugh communicated via e-mail after the U. S. Forest Industries arson in Medford in 1998.  Upon receiving the ELF communique for the arson,

Page 134  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 134 of 150

Thurston wrote to Rosebraugh, "I presume that you will do a media release?"  Rosebraugh complied with Thurston's request, thereby achieving the publicity the Family wanted.  Thurston and Rosebraugh spent hours finalizing the media release for the 1998 Vail arson, based on the communique authored by Gerlach and Rodgers.

Thurston was the mediator in the Family's dispute over the communique for the 2001 Jefferson Poplar Farm arson.  Rosebraugh received the original communique and contacted Thurston about the inaccurate listing of the target.   To the dismay of Family members, Rosebraugh changed the communique to correctly name the victim.  The matter was serious enough for Dibee to drive Gerlach to Vancouver, B.C., to meet with Thurston.  She asked Thurston to relay to Rosebraugh the group's anger.  Thurston e-mailed Rosebraugh, who also traveled to Vancouver to meet with him.  Because of the controversy, Rosebraugh ended up resigning as ELF's publicist.  Thurston recruited a Canadian to take over the job as spokesperson for the North American ELF Press Office.

In the summer of 2001, Gina Lynn sought Thurston's help in correcting Daniel McGowan's tendency to talk too much.  Thurston told McGowan running his mouth off would not be tolerated, and McGowan replied that would no longer be a problem.

In October 2001, Thurston received e-mails from Dibee and Rubin regarding a possible action in the U.S.  Thurston and Rubin illegally crossed the border with Dibee and were picked up by Jennifer Kolar.  While at Dibee's Seattle house, Thurston learned the nature of the upcoming action at the BLM horse facility in Litchfield and requested to be part of the horse release portion.  Thurston helped install the roof rack and washed the backpacks and other implements to remove fingerprints.  At Kolar's apartment Thurston and Dibee received "clean"

Page 135  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 135 of 150

maps.  The group left Seattle and picked up Tubbs in Eugene.  At the target Thurston dressed in black, wore socks over his shoes, and communicated with the others via two-way radios.  He cut through wire and wood fences to get to the horses.  His attempt to lead the horses out of the corrals failed, however.  The facility burned, and the group left for home.  In the car Thurston completed a rough draft of the communique on his Palm Pilot.  In Seattle he helped wash down the tools and implements again.  Kolar drove Thurston and Rubin north, and they hiked over the border.  The next day Thurston further researched and completed the communique, and sent it out via e-mail.

Thurston became romantically involved with Gerlach in 2001, and they remained together until their arrests on the current charges.  Thurston illegally entered the United States again in the summer of 2002.  This crossing involved long hikes in remote terrain with the help of GPS equipment.  Thurston and Gerlach moved to San Francisco, where they rented an apartment under a false name.  They traveled to New York and New Jersey to perform reconnaissance and take pictures of bio-engineering facilities, primarily ones owned by Monsanto.  Back in California in the winter of 2002, Thurston and Gerlach began to make money selling marijuana. Worried about being caught, they moved to Portland in 2003, where they continued to move marijuana in two to four-pound quantities.  Gerlach rented the apartment under an assumed name, while Thurston went by the name Ian Holladay.  He kept additional identification in the name of a real Canadian, a false permanent resident alien card and a false social security card.  Kevin Tubbs provided him with lost identification cards of real people that Tubbs had collected at the adult store where he worked in Springfield.  Thurston used a stolen credit card number to make purchases.

Page 136  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 136 of 150

In the summer of 2003 Thurston and Gerlach went to Utah for reconnaissance of the Predator Research Station and facilities of Utah State and Logan State universities.  They researched the sites through a library computer.

The same year Thurston and Gerlach dug up a cache of guns buried at the Lane County house where she had once lived with Meyerhoff.  They reburied the guns in the forest near the Oregon coast.  Thurston accompanied Gerlach to Las Vegas, where she purchased two firearms and ammunition at a gun show, along with cannon fuse and books on radio-controlled detonators and improvised incendiary devices.  They also buried these items near the same coastal site.

Thurston re-entered Canada and illegally returned to the United States twice in 2003.  The second time he returned with two ounces of MDMA, the illegal drug ecstasy, which he and Gerlach sold repeatedly up until the time of their arrests.  They also dealt in LSD, marijuana, and illegal mushrooms.

Thurston was approached by persons interested in translating into Spanish the publication *Setting Fires with Electrical Timers* so it could be sent to the Zapatista guerrillas in Mexico.  In the spring of 2003 Thurston met a representative of the Zapatistas.  He requested that Thurston teach a class on producing explosives that could take down a building or bridge.  Thurston did research and learned how to make the explosive HMTD, which he tested in Portland.  He taught the workshop on explosives in a tent near Redway, California.  Together with Gerlach and others, Thurston produced seven to ten grams of HMTD and detonated it, blowing up a stump.  The Zapatista representative was very satisfied.  Thurston further instructed him on HMTD use and storage, and recorded the information in a text file for him to take to Mexico.

Page 137  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 137 of 150

**b.    Charges**

Thurston entered guilty pleas to conspiracy, in violation of 18 U.S.C. § 371, and one count of arson in violation of 18 U.S.C. § 844(f)(1), by way of a Rule 20 transfer from the Eastern District of California, in connection with the arson at the Litchfield BLM Wild Horse Facility.

**c.    Role in the Offense**

Although Thurston actively participated with the Family only in its last arson, his overall role in the offense can only be assessed by viewing his unlawful activities throughout his adult life.  In several important ways he provided support for the Family and worked in tandem with its members.  Thurston for many years was a virtual "godfather" to the ALF and similar underground groups.  (His e-mail address, "oldman," was indicative of his stature.)  He was responsible for the ALF website, which supported a large array of illegal acts.  He provided the necessary publicity to further ALF goals, forwarded communiques reporting crimes, and authored, edited and distributed publications that aided saboteurs.  His involvement extended long after the final arson of the Family, and included firearms activities and instructing others in explosives.

10/15/01          Litchfield BLM Wild Horse Facility, Litchfield, California -- $207,497.60 loss

> Thurston was directly recruited by the leader Dibee, who knew and trusted him.  Using extreme caution, Thurston illegally crossed the border with fellow Canadian Rubin.  He carefully prepared equipment for the crime to ensure the participants could not be traced, and he cleaned the equipment upon return.  He actively engaged in the crime by cutting fences and attempting to release horses.  He authored the communique and distributed it upon returning to Canada.

EXHIBIT 2
Page 138 of 150

**d.      Restitution**

The total estimated loss for the arson personally committed by Thurston is $207,497.60.

**e.      Aggravating Factors**

 Thurston's actitvities from the early 1990s until the day of his arrest in December 2005 were those of a wholly committed criminal and saboteur.   Felony convictions in Canada, close involvement with other lawbreakers, operation of websites, publishing dangerous how-to manuals--all demonstrate why the Family chose him as a participant in the 2001 arson.  From 2001 through 2005 he supported himself by selling controlled substances.  He illegally crossed the border on repeated occasions and lived illegally in the United States.  Identity fraud was a way of life for him.  (An indictment charging false identity crimes will be dismissed as part of the instant plea agreement.)  He illegally possessed and hid several firearms.  His various publications  instructed and encouraged others in violent acts.  This culminated in his assistance to Mexican guerrillas with improvised explosives.

**f.      Mitigating Factors**

Because of Thurston's relatively limited participation in his one arson, the government is recommending a four-level reduction for minimal role under § 3B1.1(a).  Other Family members did far more to accomplish the Litchfield BLM arson, and Thurston's role was substantially less.

**g.      Cooperation**

As previously mentioned, a separate letter is being sent to the court detailing the extent and value of each defendant's cooperation.

Page 139  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 139 of 150

**h.     Specific Advisory Guidelines Calculations**

As indicated in section III.B.2 above, Thurston's base offense level is 38VI.  To that the following adjustments should be made:  Four levels should be subtracted for minimal role under § 3B1.2(a), and three levels should be subtracted for acceptance of responsbility under § 3E1.1, for an adjusted offense level of 31VI (188 - 235).

**i.     Sentence Recommendation**

Thurston and the government understand and agree that the court will consider 18 U.S.C. § 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 17-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 14VI (37 - 46).  The government recommends a sentence at the low end of the advisory guideline range, **37 months imprisonment**.  Thurston is free to request other adjustments or departures, but the government will oppose any such request.

The United States Attorney for the Eastern District of California is in agreement with the anticipated 37-month sentence recommendation and recommends a sentence in Case Number CR- 06-60120-AA (former Eastern District of California Case No. 2:06-CR-00155-DFL) of 37 months, to run concurrently with the anticipated 37-month sentence in the District of Oregon.

EXHIBIT 2
Page 140 of 150

12.    <u>**Jonathan Mark Christopher Paul**</u>



a.    **Background**

Jonathan Mark Christopher Paul, 41, has long been a public figure in activist circles,

including those advocating criminal activity.  In the September 27, 1999, issue of *The*

*Oregonian*, Paul was quoted as saying:

> None of the processes work . . . like the legal process, litigation.  We compare
> ourselves to the underground railroad, to some guerrilla movements that are
> trying to free themselves from oppressive governments. The only thing that's
> different about us is that we expand our thinking to other species and to the planet
> as a whole.

One of Paul's earliest criminal acts was the October 26, 1986 ALF burglary and animal

theft at a University of Oregon laboratory in Eugene.  Paul took part in the six-month planning

for the crime, including two "recons" of the building and a preparatory break-in with videotaping

of the interior.  One of about ten people who carried out the crime, Paul stole animals from the

building and helped destroy equipment used for research.  Criminal charges were dismissed, but

Paul has subsequently admitted his role to authorities.

In 1987 Paul co-founded the Hunt Saboteurs Association, which opposed, and actively

interfered with, the hunting of elk, bear and bighorn sheep.

EXHIBIT 2
Page 141 of 150

Paul turned to arson on April 16, 1987, at the veterinary school of the University of California at Davis. In addition to reconnaissance of the building, Paul acted as a driver, dropping off people who actually set the fire. It was the first U.S. arson attributed to the ALF.

Also in 1987 Paul assisted in a burglary at a Loma Linda University research facility in Southern California. Animals and boxes of documents were stolen. Paul drove the van which transported the actual burglars and carried away the stolen animals.

Paul and others broke into the BLM Wild Horse Corrals in Litchfield, California, in May 1987. He drove his van and performed reconnaissance of the facility. Using a hand saw, Paul cut out a large section of a wooden fence and removed horses from the corrals.

In 1988 Paul lived in Santa Cruz with Rodney Coronado, a well-known ALF member who served several years in federal prison for multiple arsons. They also lived together in 1990 in Scotts Valley, California.

On April 3, 1989, a burglary and arson occurred at the University of Arizona in Tucson. Paul drove there from California in his van. With another person, he boldly performed a daytime interior reconnaissance, dressing in coveralls so they looked like lab personnel. Paul modified one of the doors so it could be opened later that night. He took part in the burglary and animal theft. He was aware of fuel and incendiary devices present in the van. After about 1200 animals were stolen, other participants went on to perform the arson.

On October 17, 1990, Paul was arrested in Eugene and charged with the 1986 burglary at the University of Oregon. Those charges were dropped on May 1, 1991.

On November 3, 1992, Paul was jailed in Spokane, Washington, after being found in civil contempt for refusing to testify before a federal grand jury. The Ninth Circuit affirmed the

Page 142  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 142 of 150

contempt order on December 10, 1992, and he remained in custody until April 9, 1993.  During

the coming years, Paul used his Spokane experience to instruct others in resisting grand jury

investigations.

In the mid-1990s, Paul used his family wealth to purchase property in remote Williams,

Josephine County, Oregon, where he lived until moving to his current residence near Ashland.

During this time Paul maintained his public and private association with animal rights and

environmental activists.  In October 1996 Paul dug ditches and blocked the road at the China

Left timber sale protest in Southern Oregon, but avoided being arrested.

In 1997 Paul became acquainted with Jennifer Kolar at a meeting in Minneapolis,

Minnesota.  At that time she was a student at the University of Colorado in Boulder.  They

developed a long-distance romantic relationship, and Kolar visited Paul at his Williams house.

During one of these visits Paul asked Kolar about becoming involved in an ALF/ELF crime.

This led to their joint participation in the Cavel West arson in Redmond.  On several occasions

Paul gave Kolar money.  His bank account reflects six checks to her, totaling $1295.00.  One of

the checks, for $500.00, was written on July 22, 1997, the day after the Cavel West arson, to help

pay for her travel to and from Oregon.

According to Paul, he was recruited to assist in the Cavel West arson while attending the

Earth First! Rendevous in Oregon.  His recruitment occurred because of his reputation and

experience.  Paul attended a meeting in Eugene where Cavel West was targeted.  His job was to

make the fuel for the arson.  With Kolar's assistance at his Williams residence, Paul made

"Vegan Jell-O," a combination of glycerin soap and diesel designed to burn slower and better.

He painted the buckets black and made sure they had no fingerprints.  With others, Paul

Page 143  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 143 of 150

"reconned" the target.  The group assembled at a rural staging area outside Redmond and put on disposable black clothing.   Paul's role at the scene was as a lookout.  To do this, he communicated via two-radio with the others.  He also helped carry fuel to the site.  After about 45 minutes at the scene, there was a premature ignition, and Paul used the radio to call for pickup.  He and the others poured acid on their clothes and buried them at the staging area.

Being a public figure, Paul was interviewed by the media about arsons, which he generally favored as techniques in environmental and animal rights activities.  Two years after Cavel West he told *The Oregonian* that the horse meat plant arson was a good example of economic sabotage and called it a "complete success."

Paul continued to be a public spokesman for extremist and illegal activities.  He gave presentations at the E-Law Conference in Eugene on March 6, 1998.  Although not admitting his own active involvement, Paul gave his support to "actions" against those who damage the planet.  To him, striking out against inanimate objects was not violence.  He advocated the continued evolution of actions, including "actions at night."  Burning labs is not a bad thing, he said at the conference, since it is analogous to burning down a Nazi death camp.  Defending living things may have to be "extreme," he said.  In this context, he added, using force to stop physical force "is the right thing to do."

Acknowledging that his presentation at the conference was likely illegal, Paul nonetheless publicly advocated resisting grand juries to the point of going to jail, as he had in 1992.  He admitted lying in the Spokane grand jury before taking the Fifth Amendment.  Paul told the conference the U.S. District Judge who found him in contempt was a "moron."  People who cooperate with the government are "traitors," Paul said, and he emphasized the need to stay

Page 144  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 144 of 150

strong when called to testify.  At the 1998 conference Paul was photographed in the company of Kevin Tubbs.

Paul dedicated his time to the Sea Defense Alliance and the Ocean Defense International, particularly in opposition to, and unlawful interference with, whale hunting by the Makah Indians in Neah Bay, Washington.  With Paul's encouragement and assistance, numerous people were arrested and prosecuted in the Western District of Washington.  On May 11, 1999, Paul was arrested by the Clallam County Sheriff's Office and cited for violation of the Marine Mammal Protection Act.

On March 5, 2005, while in Eugene for another E-Law conference, Paul met with cooperating witness Jacob Ferguson.  Their conversation was monitored and recorded by the FBI.  When the conversation centered on the federal investigation, Paul advised, "Keep resisting it. You'll win . . . The more you resist, you'll win."  He added:

> You know I did like, last year, when that was going on, I did a little talk on grand jury stuff.  You know, what more can I say but, to people, but hey resist it.  If I did it, anyone can do it . . . It's the only honorable thing you can do. Fuck them.

Paul noted that he and Dibee had worked together in the anti-whaling campaign but "had a big falling out."  Dibee "tried to take over the group" and "tried to destroy me," Paul said.

In the same 2005 conversation, Paul and Ferguson discussed the federal investigation of their associates.  "You know, they don't have proof of anything," Paul said.  He referred to his own experience to show the need to be careful with investigators:

> [T]he first time the Feds visited me back in 1989 or something like that in Sacramento.  I knew they were coming so I was prepared.  But they didn't really freak me out.  I didn't let them in the house.  But I did make a mistake. When I first, this was in '89 when, and he handed me his ID to check, and I touched it.  And they got fingerprints off of it.  And I realized after . . . that,

Page 145  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 145 of 150

because they didn't have my fingerprints, you know.

**b.    Charges**

Paul entered pleas of guilty to conspiracy in violation of 18 U.S.C. § 371 and one count of arson in violation of 18 U.S.C. § 844(i) in connection with destruction of the Cavel West facility.

**c.    Role in the Offense**

Paul was recruited for the Cavel West arson because of his prior experience and strong dedication to the cause. Although it was his only arson with the Family, he was already a proven and proud saboteur, having previously committed arson, burglaries, thefts and related crimes over the years. Younger and less experienced saboteurs looked up to him as a mentor and virtual hero. That would continue long after Cavel West. Indeed, just a few months before his arrest for the current charges, he was still promoting the cause and advocating resistance to federal investigators. Paul's role at the Cavel West arson is briefly described as follows:

07/21/97        Cavel West, Redmond, Oregon – $1,211,388.76 loss

> Paul drew on his prior experience to commit this crime. He recruited Jennifer Kolar to take part (in fact, she would never have been a participant but for Paul asking her). He contributed to the planning and performed reconnaissance. His role included the fuel mixture, which he produced flawlessly. He helped carry fuel and assisted at the scene as a lookout. When the fire ignited prematurely, Paul radioed for a quick pick-up and exit.

**d.    Restitution**

Paul has entered into an agreement with the government and the private insurer of Cavel West that his payment of $250,000 will satisfy his restitution obligation.

**e.    Aggravating Factors**

**EXHIBIT 2**
**Page 146 of 150**

Paul was a full participant in the Cavel West arson.  Although not a leader as that term is used in the Sentencing Guidelines, he was involved in the planning, preparation and execution of the crime, and the recruitment of an accomplice.  His other unlawful activities before and after the crime are further aggravating circumstances.

**f.      Mitigating Factors**

None

**g.      Cooperation**

As previously mentioned, a separate letter is being sent to the court detailing the extent and value of each defendant's cooperation.

**h.      Specific Advisory Guidelines Calculations**

As indicated in section III.B.2 above, Paul's base offense level is 38VI.  To that the following adjustments should be made:  Three levels should be subtracted for acceptance of responsibility under § 3E1.1, for an adjusted offense level of 35VI (292 - 365).

**i.      Sentence Recommendation**

Paul and the government understand and agree that the court will consider 18 U.S.C. § 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 17-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 18VI (57 - 71).  The government recommends a sentence at the low end of the advisory guideline range, **57 months imprisonment**.  Paul is free to request other adjustments or departures, but agrees not to request a sentence below 37 months or below the sentence imposed on co-defendant Darren Todd

Page 147  -  **Government's Sentencing Memorandum**

EXHIBIT 2
Page 147 of 150

Thurston, whichever is less.  The government will oppose any adjustments or departures below

its 57-month recommendation.

Respectfully submitted this 4th day of May, 2007.

KARIN J. IMMERGUT
United States Attorney
District of Oregon

/s/
_____

KIRK A. ENGDALL
Assistant United States Attorney

/s/
_____

STEPHEN F. PEIFER
Assistant United States Attorney

/s/
_____

JOHN C. RAY
Assistant United States Attorney

EXHIBIT 2
Page 148 of 150

## <u>CERTIFICATE OF SERVICE</u>

I certify that I made service of the Government's Sentencing Memorandum on

defendants herein by mailing a full, true, and exact copy of said document this 4th day of May,

2007, in the U.S. Mail, with postage paid and addressed to:

Craig E. Weinerman                                      Attorney for defendant Gerlach
Assistant Federal Public Defender
151 West 7th Avenue, Suite 510
Eugene, OR 97401


Patrick J. Ehlers                                       Attorney for defendant Gerlach
Assistant Federal Public Defender
101 S.W. Main St., Suite 1700
Portland, OR 97204


Shaun McCrea                                            Attorney for defendant Tankersley
1147 High Street
Eugene, OR 97401


Lee D. Foreman                                          Attorney for defendant Tankersley
150 East 10th Avenue
Denver, CO 80203


Kelly R. Beckley                                        Attorney for defendant McGowan
P.O. Box 11098
Eugene, OR 97440-3298


Jeffrey P. Robinson                                     Attorney for defendant McGowan
810 Third Avenue, Suite 500
Seattle, WA 98104


Richard L. Fredericks                                        Attorney for defendant Meyerhoff
750 Lawrence St., Suite 2
Eugene, OR 97401


Terri Wood                                              Attorney for defendant Meyerhoff
730 Van Buren Street
Eugene, OR 97402

EXHIBIT 2
Page 149 of 150

Marc D. Blackman                          Attorney for defendant Paul
1001 SW Fifth Avenue, Suite 1400
Portland, OR 97204


John J. Kolego                            Attorney for defendant Savoie
804 Pearl Street
Eugene, OR 97401


Marc P. Friedman                          Attorney for defendant Tubbs
P.O. Box 11167
Eugene, OR  97440


John Storkel                              Attorney for defendant Zacher
Attorney at Law
1415 Liberty St. SE
Salem, OR 97302


William Sharp                             Attorney for defendant Block
Attorney at Law
1342 High St., 2nd Floor
Eugene, OR 97401


Daniel L. Feiner                          Attorney for defendant Thurston
Attorney at Law
1030 N.W. 12th, Unit 5
Portland, OR 97209



                                          /s/
                                          _____

                                          CHERYL L. ROOT
                                          Paralegal Specialist

EXHIBIT 2
Page 150 of 150